# EXHIBIT A

OAO91 (Rev. 12/03)  Criminal Complaint

**FILED**
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

JUN 1 7 2011

BY_____
**DEPUTY CLERK**

# UNITED STATES DISTRICT COURT

_____Middle_____ DISTRICT OF _____Tennessee_____

UNITED STATES OF AMERICA
V.
(1) HAWO OSMAN AHMED
(2) IFRAH ABDI YASSIN
(3) HAMDI AHMED MOHAMUD

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

Case Number:  **11-4032  JSB**

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about _____June 16, 2011_____ in _____Davidson_____ County, in

(Date)

the _____Middle_____ District of _____Tennessee & Minneapolis, Minnesota_____ defendant(s) did,

(Track Statutory Language of Offense)
Did knowingly engage in conduct and thereby cause bodily injury and attempt to cause bodily injury to another person and threatened to do so with intent to retaliate against a person for attendance of a witness or party at an official proceeding or any testimony given or any record, document, or other object produced by a witness in an official proceeding, that is a proceeding before a judge or court of the United States or a Federal grand jury and did knowingly engage in conduct and thereby cause bodily injury and attempt to cause bodily injury to another person for information relating to the commission or possible commission of a Federal Offense

in violation of Title _____18_____ United States Code, Section(s) _____1513(b)(1) and 1513(b)(2)_____ .

I further state that I am a(n) _____FBI TFO/ST PAUL MN PD_____ and that this complaint is based on the

Official Title

following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part of this complaint:  ☒ Yes  ☐ No

_Heather L Weyker_
Signature of Complainant

HEATHER WEYKER
Printed Name of Complainant

Sworn to before me and signed in my presence,

6/17/2011 _____ at
Date

THOMAS A. WISEMAN, JR.    SR US DISTRICT JUDGE
Name of Judge                Title of Judge

Nashville, Tennessee
City                    State

_____
Signature of Judge

<u>AFFIDAVIT</u>

Your affiant is a Police Officer with the St. Paul Police Department and has been employed there for the last 12 years and is also Federal Bureau of Investigation Task Force Officer. Your affiant is currently assigned to the Vice Unit and is part of a federally funded human trafficking task force which investigates human trafficking crimes and other related crimes such as drugs, fraud and smuggling. On June 16, 2011, your affiant became involved in the investigation of an assault of a federal witness who will be referred to by her initials as M.A. in this affidavit. The facts known to me in this affidavit are derived from my participation in the investigation as well as information received by other officers and or federal agents.

On May 4, 2011, the Federal Grand Jury Middle District of Tennessee issued a Second Superseding Indictment charging 30 persons with various federal offenses. The persons charged are either members of a gang known as the Somali Outlaws/Somali Mafia, the Lady Outlaws, or associates of these gangs. This case is listed as United States v. Adan et. al, Criminal Case 3:10-00260, Middle District of Tennessee, Judge Haynes. The indictment alleges conspiracy to sex traffic juvenile females, the sex trafficking of juvenile females, obstruction of justice, perjury, conspiracy to commit access device fraud and other charges. The persons charged in the indictment are:

1.  [1] ABDIFITAH JAMA ADAN a/k/a "SHORTY" a/k/a "FALEEBO" a/k/a "KUZZO", was an associate of members of the SOL/SM.

2.  [2] ABDULLAHI SADE AFYARE a/k/a "FOREHEAD", was a member of the SOL/SM.

3.  [3] AHMAD ABNULNASIR AHMAD a/k/a "FABULOUS", was a member of the SOL/SM.

Page 1 of 12

4.      [4] YAHYA JAMAL AHMED, was a member of the SOL/SM.

5.      [5] ABDIKARIM OSMAN ALI, a/k/a "HOMER" a/k/a "BIG ABDI", was a member of the SOL/SM.

6.      [6] MUSSE AHMED ALI a/k/a "FAT BOY",  was an associate of members of the SOL/SM.

7.      [7] HASSAN AHMED DAHIR a/k/a "MOHAMED ALI HUSSEIN", was a member of the SOL/SM.

8.      [8] FADUMO MOHAMED FARAH a/k/a "NAANA NAANA" a/k/a "GANGSTER BOO" a/k/a "BARNIE" was an associate of members of the SOL/SM.

9.      [9] IDRIS IBRAHIM FAHRA a/k/a "CHI TOWN",  was a member of the SOL/SM.

10.     [10] YASIN AHMED FARAH was an associate of members of the SOL/SM.

11.     [11] ABDULLAHI HASHI a/k/a "KAMAL", was a member of the SOL/SM.

12.     [12]  FATAH HAJI HASHI a/k/a "JERRY" a/k/a "JR", was a member of the SOL/SM.

13.     [13] ABDIRAHMAN ABDIRAZAK HERSI a/k/a "BIGGIE", was a member of the SOL/SM.

14.     [14] MUHIYADIN HUSSEIN HASSAN a/k/a "CD", was an associate of members of the SOL/SM.

15.     [15] DAHIR NOR IBRAHIM a/k/a "DAHIR LUCKY", was an associate of members of the SOL/SM.

16.     [16] ABDIFATAH BASHIR JAMA a/k/a "CASH MONEY" a/k/a "OHIO", was an associate of members of the SOL/SM.

17.     [17] ANDREW KAYACHITH a/k/a "AK", was an associate of members of the SOL/SM.

18.     [18] ABDIGADIR AHMED KHALIF  a/k/a "AWALI", was an associate of members of the SOL/SM.

19.   [19]  BASHIR YASIN MOHAMUD a/k/a "BR", was a member of the SOL/SM.

20.   [20]  MUSTAFA AHMED MOHAMED, was an associate of members of the SOL/SM.

21.   [21]  FUAD FAISAL NUR a/k/a "HANJULE", was a member of the SOL/SM.

22.   [22] ABDIFATAH SHARIF OMAR a/k/a "BRITISH" a/k/a "PINKY", was an associate of members of the SOL/SM/LOL and is the brother to defendants 23 and 24.

23.   [23]  LIBAN SHARIF OMAR a/k/a "SUNDERRA", was an associate of members of the SOL/SM/LOL and is the brother to defendants 22 and 24.

24.   [24]  MOHAMED SHARIF OMAR a/k/a "MOE D" a/k/a "MOJO", was an associate of members of the SOL/SM/LOL and is the brother to defendants 22 and 23.

25.   [25] HAMDI ALI OSMAN a/k/a "BIG HAMDI" a/k/a "BOSS LADY", was a member of the LOL and a gang called the Lady Bravehearts.

26.   [26] HAJI OSMAN SALAD  a/k/a "HOLLYWOOD", was a member of the SOL/SM.

27.   [27] BIBI AHMED SAID, was an associate of members of the SOL/SM/LOL.

28.   [28] AHMED AWEYS SHEIK

29.   [29]  YASSIN ABDIRAHMAN YUSUF a/k/a "JUNIOR" a/k/a "BLACK CAT JUNIOR", was a member of the SOL/SM.

30.   [30] MOHAMED AHMED AMALLE a/k/a "DK", was an associate of members of the SOL/SM.

Twenty Five of the defendants are charged with conspiracy to violate Title 18 U.S.C. § 1591

in violation of Title 18 U.S.C. § 1594(c) in counts one and two of the indictment. Those persons are

[1] ABDIFITAH JAMA ADAN a/k/a "SHORTY" a/k/a "FALEEBO" a/k/a "KUZZO", [2] ABDULLAHI SADE AFYARE a/k/a "FOREHEAD", [3] AHMAD ABNULNASIR AHMAD a/k/a "FABULOUS", [5] ABDIKARIM OSMAN ALI, a/k/a "HOMER" a/k/a "BIG ABDI", [6] MUSSE AHMED ALI a/k/a "FAT BOY", [7] HASSAN AHMED DAHIR a/k/a "MOHAMED ALI HUSSEIN", [8] FADUMO MOHAMED FARAH a/k/a "NAANA NAANA" a/k/a "GANGSTER BOO" a/k/a "BARNIE" , [9] IDRIS IBRAHIM FAHRA a/k/a "CHI TOWN", [11] ABDULLAHI HASHI a/k/a "KAMAL", [12] FATAH HAJI HASHI a/k/a "JERRY" a/k/a "JR", [13] ABDIRAHMAN ABDIRAZAK HERSI a/k/a "BIGGIE", [14] MUHIYADIN HUSSEIN HASSAN a/k/a "CD", [15] DAHIR NOR IBRAHIM a/k/a "DAHIR LUCKY", [16] ABDIFATAH BASHIR JAMA a/k/a "CASH MONEY" a/k/a "OHIO", [17] ANDREW KAYACHITH a/k/a "AK", [19] BASHIR YASIN MOHAMUD a/k/a "BR", [20] MUSTAFA AHMED MOHAMED, [21] FUAD FAISAL NUR a/k/a "HANJULE", [22] ABDIFATAH SHARIF OMAR a/k/a "BRITISH" a/k/a "PINKY", [23] LIBAN SHARIF OMAR a/k/a "SUNDERRA", [24] MOHAMED SHARIF OMAR a/k/a "MOE D" a/k/a "MOJO", [25] HAMDI ALI OSMAN a/k/a "BIG HAMDI" a/k/a "BOSS LADY", [26] HAJI OSMAN SALAD a/k/a "HOLLYWOOD", [29] YASSIN ABDIRAHMAN YUSUF a/k/a "JUNIOR" a/k/a "BLACK CAT JUNIOR" and [30] MOHAMED AHMED AMALLE a/k/a "DK".

The witness who I refer to as MA has provided information to law enforcement agents prior to the indictment being issued in the above referenced case. The witness also appeared before the Federal Grand Jury, Middle District of Tennessee, during the course of the investigation in this case. MA could be called by any party in this case as a witness at trial, should one occur.

On 06-16-11 at approximately 1844 hrs, I, FBI TFO Heather Weyker, received a phone call from MA. At the time of the phone call I was in Nashville, TN. MA was in Minneapolis, MN. When I answered the phone, MA was crying and very upset, breathing heavy and out of breath. MA was a juvenile when this case was initiated and is now an adult. Also present during the conversation was ICE SA Tony Langeland, TBI SA Jason Wilkerson. MA stated that she had been assaulted by three females and that the police were outside. MA stated the assault had occurred at her apartment building located in Minneapolis, Minnesota. MA stated the assault was related to the case in Nashville. MA stated that she would call back in a minute.

After speaking with MA I called the Minneapolis Police Department and was able to speak briefly with a patrol officer on the scene, Officer Beeks. Officer Beeks advised that MA had been involved in an altercation with three other females and that the other females were alleging that MA had a knife at one point during the altercation. Officer Beeks stated this assault occurred at MA's apartment building in Minneapolis, MN.

After speaking with Officer Beeks I received a phone call from MA. Due to the information I received from Officer Beeks, I decided to read MA her Miranda rights out of an abundance of precaution. I then read MA her Miranda Rights, per SPPD Form PM 247.1-95R. Also present during the conversation was TBI SA Jason Wilkerson. ICE Special Agent Toney Langeland was also present during part of this conversation. MA verbally stated she understood her rights and agreed to speak with us.

MA told us the address of the incident was at her apartment building in Minneapolis, MN., identifying the exact location. MA said she and her father, were walking back from Walgreen's, returning to her apartment building. MA stated they entered the building, and MA waited by the

elevators. MA's father checked his mailbox area, and MA noticed a girl, known to her as Hawo, (later identified by police officers as Hawo Osman Ahmed) pounding on the outside window. Hawo pointed at MA and told her she wanted to speak with her. As MA walked to the door, she observed Ifrah (later identified by police officers as Ifrah Abdi Yassin) standing behind Hawo. MA's father then opened the door for the two females and they entered the lobby area.

After the girls entered the building, Hawo Osman Ahmed and Ifrah Abdi Yassin said "MA let me talk to you". They then went to the corner of the door lobby area. Hawo asked MA why she was talking about her (Hawo) to other people. At that time, MA observed Hawo Osman Ahmed start to take off her earrings. MA asked Hawo Osman Ahmed if she was going to fight MA. Hawo Osman Ahmed said yes.

Hawo Osman Ahmed asked why MA was talking "shit" about her to another girl and provided a name of that person. MA states she does not know a person by that name. Ifrah Abdi Yassin interrupted, and stated " I want to talk to her about what I need to talk to her about." Ifrah Abdi Yassin said to MA "you locked all my ni***z up." MA asked "who?" Ifrah Abdi Yassin replied, "The SOL". MA asked ,who she was talking about. Ifrah Abdi Yassin replied, "ChiTown." MA asked Hawo Osman Ahmed and Ifrah Abdi Yassin if they wanted to fight. Hawo Osman Ahmed and Ifrah Abdi Yassin replied yes and confirmed that they wanted to fight. MA said that the 3rd girl (later identified by police officers as Hamdi Ahmed Mohamud) had come in shortly after the first two entered, who she stated she knews as Hameda. Hawo Osman Ahmed finished taking off her earrings which meant to MA that she was going to fight her. MA said ok, she would fight, she just wanted to change clothes. She informed the girls they could follow her up to her apartment

Page 6 of 12

while she changed clothes.   Hawo Osman Ahmed said she wanted to fight her together with the other two girls.  All girls then get into the elevator together.

Once inside the elevator, MA said she tried to push her floor button , which was the 3rd floor, but Hawo Osman Ahmed pushed the pause button on the elevator, which stopped it.  MA isn't sure how they managed to do that, she just did.  MA said Hawo  "hit me", and the other two tried to hold me on the floor.  MA was able to some how push a button on the elevator during the fight.  MA said in her defense, she tried to hold Hawo Osman Ahmed against the wall of the elevator so she wouldn't continue to be struck by the girls.

MA said somewhere during the elevator altercation, she was cut with a knife that one of the girls was carrying.  MA said she did not initially see the knife, and thought it was a folding knife. MA said she was struck by the knife on her hand and wrist area, in which she has several cuts.

MA said the elevator doors opened on the second floor and she was able to escape the elevator and run away from the 3 girls. MA said the girls attempted to chase after her, but she was able to get away. MA ran to her mother's apartment on another floor.  MA said she obtained a knife and went back down stairs.

MA stated when she got downstairs, she observed the car the three girls came in, and went over to it, and broke a car window.  MA stated she saw the three girls, Hawo Osman Ahmed, Ifrah Abdi Yassin, and Hameda coming out of the building and they were running towards her with a knife.  MA said Hawo had her cell phone out like they were video taping her do damage to her car. MA said at the time the three girls exited the building, her mother came out the same door and confronted the three girls.  One of the three girls then struck her mother on the facial area.  When MA saw the girls fighting with her mother, she ran to her aid and struck one of them on the head

with the butt end of the knife.  MA said Ifrah Abdi Yassinh then struck her from behind on the head with an object MA thought Ifrah Abdi Yassinh got from the ground like a stick or other longer object. MA was unsure what the object was.

MA said the girls were telling her, " We are going to get you tonight…, we are gonna make sure something gets done to you tonight…,  your not safe tonight at your home."  "Your gonna get it."  MA said she was able to get away from the three girls again and she tried to call 911 for help. She then called me.

MA said she was scarred and in fear for her life.  MA said she has been threatened in regards to this case.  MA said she knew Hawo and used to be friends when they lived next to each other in Hopkins, MN. They got into an argument over a cell phone during that time. MA also knew Hameda from that time.  Prior to June 16, 2011, MA had never met Ifrah Abdi Yassinh, but had seen a few times.

MA stated she had seen said she has seen Hawo and Hameda in a car with Junior (Yasin Yusuf #29), Abdullahi (Abdullahi Sade Afayre #2), Mohamed Afyare (Abdullahi Sade Afayre's brother).  MA  knows these persons to be SOL gang members.

I have also spoken with FBI agent Kate Koeth who interviewed MA's mother as well as Hamdi Mohamud,  Hawo Osman Ahmed and Ifrah Abdi Yassin.

Agent Koeth interviewed LAH, year of birth, herein after "YOB" 1977.  LAH identified herself as MA's mother.  LAH stated that she was sleeping and her husband woke her regarding her daughter.  LAH ran downstairs and there were three girls fighting with MA.  LAH observed an object in MA's hand but was not sure what it was.  LAH observed MA to be making motions with the object.  LAH heard the three girls fighting with MA to state "Our n****ers, you put in jail so I

Page 8 of  12

am going to put you and your mother in jail tonight.  LAH then took MA back to their apartment.

LAH also stated that groups of Somalis had come by the apartment to harass MA for the past couple

of months.

Agent Koeth also interviewed Hamdi Mohamud a/k/a Hameda Mohamud, YOB 1993.

Mohamud stated that approximately one to two hours prior to speaking with agent Koeth she and

Ifrah Abdi Yassin and Hawo came to the building in which MA is located to see a male friend of

Hawo.  Mohamud was unable to provide a name for the male friend or an apartment number.

Mohamud stated she used to hang out with MA  Hawo confronted MA about MA talking about

Hawo.  Mohamud stated that Ifrah Abdi Yassin was not talking at that time.  Mohamud stated she

then saw MA with a knife as if she was going to stab someone and took a cell phone photo.  Agent

Koeth asked Mohamud what happened at the location and who was fighting and Mohamud stated

that she did not know anything about that and reiterated that it was a verbal argument and that she

attempted to stay back from the argument.

Agent Koeth also interviewed Hawo Osman Ahmed, YOB 1992.  Ahmed, after being read

her Miranda rights and acknowledging them voluntarily answered agent Koeth's questions.  Ahmed

stated she is 8 weeks pregnant with her 4th child.  Ahmed stated they arrived at approximately 4 p.m.

at MA's apartment complex and that the police arrived at approximately 4:20 p.m.  Ahmed stated

she came to the apartment complex with Mohamud and Ifrah Abdi Yassin.  She stated that she has

known Ifrah Abdi Yassin since 2006 and has known Mohamud since the end of 2008, the beginning

of 2009. Ahmed stated she came to the apartment to see her home boy "Gamo", which she explained

was his street name which translates to "hand".  Ahmed stated that she also knew "Gamo" by the

name of Abdi and that Abdi lived on the second floor of the apartment.   Ahmed stated she saw MA

Page 9 of  12

in the hallway with Ifrah Abdi Yassin and they were arguing over a boyfriend issue. Ahmed stated that the boyfriend was "Fahad" and was MA's boyfriend and Ifrah Abdi Yassins boyfriend on the side. Ahmed stated that MA once stayed at Ahmed's place for two months and that was how they were close at one time. Ahmed stated that MA and Ifrah Abdi Yassin were arguing both downstairs and upstairs. Ahmed stated that she and MA, fought which included hair pulling and pushing and shoving. MA at one point ran upstairs.   Ahmed then went downstairs. Ahmed then observed MA with a knife and MA's mother with a big stick. MA made motions as if going to cut them and Ahmed stated she got knicked in the head. Ahmed stated Ifrah Abdi Yassin was grazed on her face. Ahmed told Mohamud to record the fight and Mohamud took pictures. MA hit the windshield of Ahmed's car with the knife. MA then ran when Mohamud began recording the incident.

Agent Koeth also interviewed Ifrah Abdi Yassin, YOB 1991. Agent Koeth Mirandized Yassin. Yassin stated that she, Mohamud, and Ahmed arrived at the apartment at approximately 6:30 p.m. and that they had come to the apartment building from the 24 mall. Yassin stated she did not know anyone in the building but did know of MA. Yassin stated that Ahmed came to the apartment building to see a friend but did not know if it was a boy or a girl, but thought it was a girl. Yassin stated that MA opened the door to the apartment lobby. She stated that Ahmed and MA started arguing. She stated that MA did not like Yassin because MA's boyfriend Fahad likes Yassin. Yassin stated no one touched each other until they were in the elevator. Yassin stated she had not told the responding Minneapolis PD officers the truth regarding the fight in the elevator but wanted to tell agent Koeth the truth because she now believed there was a video of the fight in the elevator. Yassin stated MA pushed the elevator button and floors 2, 3, and 4 were lit up. MA and Ahmed were going to fight because MA was calling Ahmed a "ho" and other girl type stuff. Ahmed pushed

Page 10 of 12

MA and MA pushed back.  Yassin became involved because Ahmed was pregnant and there was pushing and pulling of hair.  Yassin punched MA 2-3 times.  Later MA had a kitchen knife and approached Yassin trying to stab her.  MA had gotten off on the second floor and the other girls continued to ride the elevator, eventually returning downstairs.  By the time Yassin, Mohamud and Ahmed arrived outside, Yassin  observed MA to be hitting the windshield of her vehicle and MA's mother to be hitting the car with a stick.  Yassin stated she was slapped with the knife.

Agent Koeth asked Yassin who was talking about the guys getting locked up.  Yassin stated she knew a lot of those guys.  Yassin stated she had asked MA if she was involved in that.  Yassin explained there was an incident where MA was with Yassin, and Ahmed in a car.  At one point a male who Yassin identified as Abshir a/k/a  "Black" got in the car and observed MA.  Upon seeing MA, Abshir a/k/a Black stated that MA was the reason that "half the guys got locked up".  Abshir a/k/a Black then got out of the vehicle.

Agent Koeth then asked Yassin who knows "Idris" and Yassin denied knowing anyone named "Idris".  Agent Koeth then asked Yassin who knows "ChiTown".  Yassin responded that she knew ChiTown and acknowledge she also knew him as Idris.   Yassin stated she had dated "ChiTown" in 2005.     Yassin stated that she knows Hamdi (Hamdi Ali Osman), Jerry (Fatah Haji Hashi), Forehead (Abdullahi Sade Afyare) and Hanjule (Fuad Nur).  She stated that Hanjule was her cousin.  Yassin stated she left the country May 25, 2008 and returned April 16, 2011, having traveled in Kenya, Johannesburg, Dubi, and London in relation to her father's business.   Yassin then began to attempt to ask Agent Koeth questions regarding the case in the Middle District of Tennessee,

including asking if any of the defendants would be getting out.  Agent Koeth did not respond to

Yassin's questions.

      Further affiant sayeth not.

HEATHER WEYKER,
FBI TASK FORCE OFFICER /
ST PAUL MN PD OFFICER

      Sworn to and subscribed before me this  _17th_  day of June, 2011.

THOMAS A. WISEMAN JR
Senior United States District Judge
Middle District of Tennessee

Page 12 of  12

# EXHIBIT B

**FILED**
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

JUN 2 9 2011

DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO.  3:11-00132 |
| | ) | |
| v. | ) | |
| | ) | 18 U. S.C. § 1513(b)(1) |
| [1] HAWO OSMAN AHMED | ) | 18 U. S.C. § 1513(b)(2) |
| | ) | 18 U. S.C. § 1513(f) |
| [2]HAMDI AHMED MOHAMUD | ) | 18 U.S.C.  § 1513(c) |
| | ) | 18 U.S.C.  § 1591(d) |
| [3] IFRAH ABDI YASSIN | ) | |

# INDICTMENT

## COUNT ONE

THE GRAND JURY CHARGES:

On or about June 16, 2011, in the Middle  District of Tennessee and elsewhere, the

defendants, [1] HAWO OSMAN AHMED, [2] HAMDI AHMED MOHAMUD, AND [3]

IFRAH ABDI YASSIN  did combine, conspire, confederate, and agree with each other and with

others known and unknown to the Grand Jury to knowingly engage in, attempt to engage in, and

threaten to engage in conduct which caused bodily injury to another person with intent to retaliate

against a person for attendance of a witness or a party and for any testimony given at an official

proceeding and for information relating to the commission or possible commission of a Federal

Offense that is in the matter of United States v. Adan, 3:10-00260,in violation of Title 18, United

States Code, Section 1513(b)(1) and (2).

All in violation of Title 18, United States Code, Section 1513(f) and 1513(c).

1

## COUNT TWO

THE GRAND JURY FURTHER CHARGES:

On or about June 16, 2011, in the Middle District of Tennessee and elsewhere, the defendants, [1] HAWO OSMAN AHMED, [2] HAMDI AHMED MOHAMUD, AND [3] IFRAH ABDI YASSIN did knowingly engage in, attempt to engage in, and threaten to engage in conduct which caused bodily injury to another person with the intent to retaliate against a person for attendance of a witness and for any testimony given in an official proceeding, that is a proceeding before a judge or court of the United States or a Federal grand jury, in the matter of United States v. Adan, 3:10-00260.

In violation of Title 18, United States Code, Section 1513(b)(1)and 1513(c).

## COUNT THREE

THE GRAND JURY FURTHER CHARGES:

On or about June 16, 2011, in the Middle District of Tennessee and elsewhere, the defendants, [1] HAWO OSMAN AHMED, [2] HAMDI AHMED MOHAMUD, AND [3] IFRAH ABDI YASSIN did knowingly engage in conduct, attempt to engage in conduct, and threaten to engage in conduct which caused bodily injury to another person with the intent to retaliate against a person for information given by a person to a law enforcement officer relating to the commission or possible commission of a Federal offense, that is in the matter of United States v. Adan, 3:10-00260.

In violation of Title 18, United States Code, Section 1513(b)(2) and 1513(c).

2

COUNT FOUR

THE GRAND JURY FURTHER CHARGES:

On or about June 16, 2011, in the Middle District of Tennessee and elsewhere, the defendants, [1] HAWO OSMAN AHMED, [2]HAMDI AHMED MOHAMUD, AND [3] IFRAH ABDI YASSIN did combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury to knowingly obstruct, attempt to obstruct, and in any way interfere with or prevent the enforcement of Title 18, United States Code, Section 1591.

In violation of Title 18, United States Code, Section 1594(c).

COUNT FIVE

THE GRAND JURY FURTHER CHARGES:

On or about June 16, 2011, in the Middle District of Tennessee and elsewhere, the defendants, [1] HAWO OSMAN AHMED, [2] HAMDI AHMED MOHAMUD, AND [3] IFRAH ABDI YASSIN obstructed and attempted to obstruct the enforcement of Title 18, United States Code, Section 1591.

All in violation of Title 18, United States Code, Section 1591(d).

A TRUE BILL

_____
FOREPERSON

_____
JERRY E. MARTIN
UNITED STATES ATTORNEY

_____
VAN VINCENT
ASSISTANT UNITED STATES ATTORNEY

3

# EXHIBIT C



# UNITED STATES DISTRICT COURT
## District of Minnesota

Richard D. Sletten, Clerk
Lisa D. Rosenthal, Chief Deputy Clerk

Warren E. Burger Federal
Building and U.S. Courthouse
316 North Robert Street
Suite 100
St. Paul, MN  55101
(651) 848-1100

U.S. Courthouse
300 South Fourth Street
Suite 202
Minneapolis, MN 55415
(612) 664-5000

Gerald W. Heaney Federal Building and
U.S. Courthouse and Customhouse
515 West First Street
Suite 417
Duluth, MN 55802
(218) 529-3500

U.S. Courthouse
118 South Mill Street
Suite 212
Fergus Falls, MN 56537
(218) 739-5758

June 24, 2011

RECEIVED
IN CLERK'S OFFICE
JUN 3 0 2011
U.S. DISTRICT COURT
MID. DIST. TENN.

*3-11-0013d*

Mr. Keith Throckmorton, Clerk
United States District Court
Estes Kefauver Federal Building and
  United States Courthouse
801 Broadway, Room 879
Nashville, TN 37203-3816

Re:  USA v. Ahmed et al
     Our Case Number: 11mj245 JJK
     Your Case Number: 11-4032 JSB

Dear Clerk:

### Rule 5 (formerly Rule 40) Removal Proceedings

[ X ]  Enclosed please find certified copies of all documents filed in our court.

Please acknowledge receipt of these documents by returning, in the envelope provided, a copy of the enclosed letter stamped "RECEIVED".

Sincerely,

RICHARD D. SLETTEN, CLERK

Gina Olsen, Deputy Clerk

cc:   Laura M Provinzino, Assistant U. S. Attorney
      Philip Leavenworth
      Reggie Aligada
      John Hughes
      Marshal Service (Rule 20 & 5 only)
      Pretrial Services (Rule 20 &  5 only)
      File 11mj245 JJK

*Rule 5 Documents*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

# FIRST APPEARANCE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | COURTROOM MINUTES - CRIMINAL |
| | ) | BEFORE: Jeffrey J. Keyes, 6A |
| Plaintiff, | ) | U.S. Magistrate Judge |
| | ) | |
| v. | ) | Case No:         MJ 11-245 JJK |
| | ) | Date:            June 17, 2011 |
| Hamdi Ahmed Mohamud (03), | ) | Time Commenced:  2:05 p.m. |
| | ) | Time Concluded:  2:07 p.m. |
| Defendant. | ) | Time in Court:   2 Minutes |

## APPEARANCES:

Plaintiff:    Laura Provinzino, Assistant U.S. Attorney
Defendant:    Reggie Aligada, ☒ FPD                    ☒ To be appointed

Interpreter / Language:      None/English

Date Charges Filed:    June 17, 2011   Offense: Witness Tampering
                                       18 U.S.C. 1513(b)(1) and 1513(b)(2)

☒ Waived Reading of Charges       ☒ Advised of Rights

on    ☒ Complaint

☒ **Charges from Another District:** Middle District of Tennessee

☒ Government moves for detention.
Motion is ☒ granted, temporary detention ordered

Next appearance date is June 21, 2011  at 3:30 p.m.  before U.S. Magistrate Judge Franklin L. Noel, 9W for:
   ☒ detention hrg       ☒ removal hrg

A true printed copy in _____ sheet(s)
of the electronic record filed on _____
in the United States District Court
for the District of Minnesota.
CERTIFIED, _____, 20___.
          RICHARD D. SLETTEN
BY: _____
          Deputy Clerk

                              *s/T Anderson*
                              Criminal Duty Clerk

M:\templates\First Appearance.wpt                          Template Updated 6/6/06

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,
   Plaintiff,

Case No.  MJ 11-245 JJK

v.

ORDER OF TEMPORARY DETENTION
PENDING HEARING PURSUANT
TO BAIL REFORM ACT

Hamdi Ahmed Mohamud (03),
   Defendant.

   Upon motion of the United States it is ORDERED that a detention/removal

hearing is set for June 21, 2011 at 3:30 p.m.  before Magistrate Judge Franklin L. Noel ,

9W US Courthouse, 300 South 4th Street, Minneapolis, Minnesota.  Pending this

hearing, the Defendant shall be held in custody by the United States Marshal and

produced for the hearing.


Dated: June 17, 2011


      _s/ Jeffrey J. Keyes_
     JEFFREY J. KEYES
     United States Magistrate Judge


---

\* If not held immediately upon Defendant's first appearance, the hearing may be continued for up to
 three days upon motion of the Government, or up to five days upon motion of the Defendant.  18
 U.S.A. §3142(f)(2).

A hearing is required whenever the conditions set forth in 18 U.S.C. §3142(f) are present.  Subsection (1) sets forth the
grounds that may be asserted only by the attorney for the Government; subsection (2) states that a
hearing is mandated upon the motion of the attorney for the Government or upon the judicial officer's
own motion if there is a serious risk that the Defendant (a) will flee; or (b) will obstruct or attempt to
obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injury, or intimidate a
prospective witness or juror.

A true printed copy in _____ sheet(s)
of the electronic record filed on _____
in the United States District Court
for the District of Minnesota.
CERTIFIED, _____, 20___.
RICHARD D. SLETTEN
BY: _____

# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    **NOTICE OF APPEARANCE**
                              Plaintiff,

v.

HAMDI MOHAMUD,                               Case No:  11MJ245(3) JJK
                              Defendant.

Pursuant to the Court's order appointing counsel, the undersigned attorney hereby notifies

the Court and counsel that Philip Leavenworth, Attorney ID No. 211667, shall appear as

appointed counsel of record for the above named defendant in this case.

Dated:   June 20, 2011                       *s/Katherian D. Roe*
                                             KATHERIAN D. ROE
                                             Attorney ID No. 214668
                                             Attorney for Defendant
                                             Office of the Federal Defender
                                             107 U.S. Courthouse
                                             300 South Fourth Street
                                             Minneapolis, MN 55415
                                             612-664-5858

A true printed copy in _____ sheet(s)
of the electronic record filed on _____
in the United States District Court
for the District of Minnesota.
CERTIFIED, _____, 20___.
           RICHARD D. SLETTEN
BY: _____
               Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **COURT MINUTES - CRIMINAL** |
| | ) | BEFORE:  Franklin L. Noel, 9W |
| Plaintiff, | ) | U.S. Magistrate Judge |
| | ) | |
| v. | ) | Case No:         MJ 11-245 JJK |
| | ) | Date:            June 21, 2011 |
| Hamdi Ahmed Mohamud (03), | ) | Court Reporter:  Staci McGinty |
| | ) | Time Commenced:  4:11 p.m. |
| Defendant. | ) | Time Concluded:  4:28 p.m. |
| | ) | Time in Court:   17 Minutes |

☒ **DETENTION HRG**
☒ **REMOVAL HRG**
Time in Court Det/Removal: 16/1

APPEARANCES:

Plaintiff:    Carol Kayser, Assistant U.S. Attorney
Defendant:   Philip Leavenworth
                ☒ CJA          ☒ Appointed

Interpreter / Language:       None/English

On    ☒ Complaint

☒ **Charges from other District**: Middle District of Tennessee

☒ Bond set in the amount of $25,000 with conditions, see Order Setting Conditions of Release.

☒ Deft removed to charging district.

☒ Removal Order to be Issued

Additional Information:
Defendant waived her right to a removal hearing.

A true printed copy in _____ sheet(s)       s/T Anderson
of the electronic record filed on _____ Criminal Duty Clerk
in the United States District Court
for the District of Minnesota.
CERTIFIED, _____, 20___.
RICHARD D. SLETTEN
BY: _____
                    Deputy Clerk

M:\templates\Prelim-Det Hrg.wpt                                Template Updated:  6/6/06

# UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Hamdi Mohamud | ) |
| *Defendant* | ) |
| | ) |

Case No.  0864 0:11-00245M - 3  JJK

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1)   The defendant must not violate any federal, state or local law while on release.

(2)   The defendant must cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. *§ 14135a*.

(3)   The defendant must immediately advise the court, defense counsel, and the U.S. attorney in writing before any change in address or telephone number.

(4)   The defendant must appear in court as required and must surrender to serve any sentence imposed.

The defendant must appear at *To Be Notified*
*(if blank, to be notified)* _____
Place

_____ on  06/21/11  9:30 p.m.
Date and Time

### Release on Personal Recognizance or Unsecured Bond

IT IS FURTHER ORDERED that the defendant be release on condition that:

☑   (5)   The defendant promises to appear in court as required and surrender to serve any sentence imposed.

☑   (6)   The defendant executes an unsecured bond binding the defendant to pay the United States the sum of _twenty five thousand_ dollars ($ _25,000_ ) in the event of a failure to appear as required or surrender to serve any sentence imposed.

SCANNED
JUN 2 2 2011
U.S. DISTRICT COURT MPLS

AO 199 (Rev. 7/10) Order Setting Conditions of Release                     Hamdi Mohamud

## ADDITIONAL CONDITIONS OF RELEASE

Upon finding that release by one of the above methods will not by itself reasonably assure the defendant's appearance and the safety of other persons in the community,
IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

☐   (7)   The defendant is placed in the custody of:

Person or organization _____

Address (*only if above is an organization*) _____

City and state _____ Tel No. (if Organization) _____

who agrees (a) to supervise the defendant in accordance with all of the the conditions of release, (b) to use every effort to assure the defendant's appearance at all scheduled court proceedings, and (c) to notify the court immediately if the defendant violates any condition of release or disappears.

Signed: _____        _____
                        *Custodian or Proxy*                                *Date*

☑   (8)   The defendant must:

☑   (a)   report to Pretrial Services as directed.
telephone number _____ , no later than _____

☐   (b)   execute a bond or agreement to forfeit upon failing to appear as required the following sum of money or designated property:

_____

☐   (c)   post with the court the following proof of ownership of the designated property, or the following amount or percentage of the above-described sum

_____

☐   (d)   execute a bail bond with solvent sureties in the amount of $ _____

☑   (e)   maintain or actively seek employment.
☐   (f)   maintain or commence an education program.
☑   (g)   surrender any passport to Pretrial Services as directed.
☑   (h)   obtain no new passport.
☑   (i)   abide by the following restrictions on personal association, place of abode, or travel:
Travel shall be restricted to Minnesota and Tennessee for court appearances

unless approved by the supervising officer.

☑   (j)   avoid all contact, directly or indirectly, with any person who is of may become a victim or potential witness in the investigation or prosecution, including but not limited to: victims and ~~codefendants and~~ others on list provided by the Government

AO 199 (Rev. 7/10) Order Setting Conditions of Release                              Hamdi Mohamud

☐ (k) cooperate with a mental health assessment and follow any recommendations of that assessment if the pretrial services officer or the supervising officer considers it advisable.

_____

☐ (l) return to custody each (week) day at _____ o'clock after being released each (week) day at _____ o'clock for employment, schooling, or the following purpose(s): _____

☐ (m) maintain residence at a halfway house or community corrections center, as the pretrial services officer or supervising officer considers necessary.

☑ (n) refrain from possessing a firearm, destructive device, or other dangerous weapons.

☐ (o) refrain from ☐ any ☐ excessive use of alcohol.

☐ (p) refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

☐ (q) submit to any testing required by the pretrial services office or the supervising officer to determine whether the defendant is using a prohibited substance. Any testing may be used with random frequency and include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or monitoring which is (are) required as a condition of release.

☐ (r) participate in a program of inpatient or outpatient substance abuse therapy and counseling if the pretrial services office or supervising officer considers it advisable.

_____

_____

## ADDITIONAL CONDITIONS OF RELEASE

☐ (s) participate in one of the following location monitoring program components and abide by its requirements as the pretrial services officer or supervising officer instructs.

    ☐ (i) **Curfew.** You are restricted to your residence every day

        ☐ from _____ to _____

      or ☐ as directed by the pretrial services officer;

      or _____

    ☐ (ii) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the pretrial services office or supervising office; or

    ☐ (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down except for medical necessities and court appearance or other activities specifically approved by the court.

☑ (t) submit to the location monitoring indicated below and abide by all of the program requirements and instructions provided by the pretrial services officer or supervising officer related to the proper operation of the technology

    ☐ The defendant must pay all or part of the cost of the program based upon your ability to pay as the pretrial services office or supervising officer determines.

    ☐ (i) Location monitoring technology as directed by the pretrial services office or supervising officer;

    ☐ (ii) Radio Frequency (RF) monitoring;

    ☐ (iii) Passive Global Positioning Satellite (GPS) monitoring;

    ☑ (iv) Active Global Positioning Satellite (GPS) monitoring (including "hybrid" (Active/Passive) GPS);

    ☐ (v) Voice Recognition monitoring.

☑ (u) report as soon as possible, to the pretrial services office or supervising officer any contact with any law enforcement personnel, including, but not limited to, any arrest, questioning, or traffic stop within 72 hours.

☑  (v)  In the event 1) that no Indictment is returned against the Defendant, or 2) that the charges giving rise to this Release Order are dismissed, or 3) that Defendant is acquitted of the charges giving rise to this Release Order, the Attorney for the Government is hereby ORDERED to provide to the Attorney General a certified copy of a final court order establishing which of the foregoing events occurred. Upon receipt by the Attorney General of any such certified copy, the Director of the Federal Bureau of Investigation is hereby ORDERED to promptly expunge from the index, described in subsection (a) of 42 United States Code, Section 14132, the analysis of the DNA sample collected from this Defendant pursuant to the conditions of this Release Order.

☐  (w)

AO 199 (Rev. 7/10) Order Setting Conditions of Release                                          Hamdi Mohamud

## ADVICE OF PENALTIES AND SANCTIONS
TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1)     an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2)     an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3)     any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4)     a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

## Acknowledgment of the Defendant
I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
*Defendant's Signature*


_____
*City and State*

AO 199 (Rev. 7/10) Order Setting Conditions of Release                                    Hamdi Mohamud

## Directions to the United States Marshal

☒      The defendant is ORDERED released after processing.

☐      The United States Marshal is ORDERED to keep the defendant in custody until notified by the
       clerk or judge that the defendant has posted bond and/or complied with all other conditions for
       release. If still in custody, the defendant must be produced before the appropriate judge at the
       time and place specified.


Date   _6/21/11_                              _____
                                             *Judicial Officer's Signature*

                                             *U.S. Magistrate Judge Jeffrey J. Keyes*
                                             _____
                                             *Printed name and title*

# UNITED STATES DISTRICT COURT

## District of Minnesota

UNITED STATES OF AMERICA

vs                                             **Appearance Bond**

Hamdi Mohamud                                  11-mj-245 JJK - 3

Non-surety:  I, the undersigned defendant acknowledge that I am bound to pay to the United States of America the sum of $25,000 for personal recognizance.

For conditions of bond, see order setting conditions of release by FLN on June 21, 2011/defendant given copy.

The conditions of this bond are that the defendant Hamdi Mohamud is to appear before this court and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in this case, including appearance for violation of a condition of defendant's release as may be ordered or notified by this court or any other United States District  to which the defendant may be held to answer or the cause transferred.  The defendant is to abide by any judgment entered in such matter by surrendering to serve any sentence imposed and obeying any order or direction in connection with such judgment.

It is agreed and understood that this is a continuing bond (including any proceeding on appeal or review) which shall continue until such time as the undersigned are exonerated.

If the defendant appears as ordered or notified and otherwise obeys and performs the foregoing conditions of this bond, then this bond is to be void, but if the defendant fails to obey or perform any of these conditions, payment of the amount of this bond shall be due forthwith.  Forfeiture of this bond for any breach of its conditions may be declared by any United States District  having cognizance of the above entitled matter at the time of such breach and if the bond is forfeited and if the forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States District Court against each debtor jointly and severally for the amount above stated, together with interest and costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal Procedure and other laws of the United States.

This bond is signed on June 21, 2011 at Minneapolis, Minnesota.

_____
Defendant's Signature
Hamdi Mohamud

Signed and acknowledged before me on June 21, 2011.

RICHARD D. SLETTEN, Clerk of Court
Approved:_____
Judicial Officer

Filed _____
RICHARD D. SLETTEN, CLERK

Deputy Clerk: _____

SCANNED
JUN 22 2011

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                           MJ 11-245 JJK

        Plaintiff,

        v.                                          ORDER OF REMOVAL

Hamdi Ahmed Mohamud (03),

        Defendant.

_____

Carol Kayser, ASSISTANT UNITED STATES ATTORNEY, for the plaintiff.

Philip Leavenworth, ASSISTANT FEDERAL PUBLIC DEFENDER, for defendant.

_____

      The above captioned case was before the undersigned United States Magistrate Judge for an

detention hearing on June 21, 2011.   Defendant waived the removal hearing.

      Based on defendant's waiver, the court finds that the defendant is the same person named

in the warrant filed in the Middle  District of Tennessee, and she is ordered removed to that district

for further proceedings.

DATED:     June 22, 2011      s/  *Franklin L. Noel*
                                  FRANKLIN L. NOEL
                                  United States Magistrate Judge

A true printed copy in _____ sheet(s)
of the electronic record filed on _____
in the United States District Court
for the District of Minnesota.
CERTIFIED, _____, 20____.
RICHARD D. SLETTEN
BY: _____
Deputy Clerk

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-cr-00132(2)** |
| | ) | **Chief Judge Haynes** |
| **HAMDI AHMED MOHAMUD** | ) | |

**ORDER**

This matter came to be heard upon Defendant's Motion to Dismiss (D.E. 119), the Government's Response (D.E. 124), and Defendant's Reply in Support of Motion to Dismiss (D.E. 127), and after an evidentiary hearing before the Court on July 1, 2013, the Court hereby orders as follows:

By her Motion, Defendant contended that the government could not carry its burden of proving that she was at least eighteen years old at the time of the alleged offense (June 16, 2011). The proof before the Court included the testimony of Defendant's mother (at the detention review hearing on October 15, 2012) that while she believed Defendant was born in 1993 (in Somalia), she could not be more specific. The scientific proof before the Court in the form of the testimony of forensic odontologist James M. Lewis, D.M.D., D.A.B.F.O., was to the effect that there is a 78% probability that Defendant was under the age of eighteen on the date of the alleged offense. The Court deems the scientific proof of Defendant's age more reliable than the mother's testimony. In addition, the Court finds that the government's proof in light of that evidence does not meet the standard of clear and convincing evidence to prove jurisdiction over a juvenile as reflected by the Court's prior ruling in *United States v. Abdullah Hashi*, No. 3:10-00260 (D.E. 2554).

Therefore, in accordance with its prior ruling in *United States v. Abdullah Hashi, id.,* which followed the Sixth Circuit's decision in *United States vs. Chambers,* 944 F.2d 1253 (6th Cir. 1991), the Court concludes that it lacks subject matter jurisdiction in this action and that absent the immediate certification procedure contemplated by *Chambers, id.* at 1260, the charges against Defendant Hamdi Ahmed Mohamud should be dismissed with prejudice. As the government stated at the conclusion of the evidentiary hearing that it would not seek certification for further juvenile proceedings in this District, Defendant's motion is GRANTED, the Indictment against her is dismissed with prejudice, and Defendant is released from all conditions of her pre-trial release.

IT IS SO ORDERED.

William J. Haynes, Jr.
Chief Judge, United States District Court
7-10-13

**PREPARED FOR ENTRY:**

NEAL & HARWELL, PLC

By: /s/ James G. Thomas
   James G. Thomas
   Chandra N.T. Flint
150 Fourth Avenue North
Suite 2000
Nashville, TN  37219
(615) 244-1713 Phone
(615) 726-0573 Fax
jthomas@nealharwell.com
cflint@nealharwell.com

2

# EXHIBIT E

AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

| MIDDLE | DISTRICT OF | TENNESSEE |
|---|---|---|

| UNITED STATES OF AMERICA | **EXHIBIT AND WITNESS LIST** |
|---|---|
| V. | |
| Hawo O. Ahmed, Ifrah A. Yassin | Case Number:  3:11-00132 |

| PRESIDING JUDGE<br>William J. Haynes, Jr. | PLAINTIFF'S ATTORNEY<br>Van Vincent, Blanche Cook | DEFENDANT'S ATTORNEY<br>Benjamin Perry, Hallie McFadden |
|---|---|---|
| TRIAL DATE (S)<br>7/23/2013 – 7/26/2013 | COURT REPORTER<br>Peggy Turner | COURTROOM DEPUTY<br>Alex Scarbrough |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| 1 | | 7/23/2013 | | | Government Witness No. 1--Muna Abdulkadir Mohamed |
| 7 | | 7/23/2013 | X | X | Government's Exhibit No. 7--transcript of Muna Abdulkadir Mohamed Nov. 4, 2009 |
| 7A | | 7/23/2013 | X | X | Government Exhibit No. 7A--stipulation as to exhibit 7 |
| 8 | | 7/23/2013 | X | X | Government's Exhibit No. 8--transcript of Muna Abdulkadir Mohamed Aug. 25, 2010 |
| 8A | | 7/23/2013 | X | X | Government Exhibit 8A--stipulation as to exhibit 8 |
| 1A | | 7/23/2013 | X | X | Government Exhibit 1A--stipulation as to exhibit 1 |
| 1 | | 7/23/2013 | X | X | Government Exhibit No. 1--video from surveillance cameras of the fight |
| 5 | | 7/23/2013 | X | X | Government's Exhibit No. 5--photo of Muna and Leila Hassan |
| 5A | | 7/23/2013 | X | X | Government Exhibit No. 5A--stipulation as to exhibit no. 5 |
| 6 | | 7/23/2013 | X | X | Government Exhibit No. 6--photo of Muna with knife |
| 6A | | 7/23/2013 | X | X | Government Exhibit No. 6A--stipulation as to exhibit no. 6 |
| 2 | | 7/24/2013 | | | Government Witness No. 2--Patti Hall |
| | 1 | 7/24/2013 | X | X | Defense Ahmed Exhibit No. 1--letter from Patti Hall to Hawo Ahmed |
| | 2 | 7/24/2013 | X | X | Defense Ahmed Exhibit No. 2--proffer letter, plea agreement, 5K motion of Patti Hall |
| | 3 | 7/24/2013 | X | X | Defense Ahmed Exhibit No. 3--jail house call no. 1 |
| | 4 | 7/24/2013 | X | X | Defense Ahmed Exhibit No. 4--jail house call no. 2 |
| 14 | | 7/24/2013 | X | | Government's Exhibit 14--Supplemental Offense/Incident Report |
| 3 | | 7/24/2013 | | | Government Witness No. 3--Anthjuan Beeks |
| 2 | | 7/24/2013 | X | X | Government Exhibit No. 2--911 call from Ifrah Yassin June 16, 2011 |
| 2A | | 7/24/2013 | X | X | Government Exhibit No. 2A--stipulation as to exhibit 2 |
| 3 | | 7/24/2013 | X | X | Government Exhibit 3--photo of car windshield |
| 3A | | 7/24/2013 | X | X | Government Exhibit 3A--stipulation as to exhibit 3 |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

Page 1 of ___1___ Pages

✎AO 187A (Rev. 7/87)          **EXHIBIT AND WITNESS LIST – CONTINUATION**

| United States of America | vs. | Hawo Ahmed Hamdi, Ifrah Yassin | CASE NO. 3:11-00132 |
|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 4 | | 7/24/2013 | X | X | Government Exhibit 4--second photo of car windshield |
| 4A | | 7/24/2013 | X | X | Government Exhibit 4A--stipulation as to exhibit 4 |
| 4 | | 7/24/2013 | | | Government Witness No. 4--Katherine Koeth |
| 5 | | 7/25/2013 | | | Government Witness No. 5--Heather Weyker-Sanders |
| 9A | | 7/25/2013 | X | X | Government Exhibit No. 9A--stipulation as to exhibit 9 |
| 9 | | 7/25/2013 | X | X | Government Exhibit No. 9--superceding indictment Adan |
| 11A | | 7/25/2013 | X | X | Government Exhibit 11A--stipulation as to exhibit 11 |
| 11 | | 7/25/2013 | X | X | Government Exhibit 11--second superceding indictment Adan |
| 6 | | 7/25/2013 | | | Government Witness No. 6--John Bandemer |
| 7 | | 7/25/2013 | | | Government Witness No. 7--Mark Shafer |
| 8 | | 7/25/2013 | | | Government Witness No. 8--Roy Gutzman |
| 15 | | 7/25/2013 | X | X | Government Exhibit 15--video taken by police officer at response time to Muna's call |
| | 1 | 7/25/2013 | | | Defendant Ahmed Witness No. 1--Tracy Davis |
| | 5 | 7/25/2013 | X | X | Defendant Ahmed Exhibit 5--collective exhibit, photos of apartment |
| | 1Y | 7/25/2013 | X | X | Defendant Yassin Exhibit 1--photo of elevator |
| | 2 | 7/25/2013 | | | Defendant Ahmed Witness No. 2--Michael Grostyan |
| | 3 | 7/25/2013 | | | Defendant Ahmed Witness No. 3--Hawo Ahmed |
| | 1Y | 7/26/2013 | | | Defendant Yassin Witness No. 1--Ifrah Yassin |
| 9 | | 7/26/2013 | | | Government Witness 9--Michael Fossum |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Page _____ of _____ Pages

# EXHIBIT F

1   THE UNITED STATES DISTRICT COURT

2   MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

3   ------------------------------------------------------------

4   UNITED STATES OF AMERICA,      )

5   Plaintiff,      )

6   )

7   v.      )   CASE NO. 3:10-00260

8   )

9   HOWA AHMED and IFRAH YASSIN,   )

10   Defendants.      )

11   ------------------------------------------------------------

12

13   TRANSCRIPT OF PROCEEDINGS

14   TESTIMONY OF MUNA ABDULKADIR

15

16   ------------------------------------------------------------

17   DATE:           July 23, 2013

18   TIME:           9:00 A.M.

19   BEFORE:         HONORABLE WILLIAM J. HAYNES, JR.

20   And a Jury

21   ------------------------------------------------------------

22

23   COURT REPORTER:     PEGGY G. TURNER
                         OFFICIAL COURT REPORTER
24                       801 BROADWAY, ROOM A-837
                         NASHVILLE, TENNESSEE 37203
25                       PHONE:  (615)726-4893
                         Peggy_Turner@tnmd.uscourts.gov

```
 1                        A P P E A R A N C E S:

 2     For the Plaintiff:    Blanche Cook
                             Van Vincent
 3                           Assistant U.S. Attorneys
                             Nashville, TN
 4
       For the Defendant
 5     Yassin:               Hallie McFadden
                             Attorney at Law
 6                           Chattanooga, TN

 7     For the Defendant
       Ahmed:                Benjamin Perry
 8                           Attorney at Law
                             Chattanooga, TN
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

W I T N E S S

MUNA ABDULKADIR MOHAMED

Direct Examination by Mr. Vincent              Page    4

Cross Examination by Ms. McFadden              Page   50

Cross Examination by Mr. Perry                 Page   79

Redirect Examination by Mr. Vincent            Page   90

Recross Examination by Ms. McFadden            Page   99

Recross Examination by Mr. Perry               Page  102

```
 1                    (EXCERPTED PROCEEDINGS)
 2            MR. VINCENT:  The United States calls Muna Abdulkadir
 3      Mohamed.
 4            MS. MCFADDEN:  Your Honor, may we approach briefly
 5      before the witness is sworn?
 6            THE COURT:  Yes.
 7            (Whereupon, a bench conference was held, out of the
 8      hearing of the jury, to wit:)
 9            MS. MCFADDEN:  Your Honor, Mr. Perry had filed a
10      motion, and which I joined, and the Court allowed me to join,
11      asking for a bit of leeway to be able to switch the order of
12      questioning.  And we were wondering if the Court would allow me
13      to question Muna Abdulkadir first, before Mr. Perry, even though
14      the defendants are in a different order.
15            THE COURT:  I don't see any problem with that.
16            MR. VINCENT:  United States submits it's at the
17      discretion of the Court.
18            MR. PERRY:  Your Honor, that would be okay just through
19      the remainder of the witnesses as well?
20            THE COURT:  That's fine with me.
21            MR. PERRY:  Thank you, Your Honor.
22            (Witness sworn.)
23            THE CLERK:  You may take a seat.  Please state your
24      first and last name, and spell your last name for the court
25      reporter.
```

1    you're old enough to remember the old pogo stick, where you are

2    sort of jumping up and down.  Well, let me explain to you,

3    sometimes that's absolutely necessary.  And the reason it is

4    necessary is because the Court wants to try and make sure that

5    we don't make any mistakes during the course of this trial that

6    would require this case to be tried all over again where we

7    would have to repeat this entire process.  So I hope you will be

8    patient with the Court when I set these conferences.

9         In addition, we usually go in hour and a half sessions.

10   But there is another matter the Court needs to take up today, so

11   we're going to go until we complete this witness's testimony,

12   and then we'll adjourn for the day.

13        Counsel?

14   BY MR. VINCENT:

15        Q.    Muna, prior to June 16th of 2011, had you

16   appeared as a witness in a federal criminal matter?

17        A.    Yeah.

18        Q.    And before you, you have what is marked as

19   Government's Exhibit 7.  Do you recognize Government's Exhibit

20   7?

21        A.    Yeah.

22        Q.    And on or about November 4th of 2009, did you

23   apppear here in Nashville, Tennessee at the federal grand jury?

24        A.    Yeah.

25        Q.    And what is Government's Exhibit 7?

1          A.     Like, what does it say?

2          Q.     Is that a transcript of your testimony before

3     the federal grand jury on November 4th of 2009?

4          A.     Yeah.

5          MR. VINCENT:  At this time, Your Honor, I would read a

6     stipulation as to Government's Exhibit 7.

7          THE COURT:  Without objection, it will be admitted.

8          A stipulation, as I mentioned earlier, ladies and

9     gentlemen of the jury, is an agreement by the parties as to what

10    a particular exhibit shows.

11         MR. VINCENT:  This stipulation reads as follows:

12         Stipulation as to United States Exhibit 7.

13         Comes now the United States, by and through the

14    undersigned; and defendant Howa Osman Ahmed, by and through her

15    counsel, Benjamin H. Perry; and defendant Ifrah Yassin, by and

16    through her counsel, Hallie H. McFadden; and stipulate to the

17    following information.

18         United States Exhibit 7 is the grand jury testimony of

19    Muna Abdulkadir Mohamed, taken in the Middle District of

20    Tennessee on November 4th, 2009.  No custodian of records is

21    required to authenticate this exhibit.

22         And then it's signed by the attorneys and the

23    defendants.  This would, if it gets an exhibit number, be

24    Exhibit Number 17 (sic), Your Honor.

25         THE COURT:  Without objection, it will be Exhibit 7-A.

1    MR. VINCENT:  At this time, we would move Government's

2  Exhibit 7 into evidence.

3    THE COURT:  Without objection, it will be admitted.

4  BY MR. VINCENT:

5    Q.    Did you also appear on a second occasion?  If I

6  could have you please look at Government's Exhibit Number 8,

7  which there is a tab, so it will be the next tab in the book

8  before you.

9    A.    Go to Page 8?

10    MR. VINCENT:  If I may approach for a minute, Your

11  Honor.

12    THE COURT:  Yes.

13    THE WITNESS:  Oh.

14  BY MR. VINCENT:

15    Q.    Did you also appear before the federal grand

16  jury here in Nashville, Tennessee on August 25th of 2010?

17    A.    Yes.

18    Q.    And is Exhibit 8 a copy of your grand jury

19  testimony from August 25, 2010?

20    A.    Yes.

21    MR. VINCENT:  At this time, Your Honor, I would read

22  the stipulation as to United States Exhibit 8.

23    THE COURT:  All right.

24    MR. VINCENT:  Comes now the United States, by and

25  through the undersigned; and defendant Howa Osman Ahmed, by and

1    through her counsel, Benjamin H. Perry; and defendant Ifrah

2    Yassin, by and through her counsel, Hallie H. McFadden; and

3    stipulate to the following information.

4         United States Exhibit 8 is the grand jury testimony of

5    Muna Abdikadir Mohamed taken in the Middle District of Tennessee

6    on August 25, 2010.  No custodian of records is required to

7    authenticate this exhibit.

8         Signed by the attorneys and the defendants.

9         This would be Exhibit 8-A, I believe, Your Honor.

10        THE COURT:  Without objection, Exhibit 8-A will be

11   admitted.

12        MR. VINCENT:  At this time, Your Honor, we move

13   Government's Exhibit 8 into evidence.

14        THE COURT:  Without objection, Government's Exhibit 8

15   will be admitted.

16   BY MR. VINCENT:

17        Q.    In relation to the grand jury testimony that has

18   been admitted, was there an occasion in relation to -- well,

19   even prior to the grand jury testimony, did you also have any

20   occasion to speak with any officers about what you testified

21   about?

22        A.    (Respite.)

23        Q.    What you said at the grand jury?  Did you talk

24   to any officers outside the grand jury about it?  Or law

25   enforcement?

```
 1              A.      Heather.

 2              Q.      Okay.  Who is Heather to you?

 3              A.      She is a -- the FBI.

 4              Q.      And do you know a person by the name of John

 5     Bandemer?

 6              A.      Yeah.

 7              Q.      And how do you know John Bandemer?

 8              A.      He is FBI as well.

 9              Q.      And Did you talk to them about the case that was

10     being investigated that you testified about?

11              A.      Yes.

12              Q.      Do you know, in relation to that case that you

13     testified about, were there any persons charged in the case, to

14     your knowledge?

15              A.      (Respite.)

16              Q.      That got charged?

17              A.      Yeah.

18              Q.      In June of 2012, did you have occasion to

19     testify at a trial in relation to those persons?

20              A.      Yeah.

21              Q.      Pardon me.  Not June.  It was April and May of

22     2012; is that correct?

23              A.      Yeah.

24              Q.      And do you know, was it more than one person

25     that was charged in relation to what you testified about?
```

1    A.    Yeah.  Uh-huh, yes.

2    Q.    In relation to your grand jury testimony that

3  has been admitted, Government's Exhibits 7 and 8, in either of

4  those testimonies, did you have occasion to talk about someone

5  named Chi Town?

6    A.    Yes.

7    Q.    Who is Chi Town to you?

8    A.    He is really nobody to me.

9    Q.    How do you know of Chi Town?

10   A.    He was my neighbor.

11   Q.    Do you know his real name?

12   A.    No.

13   Q.    When you say he was your neighbor, when was he

14  your neighbor?

15   A.    I think 2006 or 2007.

16   Q.    And do you -- in relation to your prior

17  testimony, did you talk about someone that you know of as Double

18  D?

19   A.    Yes.

20   Q.    And in relation to Double D, did your testimony

21  relate to any activity that was occurring with Double D?

22   A.    Yes.

23   Q.    What activity did your testimony relate to that

24  occurred with Double D?

25   A.    Can you say that again?

1    A.    That I would punk out.

2    Q.    Punk out?

3    A.    Yeah.

4    Q.    Okay.  And can you explain to the jury what punk

5    out would mean in relation to what you're talking about?

6    A.    Like -- like I would be the scary one.

7    Q.    And what happened next?

8    A.    We went on the elevator.  There was a couple of

9    people on the elevator.  We waited for them to come out.  When

10   they came out, we went in.  And then they put the elevator on

11   hold.  I don't know how that happened, but they pressed

12   something, and then it was on hold.  And then Ifrah started

13   hitting me.  And then I seen that Howa was pregnant, so I didn't

14   really want to like touch her, so I hold her against the wall.

15        And then I fell on the floor, I got right back up.  I

16   pressed something, and then the elevators opened.  I tried to

17   run away from them.  And then I thought I was on the third

18   floor.  I was running toward my house.  But as soon as I got to

19   the door, it was a random woman that opened it.  So I just

20   walked back and went to my floor.

21   Q.    If you can, hold up right there.  You said the

22   elevators opened and you tried to get away.  What floor did you

23   think you were on?

24   A.    I thought I was on the third floor, but I was on

25   the second floor.

1  Q.  So did you get off the elevator at that time?

2  A.  Yeah.  I tried to get away, but they were still

3  hitting me.

4  Q.  Did you go down a hallway at that time?

5  A.  Yeah.  I went down the second floor hallway.  I

6  thought I was on the third floor.

7  Q.  Did anyone follow you down that hallway?

8  A.  Howa followed me.

9  Q.  Did anything happen while Howa was following you

10  down the hallway?

11  A.  She threw a shoe at me.

12  Q.  And you said you got to a door.  Why did you go

13  to that door that you were talking about?

14  A.  I thought it was my floor that I was on.  It

15  wasn't.  When the lady opened the door, I figured it wasn't my

16  apartment, so I walked back.

17  Q.  And when you walked back, where did you go?

18  A.  I picked up a shoe, then I went -- I took the

19  stairs to my apartment.  I got there, and then as soon as I

20  entered my apartment, I looked at the balcony, and her vehicle

21  was still there.  Howa's vehicle was still there.

22  And then I picked up something from the floor, and I

23  picked up a knife from the counter, and I walked out.

24  Q.  Why did you pick up a knife from the counter?

25  A.  Because they jumped me.

1        Q.    Did you see Howa Ahmed outside?

2        A.    Yes.

3        Q.    What, if anything, happened at that time that

4 you saw them outside at the car?  Had you hit the windshield at

5 the time, before you had seen them?

6        A.    Yeah.  Howa got mad and said, I'm going to call

7 the cops.  And I said, go ahead, you're on my property.  And

8 then Ifrah was in my face.  And I told her, get away from me, or

9 else I'm going to hit you.  And then she wouldn't, so I slapped

10 her with the knife on her cheeks.  And then she got away from

11 me, and then she just like went in the car.  And then me and my

12 mom just walked back.

13        Q.    When you say you walked back, what are you

14 referring to?  Where are you going?

15        A.    Back to the building, to the apartment.

16        Q.    And did you go back to the third floor apartment

17 that you lived in?

18        A.    Yeah.

19        Q.    Where did you go?

20        A.    I went in my house.  And I got scared, I got

21 paranoid.  And then I just went to my neighbor.  And then I

22 called Heather.

23        Q.    Now, prior to your testifying today, did you

24 have occasion to look at a video?

25        A.    Yes.

1        MR. VINCENT:  Your Honor, I may have forgotten -- the

2  grand jury testimony, Government's Exhibit 8, from August 25th

3  of 2010.

4        THE COURT:  You said 8?

5        MR. VINCENT:  8.

6        THE COURT:  All right.

7        MR. VINCENT:  If I did not move that into evidence, I

8  so move at this time.

9        THE COURT:  Without objection, Government's Exhibit 8

10  will be admitted.

11  BY MR. VINCENT:

12        Q.    When you were on the elevator on June 16, 2011

13  with the defendants, what, if anything, was said while you wore

14  on the elevator?

15        A.    What was said while I was on the elevator?

16        Q.    Correct.  And first, who said it, when you are

17  specifying?  If anything?

18        A.    I really don't remember.

19        Q.    Who began hitting whom on the elevator first?

20        A.    Ifrah hit me first.

21        Q.    After you went to your -- after you had come

22  from outside back up to the third floor, you said you went to

23  your friend's apartment.  While there, did you call anyone?

24        A.    I went to my neighbor's apartment.  And I called

25  Heather.  And the reason why I called Heather was, when Ifrah

1    said, you locked up my niggers, I called her.

2         Q.    And what, if anything, did you tell Heather at

3    that time?

4         A.    I was really mad.  I cursed her out.  I said

5    you've ruined my life.  You got people to jump me for some

6    stupid stuff.  I said a lot of things.  I really don't remember.

7         Q.    And when you said people to jump -- the

8    apartment people to jump you and stuff, what were you referring

9    to?

10        A.    About the Adakman (ph) case.

11        Q.    Did you tell Heather what happened when you

12   called her?

13        A.    I was talking too fast.  I kind of told her what

14   happened, and -- yeah.

15        Q.    And when you --

16        Let me have just one moment.

17   BY MR. VINCENT:

18        Q.    Do you -- in relation to the case that you

19   provided testimony about, you are not charged in that case;

20   correct?

21        A.    Yes.

22        Q.    Yes, you are charged?  Or you are not charged?

23        A.    I'm not charged.

24        Q.    You were a witness in that case; is that

25   correct?

1      Q.     Is that reflected in the report?

2      A.     Yeah.

3      Q.     Did you tell the officer that you were waiting

4  at the front door and holding the door and your father parked

5  the vehicle?

6      A.     Yeah.

7      Q.     Did you tell the officer that your father was

8  checking the mail, and you were in the front main area of the

9  lobby at the elevator?

10     A.     Yeah.

11     Q.     And that you saw your father let the girls in,

12 but didn't realize or know who they were at first?

13     A.     Yeah.

14     Q.     And as they got closer, you recognized them?

15     A.     Yeah.

16     Q.     And that you all began to hold casual

17 conversation as the elevator came down?

18     A.     Huh?

19     Q.     That you all were holding casual conversations?

20 Is that how the report reflects?

21     A.     Yeah.

22     Q.     And the individuals got off the elevator, and

23 you all got on; is that right?

24     A.     Yeah.

25     Q.     And that as soon as you got on, that you were

```
 1    attacked by the three girls?

 2         A.     Yeah.

 3         Q.     And that at one point, they pushed the stop

 4    button in order to get the elevator to stop?

 5         A.     Yeah.

 6         Q.     And at some point you were able to get the

 7    elevator moving again?

 8         A.     Yeah.

 9         Q.     And that the elevator went to the second floor?

10         A.     Yeah.

11         Q.     As the door opened, you were able to get away

12    and run to your apartment?

13         A.     Yeah.

14         Q.     That you ran to your apartment and you grabbed a

15    knife?

16         A.     Yeah.

17         Q.     You went back downstairs, but didn't see the

18    three girls?

19         A.     Yeah.

20         Q.     You smashed the front of the windshield of the

21    vehicle?

22         A.     Yeah.

23         Q.     Your mother asked the three females what they

24    were doing to you?

25         A.     Yeah.
```

1  Q. And that one of them slapped your mother?

2  A. Yeah.

3  Q. And you told them that it was defendant Ahmed?

4  A. Huh?

5  Q. You told them that it was Howa that slapped your

6 mother; correct?

7  A. I don't remember.  I think Idrah slapped my mom.

8  Q. Does the report reflect that you told them that

9 it was defendant Ahmed?

10  A. Yeah.

11  Q. And that that's when you slapped one of the

12 defendants with the knife?

13  A. Yeah.

14  Q. And that you did this because you wanted to

15 scare them; correct?

16  A. By me slapping her with a knife?

17  Q. Yes.

18  A. Yeah.

19  Q. And you told the officer because this has been a

20 daily occurrence of individuals harassing, threatening and

21 intimidating you to cause bodily harm?

22  A. Yeah.

23  MR. VINCENT:  And if I may approach again, Your Honor.

24 BY MR. VINCENT:

25  Q. Ms. McFadden asked you and stated you didn't

```
 1                          REPORTER'S CERTIFICATE

 2

 3         I, Peggy G. Turner, Official Court Reporter for

 4    the United States District Court for the Middle

 5    District of Tennessee, with offices at Nashville, do

 6    hereby certify:

 7         That I reported on the Stenograph machine the

 8    proceedings held in open court on July 23, 1013, in the matter

 9    of USA v. AHMED and YASSIN, Case No. 3:10-260; that said

10    proceedings in connection with the hearing were reduced to

11    typewritten form by me; and that the foregoing transcript, Pages

12    1 through 105, is a true and accurate record of said

13    proceedings.

14         This the 24th day of August, 2013.

15

16

17

18                              Peggy G. Turner
                                S/Peggy G. Turner, RPR
19                              Official Court Reporter

20

21

22

23

24

25
```

# EXHIBIT G

1              IN THE UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

3    ------------------------------------------------------------

4    UNITED STATES OF AMERICA,      )

5                    Plaintiff,     )

6                                   )

7    v.                             )  CASE NO. 3:11-00132

8                                   )

9    HAWO AHMED and IFRAH YASSIN,   )

10                  Defendants.     )

11   ------------------------------------------------------------

12

13                     TRANSCRIPT OF PROCEEDINGS

14                            VOLUME I

15

16   ------------------------------------------------------------

17   DATE:            July 23, 2013

18   TIME:            9:00 A.M.

19   BEFORE:          HONORABLE WILLIAM J. HAYNES, JR.

20                    And a Jury

21   ------------------------------------------------------------

22

23   COURT REPORTER:    PEGGY G. TURNER
                        OFFICIAL COURT REPORTER
24                      801 BROADWAY, ROOM A-837
                        NASHVILLE, TENNESSEE 37203
25                      PHONE:  (615)726-4893
                        Peggy_Turner@tnmd.uscourts.gov

```
 1                        A P P E A R A N C E S:

 2       For the Plaintiff:   Blanche Cook
                              Van Vincent
 3                            Assistant U.S. Attorneys
                              Nashville, TN
 4
         For the Defendant
 5       Yassin:               Hallie McFadden
                              Attorney at Law
 6                            Nashville, TN

 7       For the Defendant
         Ahmed:                Benjamin Perry
 8                            Attorney at Law
                              Nashville, TN
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        W I T N E S S E S:

2    MUNA ABDULKADIR

3    Direct Examination by Mr. Vincent          Page   31

4    Cross Examination by Ms. McFadden          Page   77

5    Cross Examination by Mr. Perry             Page  105

6    Redirect Examination by Mr. Vincent        Page  116

7    Recross Examination by Ms. McFadden        Page  125

8    Recross Examination by Mr. Perry           Page  128

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  You may take a seat.  Please state your

2     first and last name, and spell your last name for the court

3     reporter.

4          THE WITNESS:  Muna Abdulqadir.  A-b-d-u-l-q-a-d-i-r.

5          THE CLERK:  Thank you.

6     DIRECT EXAMINATION

7     BY MR. VINCENT:

8          Q.    Ma'am, is it all right if I call you Muna during

9     the course of your testimony?

10         A.    Yeah.

11         Q.    And in what city do you currently reside?  Not

12    the actual location, but the city.

13         A.    Huh?

14         Q.    What city do you currently live in?

15         A.    Right now?

16         Q.    Correct.

17         A.    Hopkins.

18         Q.    Okay.  And in June of 2011, approximately two

19    years ago, what city were you living in at that time?

20         A.    Minneapolis.

21         Q.    And were you living in a house or an apartment

22    complex?

23         A.    Apartment.

24         Q.    And where was the apartment complex located?

25         A.    2848 Pleasant Avenue South.

1          And she said, I wanted to ask you something.

2          And I said, okay.

3          Then she said, you are talking shit by about me to Ayan

4    Duffy.

5          And I said, I don't even know who that is.  Why I would

6    be talking shit about you to her?

7          Then we just left it at that.

8          Then Ifrah jumped and said, well, you are talking shit

9    about me, well, you locked up my niggers or something like that.

10         Q.     Was there any elaboration on you locked up those

11   persons?

12         A.     No.

13         Q.     Did you know at that time -- or what was your

14   understanding of what was being referred to?

15         A.     She -- I think she was talking about the case.

16         MS. MCFADDEN:  Objection.  Speculation, Your Honor.

17         THE COURT:  Ladies and gentlemen of the jury, we're

18   going to excuse you for a minute.  Please don't discuss the

19   evidence in the case until you receive all of the evidence, the

20   argument of counsel, and the charge of the Court.  It will be a

21   brief recess.

22         (Jury out.)

23         THE COURT:  You all can be seated.

24         At the time the statement was made, what was your

25   understanding of what she said?

```
 1              THE WITNESS:  What who said?

 2              THE COURT:  The person you referred to.

 3              THE WITNESS:  Ifrah?

 4              THE COURT:  Uh-huh.

 5              THE WITNESS:  What did she say when Hawo got done

 6    talking?

 7              THE COURT:  Uh-huh.  What did you understand her to

 8    mean?

 9              THE WITNESS:  When Hawo said, you are talking shit

10    about me to Ayan Duffy, and I said, I don't who that is, I

11    wasn't talking shit about you to her, then Ifrah jumped in.  And

12    she said, well, what you and Hawo have is not something new,

13    what-not.  I want to fight you for locking up my niggas.

14              THE COURT:  The last phrase you used, what did you

15    understand at that time about that?

16              THE WITNESS:  When she said those words to me?

17              THE COURT:  Uh-huh.  What did you understand about --

18    when she said locked up, what did you understand?

19              THE WITNESS:  She said -- she said, you locked up my

20    boyfriend, Chi Town.  And I came here for that once upon a time,

21    so I just -- I assumed that she was talking about the case.

22              THE COURT:  Any objection?

23              MS. MCFADDEN:  Your Honor, what she assumed would be

24    speculation as well.  We do have an objection to that.

25              THE COURT:  She said assumed.
```

```
 1           Q.      What activity did your testimony relate to that

 2    occurred with Double D?

 3           A.      Can you say that again?

 4           Q.      What was it you were there to testify about or

 5    talk about?  In relation to Double D.  What was going on with

 6    Double D?

 7           A.      She was getting prostituted.

 8           Q.      By whom, to your knowledge?

 9           A.      By a couple of people.

10           Q.      And did you testify about those persons at the

11    grand jury?

12           A.      Yes.

13           Q.      Did you provide information about those persons

14    to the person you know as Heather and to John Bandemer?

15           A.      Yes.

16           Q.      Did you testify about Chi Town and the

17    information you knew about Chi Town?

18           A.      Yes.

19           Q.      Now, on June 16 of 2011, in the lobby,

20    specifically talking about Yassin, what did she say in the lobby

21    at that time?

22           A.      She said, I want to fight you because you locked

23    up my nigga, my boyfriend, Chi Town.

24           Q.      At that time, to your knowledge, was the person

25    you knew as Chi Town in custody somewhere?  Meaning locked up?
```

1   your friend's apartment.  While there, did you call anyone?

2         A.     I went to my neighbor's apartment.  And I called

3   Heather.  And the reason why I called Heather was, when Ifrah

4   said, you locked up my niggers, I called her.

5         Q.     And what, if anything, did you tell Heather at

6   that time?

7         A.     I was really mad.  I cursed her out.  I said

8   you've ruined my life.  You got people to jump me for some

9   stupid stuff.  I said a lot of things.  I really don't remember.

10        Q.     And when you said people to jump -- the

11  apartment people to jump you and stuff, what were you referring

12  to?

13        A.     About the Adakman (ph) case.

14        Q.     Did you tell Heather what happened when you

15  called her?

16        A.     I was talking too fast.  I kind of told her what

17  happened, and -- yeah.

18        Q.     And when you --

19        Let me have just one moment.

20  BY MR. VINCENT:

21        Q.     Do you -- in relation to the case that you

22  provided testimony about, you are not charged in that case;

23  correct?

24        A.     Yes.

25        Q.     Yes, you are charged?  Or you are not charged?

1   by the girls?

2          A.     Stroke?

3          Q.     Struck, hit?

4          A.     Yes.

5          Q.     And by the girls, who were you referring to?

6          A.     All of them.

7          Q.     By all of them, who are they?

8          A.     Hamdi, Ifrah, and Hawo.

9          Q.     You told -- did you tell Officer Weyker that

10  Ifrah Yassin referred to Chi Town specifically?

11         A.     Yes.

12         Q.     And that was in reference to you having locked

13  the boys up?

14         A.     Yes.

15         Q.     And in your -- when you testified at trial here

16  approximately one year ago, was Chi Town one of the defendants

17  that was on trial at that time?

18         A.     Yes.

19         MR. VINCENT:  I have no further questions.

20         THE COURT:  Any recross of this witness?

21  RECROSS EXAMINATION

22  BY MS. MCFADDEN:

23         Q.     I just want to clear one thing up.  You told

24  Officer Beeks that being assaulted, or being attacked or

25  harassed, was a daily occurrence, with individuals attempting to

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Peggy G. Turner, Official Court Reporter for

 4    the United States District Court for the Middle

 5    District of Tennessee, with offices at Nashville, do

 6    Hereby certify:

 7          That I reported on the Stenograph machine the

 8    proceedings held in open court on July 23, 1013, in the matter

 9    of USA v. AHMED and YASSIN, Case No. 3:11-00132; that said

10    proceedings in connection with the hearing were reduced to

11    typewritten form by me; and that the foregoing transcript, Pages

12    1 through 131, is a true and accurate record of said

13    proceedings.

14          This the 29th day of September, 2013.

15

16

17

18                         Peggy G. Turner
                           S/Peggy G. Turner, RPR
19                         Official Court Reporter

20

21

22

23

24

25
```

# EXHIBIT H

1              IN THE UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

3    -------------------------------------------------------------

4    UNITED STATES OF AMERICA,      )

5                   Plaintiff,      )

6                                   )

7    v.                             )  CASE NO. 3:11-00132

8                                   )

9    HAWO AHMED and IFRAH YASSIN,   )

10                  Defendants.     )

11   -------------------------------------------------------------

12

13                    TRANSCRIPT OF PROCEEDINGS

14                         VOLUME II

15

16   -------------------------------------------------------------

17   DATE:           July 24, 2013

18   TIME:           9:00 A.M.

19   BEFORE:         HONORABLE WILLIAM J. HAYNES, JR.

20                   And a Jury

21   -------------------------------------------------------------

22

23   COURT REPORTER:    PEGGY G. TURNER
                        OFFICIAL COURT REPORTER
24                      801 BROADWAY, ROOM A-837
                        NASHVILLE, TENNESSEE 37203
25                      PHONE:  (615)726-4893
                        Peggy_Turner@tnmd.uscourts.gov

```
 1                          A P P E A R A N C E S:

 2     For the Plaintiff:    Blanche Cook
                             Van Vincent
 3                           Assistant U.S. Attorneys
                             Nashville, TN
 4
       For the Defendant
 5     Yassin:               Hallie McFadden
                             Attorney at Law
 6                           Nashville, TN

 7     For the Defendant
       Ahmed:                Benjamin Perry
 8                           Attorney at Law
                             Nashville, TN
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         W I T N E S S E S :

2      PATTI HALL

3      Direct Examination by Ms. Cook                Page    5

4      Cross Examination by Mr. Perry                Page   26

5      Cross Examination by Ms. McFadden             Page   79

6      Redirect Examination by Ms. Cook             Page   79

7      Recross Examination by Mr. Perry             Page  121

8

9      ANTHIJUAN BEEKS, SR.

10     Direct Examination by Mr. Vincent            Page  128

11     Cross Examination by Mr. Perry               Page  161

12     Cross Examination by Ms. McFadden            Page  180

13     Redirect Examination by Mr. Vincent          Page  190

14     Recross Examination by Mr. Perry             Page  195

15     Recross Examination by Ms. McFadden          Page  200

16     Further Examination by Mr. Vincent           Page  202

17

18     CATHERINE KOETH

19     Direct Examination by Ms. Cook               Page  204

20     Cross Examination by Mr. Perry               Page  215

21     Cross Examination by Ms. McFadden            Page  218

22     Redirect Examination by Ms. Cook             Page  223

23

24

25

1    they started fighting, and one of them had hit some button.

2         Q.    Okay.  But you just testified that Hawo told

3    that you she confirmed that paragraph that says she pushed the

4    pause button; correct?

5         A.    Yes.

6         MR. PERRY:  Okay.  Just a moment.

7         Those are my questions, Your Honor.

8         THE COURT:  For Yassin?

9         MS. MCFADDEN:  No, thank you, Your Honor.

10        THE COURT:  Any re?

11        MS. COOK:  We are done with this witness, Your Honor.

12        THE COURT:  You may step down, ma'am.

13        You may call your next witness.

14        MR. VINCENT:  Anthijuan Beeks.

15        THE COURT:  Do we know where this witness is?

16        MS. COOK:  I'm sorry, Your Honor?

17        THE CLERK:  Sir, please raise your right hand.

18        (Witness sworn.)

19        THE CLERK:  You can take a seat.  Please state your

20   first and last name and spell both for the court reporter.

21        THE WITNESS:  My first name is Anthijuan.  It's spelled

22   A-n-t-h-i-j-u-a-n.  Last name is Beeks, B-e-e-k-s, Senior.

23   DIRECT EXAMINATION

24   BY MR. VINCENT:

25        Q.    With whom are you employed?

1    didn't give me one.

2        Q.    Did she -- what else or the next thing did she

3    tell you about at that time?

4        A.    Well, she started telling me about --

5        Q.    About herself.  What Ahmed did.  Not necessarily

6    what anybody else said.

7        A.    She went -- you know, she had started going a

8    little bit into the incident itself.  And she got into the

9    elevator, and how she was attacked by Muna, how Muna had struck

10   her with a knife, Muna had broken the front windshield of her

11   vehicle.  She also made some statements about how everyone knew

12   Muna had assisted law enforcement with placing 30 Somali

13   brothers in prison.

14       Q.    And in relation to the incident on the elevator,

15   did she discuss whether a verbal disagreement occurred on the

16   elevator?

17       A.    Yes.

18       Q.    Did the verbal disagreement involve another

19   person?  Was it about another person?  Not somebody on the

20   elevator?

21       A.    Yes.

22       Q.    Was it about a male or a female, allegedly?

23       A.    It was about a male.

24       Q.    Did she provide a name for the male?

25       A.    Fahad.

1      Q.      Did you ask Ifrah Yassin to tell you anything

2  about 30 Somali males?

3      A.      Yes.  We did speak -- have a conversation about

4  that.

5      Q.      How did that come about?

6      A.      I believe I had initiated the conversation with

7  her about that.

8      Q.      And did you mention 30 Somali males being --

9  anything about the 30 Somali males when you asked her about it?

10     A.      I believe we started speaking primarily about

11 Muna, you know, suspected to be a prostitute.  And then that's

12 when we got into the males being put in prison.

13     Q.      Was there any comment about what the charge was

14 for the males?

15     A.      I know that we spoke about them being put in

16 prison.  And I'm not 100 percent certain, but I do believe that

17 the word "prostitution" had came up.  But as far as the specific

18 charge, no.

19     Q.      If you take a minute to look at your report, the

20 same paragraph I referred you to.  If you could read that

21 paragraph to yourself.

22     A.      All right.  I do -- reading my report there,

23 yes.

24     Q.      And you say, after reading the report, what, if

25 anything, came up about the 30 Somali males?

1          A.     Yes.

2          Q.     Did you also have occasion to interview Muna

3     Abdikadir?

4          A.     Yes.

5          Q.     And at the time that you interviewed Muna, what,

6     if anything, did she tell you about the incident?

7          A.     She stated that she was en route back to her

8     place of residence with her father from a local Walgreens, was

9     within a couple of blocks of her address, and she had returned

10    home.  She was waiting at the front of her apartment building as

11    her father was parking the vehicle.  Her father then came to the

12    building, he was checking the mail, and by this time she stated

13    she was at the lobby, on the first floor lobby by the elevators,

14    when she observed her father to let in three females.  She did

15    not recognize them at first.  However, as they got closer, then

16    she immediately recognized who they were.

17         Q.     Did she say if she had any type of communication

18    with those three persons?

19         A.     She told me that they had -- she told me that

20    she had just begun having a casual conversation.

21         Q.     And then what happened?

22         A.     Then she said that they had got on the elevator,

23    and when they got on the elevator, a verbal argument took place.

24    And then that's when she was -- she was attacked.

25         Q.     And what, if anything, did she say about -- at

1    the time of the attack?

2         A.     She stated that she was attacked by three girls.

3    She stated that at some point someone attempted to push the stop

4    on the elevator to get it to stop.  At some point she was able

5    to get the elevator to move again, which let her off, on the

6    second floor.  And she was then able to make it -- get away from

7    her attackers and make it to her apartment.

8         Q.     And did she make any statement about anything

9    she did after she got to her apartment?

10        A.     Yeah, she stated that she had went into her

11   apartment to get a knife.

12        Q.     And did she say she did anything after she got

13   the knife?

14        A.     She stated that she went back downstairs, but

15   did not see the three parties who had attacked her.  And then

16   she stated that she broke the front windshield of the vehicle.

17   She said that she then saw the three parties.  She stated that

18   she saw her mother not too far behind these three parties.  And

19   her mother had made a statement, something to the effect of,

20   what are you trying to do to my daughter, or something along

21   those lines.  And she stated that one of the females had slapped

22   her mother.

23        Q.     And did she say if she did anything with the

24   knife?

25        A.     Yeah, so that's when she stated she went towards

1    the females, and she struck two of them with the butt of the

2    knife.

3              Q.    And did she state anything else about --

4              A.    Yeah, she -- she stated that, you know, that

5    there was kind of an ongoing occurrence, where people was trying

6    to intimidate and assault her and cause bodily harm because of

7    an ongoing investigation that she was involved in.

8              Q.    Now, at the time that you interviewed Muna --

9    I'm just going to refer to her as Muna as opposed to Muna

10   Abdikadir.  At the time you interviewed Muna, is this before or

11   after you spoke with Officer Weyker?

12             A.    This was after.

13             Q.    And when we keep referring to speaking to

14   Officer Weyker, do you know if there was another officer on the

15   telephone simultaneously?

16             A.    Yes, there was -- as far as I understand, there

17   was a conference call that was done.

18             Q.    Was Agent Langeland part of that conference

19   call, if you recall?

20             A.    I don't recall the actual name, but I do know it

21   was on the other end.

22             Q.    And at the time of the conversation with Officer

23   Weyker, had she relayed any additional information to you about

24   what Muna, if any -- without getting into what it was, but had

25   she relayed any additional information received from Muna about

```
1              THE COURT:  Yes, ma'am.

2              MS. MCFADDEN:  I have nothing further, Your Honor.

3    Thank you.

4              THE COURT:  Any redirect of this witness?

5    REDIRECT EXAMINATION

6    BY MR. VINCENT:

7         Q.    During the conference call?

8         A.    Yes.

9         Q.    You were asked about that by counsel.  What, if

10   anything, in relation to arresting anyone, were you -- were you

11   told to do anything specifically during that conference call

12   about arresting anyone?

13        A.    No.

14        Q.    What, if anything, were you told about that?

15        A.    I was just provided, you know, some information

16   in regards to another case.  But at no time was I instructed one

17   way or another, to arrest or not to arrest anyone.

18        Q.    Were you told not to arrest Muna?

19        A.    No.

20        Q.    Were you told to arrest Ifrah Yassin?

21        A.    No.

22        Q.    Were you told to arrest Hawo Ahmed?

23        A.    No.

24        Q.    Were you told to arrest Hamdi Mohamud?

25        A.    No.
```

1        Q.    Who made the decision about who, at that time

2   and place, as to what to do with the individuals there at that

3   time?

4        A.    Myself and my sergeant had made that

5   determination.  One of the reasons why or the main reason why

6   there was no charges, or Muna was not arrested at that

7   particular time, is because we felt that we had enough

8   information to locate her at a later date and time, if needed.

9   And back home, in Minneapolis, Minnesota, we have where they can

10   -- what is called they can be charged by complaint.  That means

11   that charges can still be looked at, and if they want to charge

12   her with that, then she could be.

13        Q.    To your knowledge, was she ever charged?  Muna,

14   that is?

15        A.    To the best of my knowledge, no.

16        Q.    In relation to the conference call, was any

17   favors asked of Muna?

18        A.    No.  Within that conference call, I

19   distinctively remember it being stated multiple times that you

20   do what you feel that you need to do as an officer.

21        Q.    And Mr. Perry asked you about the interview of

22   Hawo Ahmed and Ifrah Yassin, Hamdi Mohamud.  At one point, you

23   determined to separate them from each other; is that correct?

24        A.    Correct.

25        Q.    Because your first interview with the three

1      female, and one may have said male.

2              MR. VINCENT:  Objection, Your Honor, 611, 403.

3              THE COURT:  Restate your question.

4      BY MR. PERRY:

5              Q.      What was the conflict between why they were

6      there?

7              A.      The conflicting information that I received, you

8      know, from speaking with these three parties, is one was stating

9      that they were there to see a female, one was stating that they

10     was there to see a male, another party, you know, didn't know

11     who they were there to see, she was just along for the

12     ride-along.  And then when one party was confronted about their

13     stories not adding up as far as who they were actually there to

14     see, whether it was a male or female, then that's when that

15     party attempted to change her story and say, well, I don't know

16     who, you know, I'm here to see.  So that was a conflict.

17             Q.      So my question was, the conflict is centering

18     around the sex of the individual they were there to see,

19     correct?  So the answer would have been yes instead of no?

20             A.      Correct.

21             Q.      Okay.  Now, on redirect, Mr. Vincent had, I

22     believe, mischaracterized my question.

23             THE COURT:  No, don't, don't don't don't.

24             MR. PERRY:  Okay.

25             THE COURT:  Ask your question.

1          REPORTER'S CERTIFICATE

2

3          I, Peggy G. Turner, Official Court Reporter for

4     the United States District Court for the Middle

5     District of Tennessee, with offices at Nashville, do

6     hereby certify:

7          That I reported on the Stenograph machine the

8     proceedings held in open court on July 24, 1013, in the matter

9     of USA v. AHMED and YASSIN, Case No. 3:11-00132; that said

10    proceedings in connection with the hearing were reduced to

11    typewritten form by me; and that the foregoing transcript, Pages

12    1 through 226, is a true and accurate record of said

13    proceedings.

14          This the 7th day of October, 2013.

15

16

17

18                              *Peggy G. Turner*
                                S/Peggy G. Turner, RPR
19                              Official Court Reporter

20

21

22

23

24

25

# EXHIBIT I

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2           MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

 3      -------------------------------------------------------------

 4      UNITED STATES OF AMERICA,      )

 5                    Plaintiff,       )

 6                                     )

 7      v.                             )   CASE NO. 3:11-00132

 8                                     )

 9      Hawo AHMED and IFRAH YASSIN,   )

10                    Defendant.       )

11      -------------------------------------------------------------

12                        TRANSCRIPT OF PROCEEDINGS

13                             VOLUME III

14      -------------------------------------------------------------

15

16      DATE:              July 25, 2013

17      TIME:              9:00 A.M.

18      BEFORE:            HONORABLE WILLIAM J. HAYNES, JR.

19                         And a Jury

20      -------------------------------------------------------------

21

22

23      COURT REPORTER:    PEGGY G. TURNER
                           OFFICIAL COURT REPORTER
24                         801 BROADWAY, ROOM A-837
                           NASHVILLE, TENNESSEE 37203
25                         PHONE:  (615)726-4893
                           Peggy_Turner@tnmd.uscourts.gov
```

```
 1                     A P P E A R A N C E S:

 2      For the Government:      Blanche Cook

 3                               Van Vincent

 4                               Assistant U.S. Attorneys

 5                               Nashville, TN

 6

 7      For the Defendant

 8      Ahmed:                   Hallie McFadden

 9                               Chattanooga, TN

10

11      For the Defendant

12      Yassin:                  Benjamin Perry

13                               Nashville, TN

14

15

16

17

18

19

20

21

22

23

24

25
```

W I T N E S S E S :

HEATHER WEYKER
Direct Examination by Mr. Vincent                Page    4
Cross Examination by Ms. McFadden               Page   31
Cross Examination by Mr. Perry                  Page   49
Redirect Examination by Mr. Vincent             Page   78
Recross Examination by Ms. McFadden             Page   82
Recross Examination by Mr. Perry                Page   83
Further Examination by Mr. Vincent              Page   84

JOHN BANDEMER
Direct Examination by Ms. Cook                  Page   85
Cross Examination by Ms. McFadden               Page   87

MARK SHAFER
Direct Examination by Ms. Cook                  Page   91
Cross Examination by Mr. Perry                  Page   97

ROY GUTZMAN
Direct Examination by Mr. Vincent               Page   99
Cross Examination by Mr. Perry                  Page  115
Cross Examination by Ms. McFadden               Page  117
Redirect Examination by Mr. Vincent             Page  117

TRACY DAVIS
Direct Examination by Mr. Perry                 Page  132
Examination by Ms. McFadden                     Page  140
Cross Examination by Mr. Vincent                Page  142
Redirect Examination by Mr. Perry               Page  148
Recross Examination by Mr. Vincent              Page  149

MICHAEL GROSTYAN
Direct Examination by Mr. Perry                 Page  151
Examination by Ms. McFadden                     Page  153
Cross Examination by Mr. Vincent                Page  153
Redirect Examination by Mr. Perry               Page  156
Recross Examination by Mr. Vincent              Page  156

HAWO AHMED
Direct Examination by Mr. Perry                 Page  165
Cross Examination by Ms. Cook                   Page  185
Redirect Examination by Mr. Perry               Page  258
Recross Examination by Ms. Cook                 Page  264
Further Examination by Mr. Perry                Page  274

```
 1            THE COURT:  Well, there is no need to give any
 2      instruction, then.  Everybody agreed?
 3            MR. VINCENT:  The government agrees, Your Honor.
 4            MS. MCFADDEN:  Yes, Your Honor.
 5            THE COURT:  All right.  Now, any other proof after we
 6      bring the jury back, for the defense?
 7            MR. PERRY:  Your Honor, I believe the defendants would
 8      be the only remaining proof.
 9            THE COURT:  Are they going to testify?
10            MR. PERRY:  Yes, Your Honor.
11            THE COURT:  All right.  You can bring the jury in,
12      Mr. Marshal.
13            (Jury in.)
14            THE COURT:  You may be seated.
15            The defense may call its next witness.
16            MR. PERRY:  The defense would call Hawo Ahmed.
17            (Witness sworn.)
18            THE CLERK:  Please state your first and last name and
19      spell your name for the court reporter.
20            THE WITNESS:  Hawo Ahmed.  A-h-m-e-d.
21      DIRECT EXAMINATION
22      BY MR. PERRY:
23            Q.    Good afternoon, Ms. Ahmed.
24            A.    Hello.
25            Q.    How old are you?
```

```
 1                  A.      May 20, 2011.
 2                  Q.      When is the first time you saw Muna after she
 3          turned 18?
 4                  A.      June 16, 2011.
 5                  Q.      The day we're here for?
 6                  A.      Yes.
 7                  Q.      Did you know where she lived?
 8                  A.      I knew she lived at Hopkins.  I didn't know she
 9          lived in that apartment complex.
10                  Q.      Now, is that the same area?  I'm not familiar
11          with Hopkins.
12                  A.      No, it's another city.
13                  Q.      Okay.  So you didn't know she lived at 2848?
14                  A.      No.
15                  Q.      Okay.  How did you -- let me ask it this way.
16          Who were you with prior to seeing Muna on that day?
17                  A.      That same day?
18                  Q.      Yes.  June 16, 2001.
19                  A.      Before I seen Muna?
20                  Q.      Correct.
21                  A.      I was with Ifrah, Hamdi and Hamdi's boyfriend.
22                  Q.      Okay.  And then when you actually saw Muna, who
23          were you with?
24                  A.      I was with Ifrah and Hamdi.
25                  Q.      And what were you all doing?
```

1    A.    We was in the car, driving around the mall.  We

2    was -- I was trying to go to the mall first, but I had to find

3    parking, so I was just driving around the mall trying to find a

4    parking lot.

5         Q.    And what's the name of that mall?

6         A.   Karmel right across the street from where Muna

7    lives?  Or a block or two?

8         A.    Yes, sir.

9         Q.    And when did you first see Muna?

10         A.    She was walking from the bridge, and she was

11    trying to get into the apartment complex.  And when I seen her,

12    I parked in front of the building, and I got out of the car.

13         Q.    Okay.  You got out of the car.  What happened?

14         A.    Ifrah got up out with me.  I left Hamdi to close

15    the doors.  And we got into the apartment building.  And I

16    knocked on the window.  Muna's father, I found out later on in

17    the report, opened the door for me.

18         Q.    Let me pause you right there.  Did you say

19    anything when you saw Muna?

20         A.    I told her I wanted to talk to her.

21         Q.    Well, I'm saying, when you were in the car with

22    the others, did you say anything?

23         A.    No.

24         Q.    You just parked the car and jumped out?

25         A.    Yes.  I told them I wanted to beat her up, yes.

1      Q.      Okay.  You were still angry with her?

2      A.      Yes.

3      Q.      Then continue.  I think you were saying her

4  father opened the door?

5      A.      And I told Muna I wanted to talk to her.  She

6  said okay.  And we went to the corner next to the elevator.  I

7  told her why she was talking shit about me.  She said, what do

8  you mean?  I said, you were talking shit about me to Ayan Duffy.

9  She said, I don't even know who that is.  And then she said, do

10  you want to fight me?  I said, yes.  So she invited me to her

11  apartment building, I mean, to her apartment, and told me she

12  wanted to change to fight me.

13      We went into the elevator, and I didn't even wait for

14  her to get into her apartment, because I knew she was going to

15  grab something sharp to basically fight with me.

16      Q.      And how do you know that?

17      A.      Because I've been in -- I've seen her fight a

18  couple of times.

19      Q.      That's how she operates?

20      A.      Yes.  She always grabs anything sharp, anything

21  heavy, to bust you in the head with, basically.

22      Q.      So the fight started in the elevator?

23      A.      She -- I walked up on her.  She grabbed me by my

24  Hand And when she let me go, I started hitting her.  And then

25  the elevator door opened.  And then her and Ifrah was fighting.

1    And I ran out, and I started hitting her a couple of times.  She

2    ran, got away.  I ran after her.  She left her shoe.  I took her

3    shoe, and then I ran and threw it at her.  I came back in the

4    elevator.  And then we stopped at -- I think we stopped

5    somewhere, or two, and people came on with us.

6         And then we went to one.  But by the time we reached

7    outside, Muna had a knife.  She was smashing my car window with

8    it.  And her mother had a big stick and was basically hitting my

9    -- I think the hood of the car with the stick.  So I run towards

10   her.  And basically when I run towards her, and Ifrah comes

11   right after me.  She hit Ifrah with the knife.  When she hit

12   Ifrah with the knife, I tell Hamdi to basically record it.  But

13   she takes pictures.  And Ifrah gets on the phone and calls 911.

14        Q.    And those pictures that Hamdi was taking, that's

15   what we saw, the pictures of Muna with the knife and her mom; is

16   that right?

17        A.    Yes, sir.

18        Q.    Okay.  Sorry to interrupt you.  Keep going.  So

19   Hamdi begins to take pictures.  Continue.

20        A.    And then she starts running to the back, to

21   hide.

22        Q.    Who is she?

23        A.    Muna.  When she hears Ifrah on the phone and

24   Hamdi with the knife, she starts running to the back.  And then

25   she goes to the front, and Hamdi takes a picture way while she

1    Q.    He really doesn't live in that building, does

2    he?

3    A.    I really don't know.  He hangs around that

4    building all the time.

5    Q.    Okay.  And why didn't you just tell the police

6    you saw Muna and wanted to fight her?

7    A.    I was scared to get charges, because I just went

8    into a fight.

9    Q.    On her turf?

10    A.    Yes.  I didn't know it was her turf in the

11    beginning.

12    Q.    Did Muna ever say anything to you about calling

13    the police?

14    A.    No.

15    Q.    Now, did that fight have anything to do with any

16    other case?

17    A.    No.

18    Q.    At that time, did you know that Muna was a

19    witness in any other case?

20    A.    No, sir.

21    Q.    Now, obviously, you have been charged and in

22    jail for two years.  You have learned now that the Adan case was

23    a sex trafficking case; is that right?

24    A.    Yes, sir.

25    Q.    Did you know that then?

1    is that right?

2         A.    Yes, ma'am.

3         Q.    You had been to the hospital three times before

4    June 16 related to your pregnancy; is that right?

5         A.    Yes, ma'am.

6         Q.    And yet you just saw a videotape of you taking

7    your earrings off; is that right?

8         A.    Yes, ma'am.

9         Q.    Getting ready to do what?

10        A.    To fight.

11        Q.    That's right.  Now, I want to go back to this,

12   this fight on June 16, 2011.  Before the fight started, you

13   testified you were at the Karmel Mall; is that right?

14        A.    No, I was driving around the Karmel Mall trying

15   to park so I can could go to the Karmel Mall.

16        Q.    And then why did you make a decision to go and

17   see Muna?

18        A.    Go to Muna?  I had been trying to fight Muna, so

19   I seen her, and that was my only chance.

20        Q.    Okay.  So you had to wait until she was of age

21   to have this fight; right?

22        A.    Yes, ma'am.

23        Q.    Because you don't wait in jail to have a fight,

24   do you?

25        A.    No, ma'am.

1    before you could fight her; is that right?

2         A.    Yes, ma'am.

3         Q.    Okay.  So on June 16, 2011 -- on June 16, 2011,

4    you are driving around the mall looking for parking; is that

5    right?

6         A.    Yes, ma'am.

7         Q.    Why did you just decide to go to Muna's

8    apartment?

9         A.    That's the surrounding areas to park.

10        Q.    But why did you decide to go to Muna's

11   apartment?

12        A.    I seen Muna.

13        Q.    You saw Muna?

14        A.    Yes.

15        Q.    Okay.  And what discussion did you have in the

16   car with the people that were in the car with you?

17        A.    All I said to them was I was going to go beat

18   her up.

19        Q.    Okay.  So you are driving around in the car, you

20   see Muna, and you say to them, I'm getting ready to go get Muna,

21   I'm getting ready to beat her up.

22        A.    Yes, ma'am.

23        Q.    Did they say anything in response to that?

24        A.    No, ma'am.

25        Q.    They just said okay?

1     A.     She didn't live with me, but in the same
2  apartment complex.  She lived on the third floor.  I lived on
3  the third floor.
4     Q.     So you didn't live in the same apartment
5  building?
6     A.     No, ma'am.
7     Q.     But you lived on the same floor?
8     A.     We lived on the same floor at that point, but
9  when I moved in Burnsville, she stayed with me a couple of
10  weeks, like two, three, four weeks.  I can't remember by this
11  time.
12     Q.     And I'm sorry, I'm misunderstanding things.  Did
13  she ever live with you in the same apartment?
14     A.     In Burnsville.  I wouldn't call it live.  I
15  would call it stay.
16     Q.     What's the distinction?
17     A.     She didn't live with me.  Like she wasn't on my
18  lease or anything.  The apartment managers didn't know that she
19  was staying there, but she was staying there.
20     Q.     I see.  From what period to what period was she
21  staying there?
22     A.     I would say four weeks, five weeks.
23     Q.     Okay.  I want to turn now to the facts of the
24  fight.  You testified that you got on the elevator?
25     A.     Yes, ma'am.

1    Q.    And you hit Muna on the elevator?

2    A.    Yes, ma'am.

3    Q.    And you chased her down the hallway?

4    A.    Yes, ma'am.

5    Q.    And you threw a shoe at her?

6    A.    Yes, ma'am.

7    Q.    Now, did you share all of that information with

8    the police when they questioned you on the night of June 16,

9    2011?

10    A.    I think I shared it with the FBI agent that came

11    and interviewed me.

12    Q.    Did you share it with the police?  Did you share

13    it with Officer Beeks?

14    A.    I don't recall at this moment.

15    Q.    Okay.  So when Officer Beeks asked you what

16    happened -- ?

17    A.    Yes, ma'am.

18    Q.    -- you don't remember if you gave him that level

19    of detail, do you?

20    A.    I think I told him we went into a fight, but I

21    don't remember the whole details I told him.  It was two years

22    ago.

23    Q.    Okay.  But you did hear the officer testify?

24    A.    Yes, I did.

25    Q.    Okay.  Did you remember him testifying about

```
1          Q.     Okay.  And he interviewed you by your car; is
2     that right?
3          A.     All three of us, yes.
4          Q.     Okay.  Were you handcuffed at the time?
5          A.     Not at that time.
6          Q.     Okay.  But were you trying to tell him about how
7     Muna was attacking you?  Were you trying to tell him about that?
8          A.     I was telling him that we went into a fight,
9     yes.  And then she came out there and busted my car windows.
10         Q.     Okay.  And when he was interviewing you, what
11    reason did you give for being there?
12         A.     I told him I was there to see my friend Gamu.
13         Q.     Did you give him any other reasons for being
14    there?
15         A.     No, ma'am.
16         Q.     And then later Kate Koeth interviewed you; is
17    that right?
18         A.     Yes, ma'am.
19         Q.     And what were the reasons you gave to Kate for
20    being there?
21         A.     I was there to see my friend Gamu.
22         Q.     Okay.  But, in fact, that wasn't correct; is
23    that right?
24         A.     (Respite.)
25         Q.     That was a lie?
```

206

1      A.     Yes.

2      Q.     Okay.  And how is it that you thought that
3   telling them that you were there to see Gamu would get you in
4   less trouble?

5      A.     I didn't know I was going to get arrested for
6   tampering with a federal witness.  I didn't know she was a
7   federal witness at that point.

8      Q.     I see.  So you thought that if you said, I'm
9   here to see Gamu, rather than seeing Muna, you would eliminate
10  that problem?

11     A.     Because they were trying to lie and say that I
12  went over there to beat her up because she was a federal
13  witness.  And I didn't go over there to beat her up because she
14  was a federal witness.  I beat her up because she got me locked
15  up and evicted me from my apartment.

16     Q.     When Officer Beeks asked you why you had gone to
17  that apartment, did you know Muna was federal witness?

18     A.     No, ma'am.

19     Q.     Okay.  Well, I'm confused, now.  I need you to
20  help me.

21     A.     I didn't want to get an assault charge when he
22  asked me that.

23     Q.     Okay.  You told us just now that you said you
24  were going to see Gamu because you didn't want to get charged
25  with tampering with a federal witness.  Is that right?

1          A.      Yes.

2          Q.      You also just told me that you did not know --

3          A.      I didn't know what your question was about.  I

4    thought you said FBI Agent Kate -- I don't know her name, but

5    that agent, when she said it, she told me at that point.  And I

6    stuck to my story, the story I told Officer Beeks.

7          Q.      Okay.  Let's walk through this.  You told Beeks

8    you were there to see Gamu?

9          A.      Yes, ma'am.

10         Q.      You told Beeks you were there to see Gamu

11   because you didn't want to tell him that you were there to see

12   Muna, because you didn't want to get charged with giving -- with

13   tampering with a federal witness; is that right?

14         A.      Can you rephrase that question?  What did you

15   say?

16         Q.      Sure.  Why did you tell Officer Beeks that you

17   were there to see Gamu?

18         A.      Because I didn't want to get an assault charge.

19   I was scared.

20         Q.      Okay.  But what does telling Officer Beeks that

21   you are there to see Gamu -- how does that mean you won't get

22   charged with assault?

23         A.      Because she lives in the apartment.  I found at

24   that point that she lived in the apartment.  And me going to her

25   territory, I would get locked up for fighting her there.  I

REPORTER'S CERTIFICATE

1

2

3      I, Peggy G. Turner, Official Court Reporter for

4   the United States District Court for the Middle

5   District of Tennessee, with offices at Nashville, do

6   hereby certify:

7      That I reported on the Stenograph machine the

8   proceedings held in open court on July 25, 1013, in the matter

9   of USA v. AHMED and YASSIN, Case No. 3:11-00132; that said

10  proceedings in connection with the hearing were reduced to

11  typewritten form by me; and that the foregoing transcript, Pages

12  1 through 278, is a true and accurate record of said

13  proceedings.

14      This the 9th day of October, 2013.

15

16

17

18                  *Peggy G. Turner*
                        S/Peggy G. Turner, RPR

19                   Official Court Reporter

20

21

22

23

24

25

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1235 (JNE/TNL)

**Abdifitah Jama Adan,**

       Plaintiff,

       v.

       **CERTIFICATION OF
SCOPE OF EMPLOYMENT**

**Heather Weyker,** *et al.,*

       Defendants.

---

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1758 (JNE/TNL)

**Abdullahi Sade Afyare,**

       Plaintiff,

       v.

       **CERTIFICATION OF
SCOPE OF EMPLOYMENT**

**Heather Weyker,** *et al.,*

       Defendants.

---

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1902 (JNE/TNL)

**Ahmad Abnulnasir Ahmad,**

       Plaintiff,

       v.

       **CERTIFICATION OF
SCOPE OF EMPLOYMENT**

**Heather Weyker,** *et al.,*

       Defendants.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1241 (JNE/TNL)

**Musse Ahmed Ali**,

      Plaintiff,

      v.

**Heather Weyker,** *et al.*,

      Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1898 (JNE/TNL)

**Mohamed Amalle**,

      Plaintiff,

      v.

**Heather Weyker,** *et al.*,

      Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1865 (JNE/TNL)

**Dahir Nor Ibrahim,**

      Plaintiff,

      v.

**Heather Weyker,** *et al.*,

      Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1146 (JNE/TNL)

**Idris Ibrahim Fahra**,

       Plaintiff,

       v.

**Heather Weyker,** *et al.*,

       Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1175 (JNE/TNL)

**Faduma M. Farah**,

       Plaintiff,

       v.

**Heather Weyker,** *et al.*,

       Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1911 (JNE/TNL)

**Muhiyadin Hussein Hassan**,

       Plaintiff,

       v.

**Heather Weyker,** *et al.*,

       Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-3714 (JNE/TNL)

**Abdirahman Abdirzak Hersi,**

     Plaintiff,

     v.

**Heather Weyker,** *et al.*,

     Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1230 (JNE/TNL)

**Abdifatah Bashir Jama,**

     Plaintiff,

     v.

**Heather Weyker,** *et al.*,

     Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1237 (JNE/TNL)

**Abdigadir Ahmed Khalif,**

     Plaintiff,

     v.

**Heather Weyker,** *et al.*,

     Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1894 (JNE/TNL)

**Bashir Yasin Mohamud**,

     Plaintiff,

     v.

                    **CERTIFICATION OF
SCOPE OF EMPLOYMENT**

**Heather Weyker,** *et al.*,

     Defendants.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1243 (JNE/TNL)

**Abdifatah Sharif Omar**,

     Plaintiff,

     v.

                    **CERTIFICATION OF
SCOPE OF EMPLOYMENT**

**Heather Weyker,** *et al.*,

     Defendants.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1113 (JNE/TNL)

**Liban Sharif Omar**,

     Plaintiff,

     v.

                    **CERTIFICATION OF
SCOPE OF EMPLOYMENT**

**Heather Weyker,** *et al.*,

     Defendants.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1166 (JNE/TNL)

**Mohamed Sharif Omar**,

    Plaintiff,

    v.

**Heather Weyker,** *et al.*,

    Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

---

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-0908 (JNE/TNL)

**Hamdi Ali Osman**,

    Plaintiff,

    v.

**Heather Weyker,** *et al.*,

    Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

---

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1242 (JNE/TNL)

**Haji Osman Salad**,

    Plaintiff,

    v.

**Heather Weyker,** *et al.*,

    Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 16-1012 (JNE/TNL)

**Yassin Abdirahman Yusuf**,

Plaintiff,

v.

**Heather Weyker,** *et al.*,

Defendants.

**CERTIFICATION OF
SCOPE OF EMPLOYMENT**

I, C. Salvatore D'Alessio, Jr., Acting Director, Torts Branch, Civil Division,
United States Department of Justice, acting by virtue of the authority vested in me by
28 C.F.R. §15.4, hereby certify that I have read the complaints listed in the above
captioned cases. On the basis of the information now available with respect to the
claims for malicious prosecution under Minnesota state law set forth therein, and
pursuant to the provisions of 28 U.S.C. § 2679(d)(1), I find that John Bandemer and
Heather Weyker were each acting within the scope of their federal office or
employment at the time of the incident out of which the malicious prosecution claim
asserted in the complaints in the cases captioned above arose.

Dated:  December 20, 2016

*s/ C. Salvatore D'Alessio, Jr.*
C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch
Civil Division, U.S. Department of Justice

# EXHIBIT K

## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

Andrew Kayachith,

      Plaintiff,

v.                                                              Case No. 18-cv-326 (JNE/TNL)
                                                                ORDER

Heather Weyker, Sergeant John Bandemer,
City of Saint Paul, and Robert Roes 1-3,

      Defendants.

     Asserting violations of his rights under the Fourth Amendment, Andrew

Kayachith brought this action against Heather Weyker, Sergeant John Bandemer, the City

of St. Paul, and unidentified supervisors in the St. Paul Police Department under 42

U.S.C. § 1983 (2012) and *Bivens v. Six Unknown Named Agents of Federal Bureau of

Narcotics*, 403 U.S. 388 (1971).  Kayachith alleged that Weyker, a St. Paul police officer,

fabricated evidence in an investigation of sex trafficking that yielded indictments against

him and many others in the United States District Court for the Middle District of

Tennessee.  Several defendants, including Kayachith, went to trial on some of the charges

in March 2012.  A jury found six not guilty on all charges tried and three, including

Kayachith, guilty on some of the charges tried.  The Middle District of Tennessee granted

Kayachith's motion for acquittal, *United States v. Adan*, 913 F. Supp. 2d 555 (M.D.

Tenn. 2012), and the United States Court of Appeals for the Sixth Circuit affirmed,

*United States v. Fahra*, 643 F. App'x 480 (6th Cir. 2016).  Approximately one week after

the Sixth Circuit decided *Fahra*, all outstanding charges against the remaining defendants

were dismissed on motion of the United States.

Several of the individuals who were prosecuted in the Middle District of Tennessee brought actions against Weyker and others in the United States District Court for the District of Minnesota. The Court dismissed some of the cases. *See, e.g.*, *Salad v. Weyker*, Case No. 16-cv-1242 (JNE/TNL), 2017 WL 3425671 (D. Minn. Aug. 9, 2017). In other cases, the Court granted in part and denied in part Weyker's motion to dismiss. *See, e.g.*, *Osman v. Weyker*, Case No. 16-cv-908 (JNE/TNL), 2017 WL 3425647 (D. Minn. Aug. 9, 2017), *appeal docketed*, No. 17-3209 (8th Cir. Oct. 13, 2017). Kayachith's case is before the Court on the defendants' motions to dismiss.[1] *See* Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the Court grants the motions.

## I.    BACKGROUND

The following paragraphs summarize Kayachith's Second Amended Complaint.

Weyker and Bandemer are St. Paul police officers. 2d Am. Compl. ¶¶ 2-3, ECF No. 10. Robert Roes 1-3 are supervisors in the St. Paul Police Department. *Id.* ¶ 5. The City of St. Paul "is a municipality duly incorporated under the laws of the State of Minnesota." *Id.* ¶ 4.

"From November 2008 until the initial indictment was filed on October 20, 2010, Weyker was the lead investigator and a deputized member of an FBI Human Trafficking Task Force that was investigating what Weyker alleged was a prostitution- and sex-

---

[1]    A few days after they filed a motion to dismiss that cited Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, the City of St. Paul and Robert Roes 1-3 amended their motion to omit Rule 12(b)(1). The Court terminates their first motion.

trafficking ring."[2]  *Id.* ¶ 8.  In November 2008, secret meetings between Weyker and Jane

Doe 2 started to take place at Jane Doe 2's school.  *Id.* ¶ 9.  "In addition to fostering a

close and influential relationship with Jane Doe 2, these meetings generated dozens of

recorded interviews and thousands of pages of notes."  *Id.*  The notes and interviews

formed the initial basis for Weyker's investigation, "even though prostitution was

mentioned only once in Weyker's rough, handwritten notes."  *Id.*  Although her

handwritten notes "mention a sex-for-money scheme only once, Weyker, knowing the

prostitution allegations were false, intentionally and repeatedly included those allegations

in her final, written reports."[3]  *Id.* ¶ 10.  Weyker presented the case to the United States

Attorney's Office for the District of Minnesota, which declined to prosecute the case for

lack of evidence.  *Id.* ¶ 13.

     "Because of the meetings with Jane Doe 2, Weyker was aware that Jane Doe 2

engaged in consensual sex acts with" others.  *Id.* ¶ 11.  "Jane Doe 2 was known to police

as a habitual runaway who had spent time in juvenile detention."  *Id.* ¶ 12.

---

[2]     Exhibit Q to the Motion to Dismiss of Weyker and Bandemer contains a special
deputation form of Weyker.  She was deputized as a Special Deputy United States
Marshal in August 2010.  In his opposition to the motions to dismiss, Kayachith
acknowledged that Weyker was deputized in August 2010.

[3]     Excerpts of Weyker's notes were submitted to support the motion of Weyker and
Bandemer.  The excerpts contain many references to sex for money.  *Cf. Osman*, 2017
WL 3425647, at *13 ("[T]he *Fahra* opinion stated 'that Weyker's final reports frequently
referred to sex for money while that assertion was conspicuously absent from her
handwritten notes' as support for its proposition that '[t]he district court opined that
Officer Weyker likely exaggerated or fabricated important aspects of this story.'  But the
district court's discussion of Weyker's reports is actually more complex.  Focusing on
four pages of Weyker's rough notes out of thousands, the court found three references to
sex for money." (second alteration in original) (citation omitted)).

On Friday, April 24, 2009, Jane Doe 2 and a friend met Kayachith and two other males and accompanied them to a party at a hotel.  *Id.* ¶ 14.  The next day, Kayachith and two other males planned a trip to Nashville, Tennessee.  *Id.* ¶ 15.  A few others joined the trip, and the group, including Jane Doe 2, set off to Nashville by automobile late on April 25.  *Id.* ¶¶ 15-16.  The group arrived in Nashville on Monday, April 27.  *Id.* ¶ 15.

During the weekend, Jane Doe 2's parents reported her missing.  *Id.* ¶ 17.  "Weyker immediately drew an incorrect conclusion that Jane Doe 2's willing decision to go to Nashville was actually a kidnapping scenario and involved the FBI in the investigation."  *Id.*  Nashville police located and arrested the group, including Kayachith, on April 28.  *Id.*

Jane Doe 2 was questioned, and she stated she had sex with several people over the preceding days.  *Id.* ¶ 18.  There was no evidence of money or anything of value being exchanged for sex.  *Id.*  Jane Doe 2 did not claim "that she had been prostituted either before or after the trip to Nashville."  *Id.*

After Jane Doe 2 was questioned, Weyker contacted her by telephone.  *Id.* ¶ 19.  Jane Doe 2 changed her story, claiming that the males with whom she travelled to Nashville, including Kayachith, had prostituted her.  *Id.*  "Weyker, without giving due regard to Jane Doe 2's statements to Nashville police, again drew the wrong conclusion and labeled the situation a 'kidnapping' and persuaded the Middle District of Tennessee to prosecute the case."  *Id.* ¶ 20.

"Based on Weyker's false statements of prostitution and using telephone conversations recorded while the boys were incarcerated, Weyker and the U.S.

Attorney's Office for the Middle District of Tennessee, apparently influenced by Weyker and without sufficient evidence, linked 30 defendants to an alleged sex-trafficking ring." *Id.* ¶ 21.  The U.S. Attorney's Office filed an indictment that charged Kayachith "with, among other things, sex trafficking of children by force, fraud, or coercion pursuant to 18 U.S.C. § 1591(a)(1)." *Id.*  Because he was charged under § 1591, he was subject to presumptive pretrial confinement. *Id.* ¶ 22.  "Kayachith could not afford bail and remained incarcerated in county jail from his initial arrest in April 2010 [sic] until October 2010.  Kayachith was then placed on electronic monitoring until March 4, 2016."[4]  *Id.*

---

[4]     Kayachith was arrested in Nashville in April 2009 and charged in state court with contributing to the delinquency of a minor.  The charge was dismissed in April 2010.

In an indictment filed in the Middle District of Tennessee in October 2010, which Kayachith recognized as "the initial indictment," 2d Am. Compl. ¶ 8, a United States grand jury charged Kayachith with (1) conspiracy to commit sex trafficking of children; (2) conspiracy to benefit financially from sex trafficking of children; (3) sex trafficking of children; and (4) attempting to commit sex trafficking of children.  The next month, a superseding indictment, which contained the same charges against Kayachith was filed.  An arrest warrant for Kayachith was issued.

Kayachith was arrested in Minnesota and temporarily detained on November 8, 2010.  At his initial appearance, Kayachith stated that he was employed. *United States v. Kayachith*, Case No. 10-mj-471 (FLN) (6) (D. Minn. Nov. 8, 2010).  After a removal-and-detention hearing, which took place on November 10, Kayachith was ordered removed to the Middle District of Tennessee.  At the November 10 hearing, Kayachith's attorney stated that Kayachith resides with his parents and siblings and has been employed for at least seven months.

Kayachith's initial appearance in the Middle District of Tennessee took place on November 22, 2010.  In March 2011, he was released on bond.  Electronic monitoring was one of the conditions of his release.  A second superseding indictment was filed in May 2011.  It added a charge against Kayachith of conspiracy related to credit card fraud.

One year before trial, the United States' lead attorney "was provided with credible evidence that Jane Doe 2's birth certificate was falsified, and that Jane Doe 2 was at least 4 months older, and likely up to several years older, than the date on her birth certificate." *Id.* ¶ 25. Nevertheless, "the government and Weyker continued to assert the validity of Jane Doe 2's birth certificate and age." *Id.* "In reality, Jane Doe 2 was either 18 or 19 years-old at the time of the alleged trafficking during the Nashville trip." *Id.*

In February 2012, the Middle District of Tennessee issued a memorandum that addressed some of the defendants' motions. *Id.* ¶ 26. In it, the district court indicated serious concerns about Weyker's testimony before the grand jury. *Id.* Based on the memorandum, the City of St. Paul and Weyker's supervisors "had actual knowledge as early as February 2012 that Weyker's credibility was in serious question with the court and that the court suspected Weyker of fabricating evidence." *Id.*

"Kayachith did not go to trial until May 2012."[5] *Id.* ¶ 27. "At trial, Jane Doe 2 authenticated the statements she made to Nashville police that did not include any claim of prostitution and a recording made of her telephone call with Weyker wherein she changed her story to include acts of sex trafficking." *Id.* ¶ 28. "On cross-examination, Jane Doe 2 testified that in Weyker's final reports, Weyker misstated facts and added to or took things out of Jane Doe 2's statements." *Id.* ¶ 29. Neither Weyker, the lead agent in the investigation of the alleged sex-trafficking ring, nor Bandemer, who "spent 'thousands of hours' on the case with Weyker," testified at trial. *Id.* ¶¶ 31-32.

---

[5] The Middle District of Tennessee selected a jury in March 2012. Closing arguments took place in late April 2012. The jury returned verdicts in early May 2012.

After the United States rested, Kayachith and his co-defendants moved for acquittal. *Id.* ¶ 35. "The court did not immediately decide the motions. Ultimately, the jury acquitted six of the nine defendants and convicted three defendants on some of the charges. Kayachith was convicted of a single count of conspiracy to sex traffick children in relation to the April 2009 Nashville trip." *Id.* He renewed his motion for acquittal, and the district court granted the motion "because it found that a material variance existed between the count charged and the evidence produced."[6] *Id.* ¶ 36. The United States appealed, and the Sixth Circuit affirmed. *Id.* ¶¶ 36, 39.

In its opinion, the court of appeals remarked that "this story of sex trafficking and prostitution may be fictitious and the prosecution's two primary witnesses, Jane Doe 2 and Jane Doe 5, unworthy of belief. . . . These witnesses repeatedly contradicted, disavowed, and refuted their own testimony, while other portions of their testimony defied belief or were rendered implausible by indisputable contradictory evidence." *Fahra*, 643 F. App'x at 484; *see* 2d Am. Compl. ¶¶ 37-38. It also stated:

> The district court opined that Officer Weyker likely exaggerated or fabricated important aspects of this story, noting (among other inconsistencies) that Weyker's final reports frequently referred to sex for money while that assertion was conspicuously absent from her handwritten notes, appearing only once in all of those rough notes. And Jane Doe 2 herself furthered the district court's suspicion when she testified on cross examination that Weyker had

---

[6]     The district court rejected arguments for acquittal based on the age of Jane Doe 2 (finding there was evidence that "could provide the jury a basis to find that at the times at issue, Jane Doe Two was under the age of 18") and based on alleged inconsistencies in Jane Doe 2's trial testimony (finding that "the Defendants have raised serious issues of credibility, but have not shown Jane Doe's testimony to be 'indisputably false'"). *Adan*, 913 F. Supp. 2d at 564, 570.

> misstated facts in the reports, adding to and omitting things
> from her statements.  Elsewhere, the district court caught
> Weyker lying to the grand jury and, later, lying during a
> detention hearing, and scolded her for it on the record.  The
> defense has since pointed out that Weyker also lied on an
> application to get Jane Doe 2's family some $3,000 from the
> Tennessee victim's compensation fund, by claiming
> "abduction" (Jane Doe 2 flatly denied an abduction) and
> endorsing the validity of the forged birth certificate.  Finally,
> it is curious that even though Officer Weyker (the lead agent),
> Jane Doe 2 (the principal victim-witness), and all but a few of
> the 30 defendants reside in Minnesota, and an overwhelming
> portion of the events at issue occurred in Minnesota, the
> federal prosecutor in Minnesota did not prosecute this case in
> Minnesota.

*Fahra*, 643 F. App'x at 482; *see* 2d Am. Compl. ¶ 38.[7]

Two days after the Sixth Circuit issued its opinion, Kayachith was released from

electronic monitoring.  2d Am. Compl. ¶ 40.  A few days later, the Middle District of

Tennessee granted the United States' motion to dismiss all outstanding charges against all

remaining defendants.  *Id.* ¶ 41.

"Bandemer, at best, failed to properly supervise Weyker's work and, at worst,

through his mutual work on the case, assisted Weyker in fabricating the evidence that led

to violations of Kayachith's well-settled Constitutional rights and Kayachith's wrongful

arrest and prosecution."  *Id.* ¶ 33.  "Robert Roes 1-3 failed to supervise or review the

work of both Bandemer and Weyker, in direct violation of police department policy, and

those failures allowed Weyker to exaggerate and fabricate evidence that led to violations

of Kayachith's well-settled Constitutional rights and Kayachith's wrongful arrest and

prosecution."  *Id.* ¶ 34.  The failures of Robert Roes 1-3 to supervise Weyker and

---

[7]      *See supra* note 3.

Bandemer and to review Weyker's final reports led to the violation of Kayachith's constitutional rights.  *Id.* ¶ 44.  "The City of Saint Paul and Weyker's supervisors had previously disciplined Weyker for fabricating or concealing evidence in other investigations.  Even with actual knowledge that Weyker had been untruthful on other occasions, the City and Weyker's supervisors allowed Weyker to travel, unsupervised, out-of-state several times.  Because of that failure, Weyker was able to construct an elaborate, and simply untrue, story of sex trafficking."  *Id.* ¶ 47.

Kayachith's Second Amended Complaint contains four counts.  In Count I, he asserted a claim under 42 U.S.C. § 1983 against Weyker in her individual and official capacities for violations of his rights under the Fourth Amendment.  In Count II, he asserted a claim under *Bivens* against Weyker in her individual capacity for violations of his rights under the Fourth Amendment.  In Count III, Kayachith asserted a claim under 42 U.S.C. § 1983 against Bandemer and Robert Roes 1-3 in their individual capacities as supervisors of Weyker.  In Count IV, Kayachith asserted a claim under 42 U.S.C. § 1983 against the City of St. Paul, as well as Bandemer and Robert Roes 1-3 in their official capacities, for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

## II.    DISCUSSION

Weyker and Bandemer moved to dismiss Kayachith's claims against them in their individual capacities.  They argued that "qualified immunity protects [them] because Kayachith fails to plausibly allege that these officers violated any clearly established Fourth Amendment right"; that "the supervisory-liability claims against Officer

Bandemer fail because neither Section 1983 nor *Bivens* allows for supervisory liability"; that "no cause of action exists under Section 1983 because Weyker and Bandemer were deputized federal officers when Kayachith was arrested, detained, and prosecuted on federal charges"; and that "no cause of action exists under *Bivens* because special factors counsel hesitation against creating such a remedy."

The City of St. Paul and Robert Roes 1-3 moved to dismiss Kayachith's claims against them. They argued that qualified immunity bars the supervisory liability claims, that Kayachith failed to sufficiently plead supervisory liability, and that Kayachith failed to state a *Monell* claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff satisfies this requirement by "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

In considering a motion to dismiss for failure to state a claim, "a district court generally may not consider materials outside the pleadings." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008). A district court may "consider some public records, materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.'" *Id.* In this case, the Court excludes the materials submitted by the parties that may not be considered under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(d).

"[D]efendants seeking dismissal under Rule 12(b)(6) based on an assertion of qualified immunity 'must show that they are entitled to qualified immunity on the face of the complaint.'" *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (alteration in original) (quoting *Carter v. Huterson*, 831 F.3d 1104, 1107 (8th Cir. 2016)); *accord Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018); *Kiesling v. Holladay*, 859 F.3d 529, 533 (8th Cir. 2017). "The doctrine of qualified immunity generally shields public and government officials performing discretionary functions from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kulkay*, 847 F.3d at 642 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine whether a defendant is entitled to dismissal on the basis of qualified immunity, we consider '(1) whether the official's conduct violated a constitutional right; and (2) whether the violated right was clearly established.'" *Stanley*, 899 F.3d at 627 (quoting *Manning v. Cotton*, 862 F.3d 663, 668 (8th Cir. 2017)).

## A.     Weyker

Kayachith claimed that Weyker violated his rights under the Fourth Amendment because he was arrested and detained based on evidence fabricated by Weyker.  Weyker asserted that Kayachith's claims against her in her individual capacity should be dismissed because she is entitled to qualified immunity.

"[A]n indictment, 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry." *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975); *accord Kaley v. United States*, 571 U.S. 320, 328-29 (2014). Nevertheless, "pretrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process in a criminal case.  The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause.  That can happen when the police hold someone without any reason before the formal onset of a criminal proceeding.  But it also can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel v. City of Joliet*, 137 S. Ct. 911, 918 (2017) (citation omitted); *see Stewart v. Wagner*, 836 F.3d 978, 983 (8th Cir. 2016); *Osman*, 2017 WL 3425647, at *5-6.  If the legal proceeding used to establish probable cause is tainted such that probable cause is lacking, "then the ensuing pretrial detention violates the confined person's Fourth Amendment rights." *Manuel*, 137 S. Ct. at 920 n.8 (rejecting view that a grand jury indictment "does expunge such a Fourth Amendment claim"); *see King v. Harwood*, 852 F.3d 568, 587-88 (6th Cir. 2017) (post-

12

*Manuel*, holding that "where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements . . . or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony . . . , the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive"), *cert. denied*, 138 S. Ct. 640 (2018).

To evaluate whether a person's Fourth Amendment right has been violated by an arrest pursuant to a warrant that lacked probable cause, a court applies the analysis set out in *Franks v. Delaware*, 438 U.S. 154 (1978). *See Hawkins v. Gage Cty.*, 759 F.3d 951, 958-59 (8th Cir. 2014); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101, 105 (1st Cir. 2013). Thus, the court considers whether there were deliberately or recklessly false statements made in support of a finding of probable cause and whether those statements were necessary to the finding of probable cause. *See Franks*, 438 U.S. at 171-72; *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014). The court also considers whether material information was omitted with the intent to mislead or with reckless disregard as to whether the omission was misleading. *See Williams*, 772 F.3d at 1312; *Hawkins*, 759 F.3d at 959. If, setting aside the false statements (or adding in the omitted information), there was no probable cause to arrest, then the arrest violated the Fourth Amendment. *See Williams*, 772 F.3d at 1312-13; *Hawkins*, 759 F.3d at 958-59; *Hernandez-Cuevas*, 723 F.3d at 105. "Probable cause exists when the totality of the

circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Greenman v. Jessen*, 787 F.3d 882, 888 (8th Cir. 2015) (quoting *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014)).

Where a plaintiff alleges that she was arrested without probable cause and the defendant asserts the qualified immunity defense, a court asks whether there was "*arguable* probable cause to arrest." *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (citing *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015)). "[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *New*, 787 F.3d at 899 (alteration in original) (quoting *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)). "It is clearly established that the Fourth Amendment requires a truthful factual showing sufficient to constitute probable cause before an arrest warrant can issue." *Peterson v. City of Plymouth*, 60 F.3d 469, 477 (8th Cir. 1995) (quoting *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994)).

To support her assertion of qualified immunity, Weyker argued that, "even if Kayachith has plausibly alleged that Weyker fabricated evidence, he has not shown that the fabrications were material to probable cause." Kayachith responded that he "is in the same position that the other plaintiffs are in—the complexity of the case, the unusual Sixth Circuit opinion which excoriates Weyker's conduct, and the fact that only a small amount of the criminal record has been analyzed by the parties requires further discovery to determine whether Kayachith's claims can survive." He also "briefly address[ed] the

14

materiality element of the analysis to establish that he has sufficiently pleaded facts that overcome [Weyker's] claim of qualified immunity."

In some cases against Weyker, the Court found that some of the statements about Weyker by judges in the Sixth Circuit and the Middle District of Tennessee were remarkable and that, considered with the plaintiff's well-pleaded facts, they nudged the plaintiff's Fourth Amendment claim against Weyker over the *Iqbal* plausibility line. *See, e.g.*, *Osman*, 2017 WL 3425647, at *15; *Ahmad v. Weyker*, Case No. 16-cv-1902 (JNE/TNL), 2017 WL 3425685, at *5 (D. Minn. Aug. 9, 2017), *appeal docketed*, No. 17-3210 (8th Cir. Oct. 13, 2017). In addition to the statements about Weyker by judges in the Sixth Circuit and the Middle District of Tennessee, Kayachith relied on the following to demonstrate he pleaded sufficient facts to overcome Weyker's assertion of qualified immunity: Jane Doe 2 was not a minor; Jane Doe 2 was not initially supposed to go to Nashville and joined the group only after another individual was unable to go; Jane Doe 2 consensually went to Nashville with the group; Jane Doe 2 did not engage in sex acts for money; Jane Doe 2 denied that any prostitution occurred when questioned by Nashville police officers; Jane Doe 2 changed her story when Weyker reached her by telephone; Weyker had an influential relationship with Jane Doe 2, whom Kayachith characterized as "a girl with some trouble in her past."

Kayachith has not plausibly alleged that any alleged fabrications by Weyker were material to probable cause. He did not allege that Weyker knew Jane Doe 2 was not a

minor when the group went to Nashville in April 2009.[8]  He did allege that Jane Doe 2

"was known to police as a habitual runaway who had spent time in juvenile detention,"

2d Am. Compl. ¶ 12; that Jane Doe 2's parents reported Jane Doe 2 missing when she

travelled to Nashville, 2d Am. Compl. ¶¶ 15-17; that Nashville police located Jane Doe 2

and arrested the group, including Kayachith, 2d Am. Compl. ¶ 17; that Jane Doe 2 was

questioned, indicated she had sex with several people over the preceding days, and did

not claim she had been prostituted, 2d Am. Compl. ¶ 18; and that, when Weyker

contacted her by telephone later that day, Jane Doe 2 claimed that Kayachith and the

others prostituted her, 2d Am. Comp. ¶ 19.  Kayachith has not plausibly alleged that

Weyker fabricated evidence material to his indictment.  *Cf. Hosea v. City of St. Paul*, 867

F.3d 949, 956 (8th Cir. 2017) ("When an officer is faced with conflicting information that

cannot be immediately resolved, however, he may have arguable probable cause to arrest

a suspect.").  The Court concludes that Weyker is entitled to qualified immunity on

Kayachith's claims against her in her individual capacity.[9]

## B.     Bandemer and Robert Roes 1-3

A supervisor sued in his or her individual capacity in a § 1983 or *Bivens* suit "is

only liable for his or her own misconduct."  *Iqbal*, 556 U.S. at 677; *see S.M. v. Krigbaum*,

---

[8]      *See supra* note 6.

[9]      The Court previously declined to determine whether § 1983 or *Bivens* applies to
claims against Weyker.  *See Osman*, 2017 WL 3425647, at *6-7.  The Court does the
same here.

Had Kayachith plausibly alleged a claim against Weyker based on his arrest and
detention on federal charges, his claim would be limited by the new charge brought
against him in the second superseding indictment.  *See Salad*, 2017 WL 3425671, at *5-6.

808 F.3d 335, 340 (8th Cir. 2015) ("Government officials are personally liable only for their own misconduct."). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Krigbaum*, 808 F.3d at 340 (citing *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012)). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient. 'To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability.'" *Id.* (quoting *Livers*, 700 F.3d at 356).

Kayachith alleged that "Bandemer, at best, failed to properly supervise Weyker's work and, at worst, through his mutual work on the case, assisted Weyker in fabricating the evidence that led to violations of Kayachith's well-settled Constitutional rights and Kayachith's wrongful arrest and prosecution." 2d Am. Compl. ¶ 33. Kayachith did not support his conclusory allegation that Kayachith assisted Weyker in fabricating evidence.

As to his claims that Bandemer failed to properly supervise Weyker and that Robert Roes 1-3 failed to properly supervise Weyker and Bandemer, Kayachith maintained that he adequately alleged Bandemer and Robert Roes 1-3 had notice of a pattern of unconstitutional acts by Weyker. Kayachith alleged that Bandemer "led the task force" and "spent 'thousands of hours' on the case with Weyker," *id.* ¶ 32; that

Bandemer "failed to properly supervise Weyker's work"; *id.* ¶ 33; that the failure of Robert Roes 1-3 "to supervise Weyker and Bandemer, and their failure to review Weyker's final reports, in light of the District of Minnesota's declining to prosecute the case for lack of evidence, led to the violations of Kayachith's well-settled Constitutional rights," *id.* ¶ 44; that "[t]he City of St. Paul and Weyker's supervisors had previously disciplined Weyker for fabricating or concealing evidence in other investigations," *id.* ¶ 47; and that "[t]he City of St. Paul and Weyker's supervisors had actual knowledge as early as February 2012 that Weyker's credibility was in serious question with the court and that the court suspected Weyker of fabricating evidence because in 2012 and 2013, the court drafted memoranda addressing several defendants' motions and cited that it had 'serious concerns' regarding Weyker's grand jury testimony," *id.* ¶ 26.

Kayachith's allegations do not sufficiently plead supervisory liability based on notice. *See Osman*, 2017 WL 3425647, at *16-17; *Farah v. Weyker*, Case No. 16-cv-1289 (JNE/TNL), 2017 WL 3425676, at *7 (D. Minn. Aug. 9, 2017), *appeal docketed*, No. 17-3207 (8th Cir. Oct. 13, 2017). Nor do they establish a pattern of unconstitutional acts by Weyker. Kayachith did not plausibly allege any other similar acts by Weyker or Bandemer before the investigation that could show a pattern about which Bandemer, as Weyker's supervisor, or Robert Roes 1-3, as supervisors of Weyker and Bandemer, knew.

The Court concludes that Bandemer and Robert Roes 1-3 are entitled to qualified immunity on Kayachith's claims against them in their individual capacities.

## C.     Municipal liability

Kayachith sued the City of St. Paul[10] for municipal liability under *Monell*.  "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694.  A municipality is, however, liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.*

A plaintiff must show that there is an "official" policy or a "custom or usage with the force of law." *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016).  A plaintiff must plead "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (alteration in original) (quoting *Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003)).  "Misconduct among a municipality's employees must be 'continuing, widespread, [and] persistent' to establish such a custom." *Kelly*, 813 F.3d at 1075 (alteration in original) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)).  Also, "the municipality will not be liable unless policymaking officials exhibit '[d]eliberate indifference to or tacit authorization of such conduct . . . after notice to the officials of that misconduct.'" *Id.* at 1075-76 (alterations in original) (quoting *Mettler*,

---

[10]     Kayachith also sued Weyker, Bandemer, and Robert Roes 1-3 under § 1983 in their official capacities.  Kayachith's official-capacity claims are claims against the City of St. Paul "in all respects other than name." *Banks v. Slay*, 875 F.3d 876, 881 (8th Cir. 2017) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)); *see King v. City of Crestwood*, 899 F.3d 643, 650 (8th Cir. 2018).

165 F.3d at 1204).  The question is whether a "governmental policy or custom was the 'moving force' that led to the deprivation of [the plaintiff's] constitutional rights." *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002).  Even if no individual employee is found liable, a municipality might be liable, but only where "the combined actions of multiple officials or employees may give rise to a constitutional violation." *Id.*

Kayachith did not adequately support his conclusory municipal liability allegations.  He did not allege with well-pleaded facts that Weyker or other St. Paul Police Department employees fabricated evidence in other investigations, nor that policymaking officials in the department were aware of any previous incidents of fabrication of evidence.  He did not allege well-pleaded facts to support a theory that multiple St. Paul Police Department members combined to violate his rights.  Nor did he allege facts that would demonstrate an official department policy that moved officers to fabricate evidence or coerce witnesses and mislead prosecutors and grand juries to secure indictments.  He did not plausibly allege any such custom because, among other reasons, he has not adequately alleged notice, as explained above.  The Court dismisses Kayachith's claim against the City of St. Paul.

## III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      The Clerk of Court shall terminate the Motion to Dismiss [Docket No. 15] of the City of St. Paul and Robert Roes 1-3.

2.      The Motion to Dismiss of Weyker and Bandemer [Docket No. 20] is GRANTED.

3.      The Amended Motion to Dismiss [Docket No. 26] of the City of St. Paul and Robert Roes 1-3 is GRANTED.

4.      This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: January 2, 2019

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

# EXHIBIT L

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                     )
       United States of America,       )   File No. MJ 11-245
 4                                     )
                 Plaintiff,            )
 5                                     )
       vs.                             )   Minneapolis, Minnesota
 6                                     )   June 21, 2011
       (1)Hawo Osman Ahmed,            )   3:30 p.m.
 7     (2)Ifrah Abdi Yassin, and       )
       (3)Hamdi Ahmed Mohamud,         )
 8                                     )
                 Defendants.           )
 9     ------------------------------------------------------------

10                        BEFORE THE HONORABLE
                            FRANKLIN L. NOEL
11               UNITED STATES DISTRICT COURT JUDGE
                      (DETENTION & REMOVAL HEARING)
12

13     APPEARANCES
        For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
14                                Carol M. Kayser, AUSA
                                  600 U.S. Courthouse
15                                300 South Fourth Street
                                  Minneapolis, Minnesota 55415
16
        For Defendant Ahmed:      LAW OFFICE OF JOHN S. HUGHES
17                                John S. Hughes, ESQ.
                                  247 Third Avenue South
18                                Minneapolis, MN 55415

19      For Defendant Yassin:     FEDERAL DEFENDER'S OFFICE
                                  Reggie Aligada, ESQ.
20                                U.S. Courthouse, Room 107
                                  300 South Fourth Street
21                                Minneapolis, MN 55415

22      For Defendant Mohamud:    LEAVENWORTH LAW OFFICE
                                  Philip G. Leavenworth
23                                182 Star Circle
                                  Vadnais Heights, MN 55127

24

25
```

```
 1              MR. HUGHES:  Yes, Your Honor.  Your Honor, a
 2     couple of things.  As to -- the Court has read a copy of the
 3     complaint and affidavit, I assume?
 4              I'm going to direct the Court to page six of the
 5     affidavit.  First of all, backing up to page five, I'd
 6     submit that probable cause is lacking and there's little
 7     nexus between my client's actions and the case in Tennessee.
 8     And I would just submit the following things.  First of all,
 9     according to the complaining witness, she agrees that M.A.
10     is the one that introduced the knife into the altercation.
11     In fact, after review of the police reports that were
12     supplied by the government, it appears that my client and
13     her friends are the ones that called the police and
14     responded to -- that responded to the allegation.  In fact,
15     it's noted in the complaint that at page six, the middle of
16     the first -- I guess it's the second -- right in the middle
17     of the page that addresses my client, Ms. Ahmed, asked why
18     M.A. was talking shit about another girl and provided a name
19     of that person.  And it -- essentially offering a different
20     motive for the alleged -- alleged assault as opposed to
21     anything my client had to do with the -- the allegations of
22     tampering with a witness.
23              In fact, the affidavit goes on to say that, in
24     fact, my client and M.A. had a prior relationship where M.A.
25     stayed at my client's house when it turns out that she was
```

1    pregnant and out of sorts with her family and my client

2    provided her with a place to stay.  So it's got nothing to

3    do with witness tampering.  It's got all to do with an

4    argument between 18 and 19-year-old girls about something

5    other than the case in Tennessee.  There is an

6    allegation -- there are other allegations about the nexus

7    between that case and other persons, but they don't include

8    a nexus to my client.

9            Judge, my client has resided in the Twin Cities

10   for 11 years.  I would dispute the -- the recommendation

11   from pre-trial services that there is no -- there is no

12   community ties that my client has to the community.  Her

13   family is here.  Her mother, two sisters and a brother are

14   seated in the second row.  My client has three children,

15   Your Honor, one of whom is disabled, that she cares for at

16   her mother's house.  That child is an infant who is on SSI.

17   She's resided with her mother and the children for a period

18   of time in Burnsville.  I know this because I represent her

19   in and was appointed in the Hennepin County case that's

20   referred to that's pending for sentencing.  I can -- I can

21   tell the Court that, that was another dispute amongst high

22   school girls, for lack of a better explanation.  It had

23   nothing to do with anything that's before the Court.  And

24   while that doesn't excuse her behavior, that matter was

25   resolved for a non-felony disposition and it's set for

1   number of run-ins with law enforcement.  January 28th, a hit

2   and run; January 31st, possession of marijuana; February,

3   third-degree assault; March, speeding; April, trespass.  The

4   only month that she hasn't been arrested or had a law

5   enforcement encounter was May of this year.  It's the

6   government's position that she's both a risk of flight and a

7   danger to the community.  You know, while she's out on

8   pre-trial release for the third-degree assault charge, she's

9   picked up on this case.  She doesn't have a job.  She also

10  has ties outside the United States.  She's a young woman who

11  perhaps can't appreciate the severity of the charges against

12  her, so the government would ask that she be detained.

13          THE COURT:  All right.  It appears to me based on

14  the information set forth in the pre-trial services report

15  that there is no condition or combination of conditions that

16  would reasonably ensure the defendant's appearance and/or

17  reasonably ensure the safety of the community and therefore

18  I will order her detained.

19          In particular, in making those findings I rely

20  upon the fact that it appears the defendant has lived for a

21  number of years in Kenya and has a passport to travel there;

22  that she has pled guilty to an offense that appears to

23  entail an assault with scissors on a victim, which is not

24  entirely different than the nature of the offense alleged in

25  the instant case; and therefore will order that the

1          government prepare a detention order setting forth those

2          specific findings of fact and conclusions of law and the

3          defendant will be ordered removed and detained to the Middle

4          District of Tennessee.

5                    Mr. Leavenworth.  I'm sorry, hold on

6          Mr. Leavenworth.  I haven't heard from the government on

7          your side yet.  I mean, yeah, the government so I'll come

8          back to you.

9                    MS. KAYSER:  Your Honor, the government would ask

10         that like Ms. Yassin, the Court order that she be placed in

11         a halfway house.  This defendant has no significant work

12         history.  She's currently unemployed.  She doesn't have

13         significant ties to the community.  I'm not aware that her

14         parents, judging from the pre-trial services report, that

15         her family knows that she's been incarcerated.  And so, Your

16         Honor, the government would just ask that she also be

17         released to a halfway house and that the same conditions

18         which the Court imposed with respect to Ms. Yassin be

19         imposed with respect to Ms. Mohamud.

20                   THE COURT:  Okay.  Now, Mr. Leavenworth.

21                   MR. LEAVENWORTH:  Thank you, Your Honor.  I'd like

22         the Court to know, first of all, that Ms. Mohamud's mother

23         and sister have come to show their support for their family

24         member here today, so the family does know about her

25         predicament.

1        I have inquired with Ms. Mohamud last night on a

2    couple of matters having to do with her ties to the

3    community.  I would like the Court to know that apparently

4    she does not have a passport so there would be nothing to

5    obtain there.  She arrived in the United States at the age

6    of 12 and she's been in Minnesota ever since.  Her one and

7    only trip outside of Minnesota has been one trip to Nebraska

8    to visit some family.  That has been the extent of it.

9        It's -- the fact that we can't provide a lot of

10   details about community ties doesn't mean they are not

11   there.  She's just been living with her mother.  She

12   mentioned that she has, from time to time, had some

13   arguments with her mother and her mother has complained to

14   her daughter that she comes home too late and stays out with

15   the wrong kind of boys and doesn't attend school regularly.

16   I'd say from that, Your Honor, those are all good signs of a

17   good and caring mother, a responsible mother.  That is the

18   person -- if the Court releases her, that is the person that

19   Ms. Mohamud would go to stay with.

20       The Target Field employment is about all that

21   Ms. Mohamud has done.  She was paid $35 after ball games for

22   four hours of clean-up work, and it's my understanding that,

23   that work is still available to her and she can go back and

24   do more of it.  So she has a pretty good employment

25   available to her, at least when there are home games on the

```
 1      schedule.

 2              Beyond that, Your Honor, it is my understanding

 3      that two weeks -- approximately two weeks after this

 4      incident, June 16th, Ms. Mohamud had some kind of plan in

 5      mind to begin taking G.E.D. classes.  And if she is

 6      released, certainly that is something that I am encouraging

 7      her and she intends to pursue.

 8              Beyond all that, Your Honor, I guess I'll leave it

 9      that we endorse the recommendation from probation.  And I

10      guess the only disagreement with the government here is

11      whether a halfway house is the right place for her to go

12      with a responsible and caring mother, pretty good

13      environment for her to go to, I'd say, Your Honor, that home

14      is the best place for her.  That's all.

15              THE COURT:  Is home where she's been living the

16      whole time?

17              MR. LEAVENWORTH:  My understanding is that, that

18      is exactly the case, except that after some of these

19      arguments with mom, she has spent some days away with

20      friends, but she's over the age of 18 and so that's

21      something she's entitled to do.  But for the most part,

22      except for those very occasional incidents, which I'd call

23      cooling off periods, she has resided with her mother, yes.

24              THE COURT:  Okay.  All right.  Ms. Mohamud, do you

25      want to come to the podium with your lawyer, please.
```

1          Okay.  We're going to release you on a $25,000

2     unsecured bond which means you don't have to put up any

3     money to secure your release but if you fail to appear

4     whenever your appearance is required or if you fail to

5     comply with the conditions I'm about to describe to you, you

6     would owe the United States $25,000.  Do you understand

7     that?

8          DEFENDANT MOHAMUD:  Yes.

9          THE COURT:  Conditions of your release are that

10    you not violate any federal, state or local law while you're

11    on release in this case; that you cooperate in the

12    collection of a DNA sample; that you immediately advise the

13    Court, your attorneys and the United States Attorney in

14    writing prior to any change in your address or telephone

15    number; and that you appear in court as required and

16    surrender for the service any sentence that might be imposed

17    if you are convicted of any offense.  Do you understand

18    that?

19         DEFENDANT MOHAMUD:  Yes.

20         THE COURT:  It's also a condition of your release

21    that you report to the pre-trial service office as directed;

22    that you remain -- that you maintain or actively seek

23    employment; that you surrender any passport that you might

24    have to the pre-trial service office; that you obtain no new

25    passport; that you not travel outside the state of Minnesota

1    can put me on house arrest.  I'll stay somewhere that I

2    won't get outside.  Please just don't take me to Tennessee.

3                  THE COURT:  I'm not -- I'm not unsympathetic to

4    your plight.  I'm sorry that --

5                  DEFENDANT AHMED:  I showed up to all my other

6    courts, sir.  I can show up to this one too.  Just put me on

7    house arrest or something, please.  Don't take me away from

8    my kids.

9                  THE COURT:  Having reviewed the information in the

10   pre-trial services report, including your guilty plea to a

11   third-degree assault in Hennepin County, the nature of the

12   offense alleged here --

13                 DEFENDANT AHMED:  It's not the same thing, sir.  I

14   didn't -- with --

15                 THE COURT:  And we're not here to decide whether

16   you're guilty or not guilty of this offense.  We're here to

17   decide whether or not there is conditions or combination of

18   conditions that would reasonably assure your appearance in

19   Tennessee.

20                 DEFENDANT AHMED:  Sure.  I --

21                 THE COURT:  Reasonably assure the safety of the

22   community if you were to be released and I have concluded

23   that there are not.  I'm sorry.

24                 DEFENDANT AHMED:  But I will show up.  I showed up

25   to all of my other courts.  I did everything.  Can I be

```
 1    released?  I'll be on house arrest or anything.  Please --

 2               THE COURT:  The Court's order that you be

 3    detained.  We're in recess.

 4               (Court adjourned at 4:28 p.m.)

 5                         *      *      *

 6

 7

 8          I, Staci A. McGinty, certify that the foregoing is

 9    a correct transcript from the record of proceedings in the

10    above-entitled matter.

11

12               Certified by:   s/ Staci A. McGinty

13                               Staci A. McGinty,
                                 RMR, CRR, CBC, CCP
14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT M



# UNITED STATES DISTRICT COURT
## District of Minnesota

Richard D. Sletten, Clerk
Lisa D. Rosenthal, Chief Deputy Clerk

RECEIVED
IN CLERK'S OFFICE
NOV - 7 2011
U.S. DISTRICT COURT
MID. DIST. TENN.

| | | | |
|---|---|---|---|
| Warren E. Burger Federal Building and U.S. Courthouse<br>316 North Robert Street<br>Suite 100<br>St. Paul, MN 55101<br>(651) 848-1100 | U.S. Courthouse<br>300 South Fourth Street<br>Suite 202<br>Minneapolis, MN 55415<br>(612) 664-5000 | Gerald W. Heaney Federal Building and U.S. Courthouse and Customhouse<br>515 West First Street<br>Suite 417<br>Duluth, MN 55802<br>(218) 529-3500 | U.S. Courthouse<br>118 South Mill Street<br>Suite 212<br>Fergus Falls, MN 56537<br>(218) 739-5758 |

November 4, 2011

Mr. Keith Throckmorton
Clerk
United States District Court
Estes Kefauver Federal Building and
 United States Courthouse
801 Broadway, Room 879
Nashville, TN 37203-3816

Re:   Hamdi Ahmed Mohamud
      Our Case Number: 11-mj-451 FLN
      Your Case Number: 3:11-CR-00132-02

Dear Clerk:

**Rule 5 (formerly Rule 40) Removal Proceedings**

 [ X ]   Enclosed please find certified copies of all documents filed in our court.

**Rule 20**

 [   ]   Enclosed please find certified copies of the Docket Sheet, charging instrument, and Consent to Transfer pursuant to Rule 20.

Please acknowledge receipt of these documents by returning, in the envelope provided, a copy of the enclosed letter stamped "RECEIVED".

Sincerely,

RICHARD D. SLETTEN, CLERK

Jenny Dunbar Fannemel, Deputy Clerk

cc:   Charles J. Kovats Jr., Assistant U. S. Attorney
      Caroline Durham
      Marshal Service (Rule 20 & 5 only)
      Pretrial Services (Rule 20 & 5 only)
      File 11-mj-451 FLN

criminaltransferletter.frm

Form Modified 10/14/08

RECEIVED
IN CLERK'S OFFICE

NOV - 7 2011

U.S. DISTRICT COURT
MID. DIST. TENN.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

# FIRST APPEARANCE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | COURTROOM MINUTES - CRIMINAL |
| | ) | BEFORE: Franklin L. Noel, 9W |
| Plaintiff, | ) | U.S. Magistrate Judge |
| | ) | |
| v. | ) | Case No:          MJ 11-451 FLN |
| | ) | Date:               October 28, 2011 |
| Hamdi Ahmed Mohamud, | ) | Time Commenced:  11:05 a.m. |
| | ) | Time Concluded:   11:13 a.m. |
| Defendant. | ) | Time in Court:      8 Minutes |

**APPEARANCES:**

Plaintiff:     Charles Kovats, Assistant U.S. Attorney
Defendant:   Andrew Mohring, ☒ FPD          ☒ To be appointed

Interpreter / Language:  None/English

Date Charges Filed:    October 13, 2011     Offense: Failure to report to Probation and Whereabouts Unknown
                                                                    Title 18 U.S.C. § 1513(f) and 1513(c)

          ☒ Waived Reading of Charges          ☒ Advised of Rights

on        Violation of  ☒ Pretrial Release

☒ **Charges from Another District:** Middle District of Tennessee

☒ Government moves for detention.
Motion is ☒ granted, temporary detention ordered  ☐ denied  ☐ moot, defendant serving sentence.

Next appearance date is November 2, 2011  at 3:00 p.m.  before Chief U.S. Magistrate Judge Arthur J. Boylan, 9E.
for:
  ☒ Detention hrg          ☒ Removal

                                                                         _s/T Anderson_
                                                                         Criminal Duty Clerk

True copy in _____1_____ sheet (s)
of the record in my custody.
CERTIFIED November 40, 11
Richard D. Sletten, Clerk
Jenny Dunbar Fennemel
Deputy Clerk

M:\templates\First Appearance.wpt                                                      Template Updated 6/6/06

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,
        Plaintiff,

Case No.  MJ 11-451 FLN

      v.

ORDER OF TEMPORARY DETENTION
PENDING HEARING PURSUANT
<u>TO BAIL REFORM ACT</u>

Hamdi Ahmed Mohamud,

        Defendant.

_____

      Upon motion of the United States it is ORDERED that a detention/removal

hearing is set for November 2, 2011 at 3:00 p.m. before Chief Magistrate Judge Arthur

J. Boylan, 9E,  U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.

Pending this hearing, the Defendant shall be held in custody by the United States

Marshal and produced for the hearing.

Dated: October 28, 2011

           _s/ Franklin L. Noel_____
           FRANKLIN L. NOEL
           United States Chief Magistrate Judge

_____

\*    If not held immediately upon Defendant's first appearance, the hearing may be continued for up to
three days upon motion of the Government, or up to five days upon motion of the Defendant.  18
U.S.A. §3142(f)(2).

A hearing is required whenever the conditions set forth in 18 U.S.C. §3142(f) are present.  Subsection
(1) sets forth the grounds that may be asserted only by the attorney for the Government; subsection
(2) states that a hearing is mandated upon the motion of the attorney for the Government or upon the
judicial officer's own motion if there is a serious risk that the Defendant (a) will flee; or (b) will obstruct
or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injury, or
intimidate a prospective witness or juror.

November 4 20 11

Jenny Dunbar Farmer?

RECEIVED
IN CLERK'S OFFICE
NOV - 7 2011
U.S. DISTRICT COURT
MID. DIST. TENN.

# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

                       Plaintiff,

v.

HAMDI AHMED MOHAMUD,

                       Defendant.

**NOTICE OF APPEARANCE**

Case No:  11 MJ 451 (FLN)

Pursuant to the Court's order appointing counsel, the undersigned attorney hereby notifies the Court and counsel that Caroline Durham shall appear as appointed counsel of record for the above named defendant in this case.

Dated:   October 31, 2011

           *s/Caroline Durham*
           Caroline Durham
           Attorney ID No. 24921X
           Attorney for Defendant
           Office of the Federal Defender
           107 U.S. Courthouse
           300 South Fourth Street
           Minneapolis, MN 55415

A copy in ___1___ sheet (s)
the record in my custody,
CERTIFIED November 4 2011
Richard D. Sletten, Clerk
Jenny Dunbar Funnemed
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **COURT MINUTES - CRIMINAL** |
| | ) | BEFORE:  Arthur J. Boylan, 9E |
| Plaintiff, | ) | U.S. Chief Magistrate Judge |
| | ) | |
| v. | ) | |

Case No:        MJ 11-451 FLN
Date:           November 1, 2011
Time Commenced: 2:56 p.m.
Time Concluded: 3:02 p.m.
Time in Court:  6 Minutes

Hamdi Ahmed Mohamud,

                    Defendant.

√ **DETENTION /REMOVAL HRG**

Time in Court Det/Removal: 5 min/1 min

**APPEARANCES:**

Plaintiff:    Charles Kovats, Assistant U.S. Attorney
Defendant:    Caroline Durham
              √ FPD          √ Appointed

Interpreter / Language:      None/English

On Violation of √ Pre-trial Release

√ **Charges from other District** Middle District of Tennessee

√ Deft Ordered Detained - Govt to submit proposed order   ☐ Bond Continued   ☐ Moot Currently Srvg Sentence
or
☐ Bond set in the amount of $ with conditions, see Order Setting Conditions of Release.

☐ Probable cause found.  Deft bound over to District Court of Minnesota

☐ Deft removed to charging district and is ordered to appear before on.

√ Commitment to Another District to be Issued

Additional Information:

_____ sheet (s)
of the record in my custody.
CERTIFIED November 4 20 11
Richard D. Sletten, Clerk
Jenny Dunbar Firment
Deputy Clerk

s/KAT
Judicial Assistant

RECEIVED
IN CLERK'S OFFICE

AO 94 (Rev. 8/97) Commitment to Another District

# UNITED STATES DISTRICT COURT

NOV – 7 2011

U.S. DISTRICT COURT
MID. DIST. TENN.

District of _____ Minnesota _____

| UNITED STATES OF AMERICA<br>**V.**<br><br>Hamdi Ahmed Mohamud | **COMMITMENT TO ANOTHER<br>DISTRICT** |
|---|---|

| DOCKET NUMBER | | MAGISTRATE JUDGE CASE NUMBER | |
|---|---|---|---|
| District of Arrest | District of Offense | District of Arrest | District of Offense |
| | 3:11-CR-00132-02 | 11-MJ-451 FLN | |

**CHARGES AGAINST THE DEFENDANT ARE BASED UPON AN**

☐ Indictment ☐ Information ☐ Complaint ✓ Other (specify) Violation of Pretrial Release

**charging a violation of**   18   **U.S.C. §**  1513(f) and 1513(c)

**DISTRICT OF OFFENSE**
Middle District of Tennessee

**DESCRIPTION OF CHARGES:**

Failure to Report to Probation and Whereabouts Unknown

**CURRENT BOND STATUS:**

☐ Bail fixed at _____ and conditions were not met
x  Government moved for detention and defendant detained after hearing in District of Arrest
☐ Government moved for detention and defendant detained pending detention hearing in District of Offense
☐ Other (specify)

| **Representation:** | ☐ Retained Own Counsel | x  Federal Defender Organization | ☐ CJA Attorney | ☐ None |
|---|---|---|---|---|

| **Interpreter Required?** | X  No | ☐ Yes | Language: | |
|---|---|---|---|---|

**DISTRICT OF**

## TO: THE UNITED STATES MARSHAL

You are hereby commanded to take custody of the above named defendant and to transport that defendant with a certified copy of this commitment forthwith to the district of offense as specified above and there deliver the defendant to the United States Marshal for that District or to some other officer authorized to receive the defendant.

| November 2,2011 | s/ Arthur J. Boylan |
|---|---|
| Date | United States Chief Magistrate Judge |

**RETURN**

This commitment was received and executed as follows:

| DATE COMMITMENT ORDER RECEIVED | PLACE OF COMMITMENT | DATE DEFENDANT COMMITTED |
|---|---|---|
| | | |

| DATE | UNITED STATES MARSHAL | (BY) DEPUTY MARSHAL |
|---|---|---|
| | | |

copy in _____ sheet (s)
the record in my custody.
CERTIFIED November 4, 20 11
Richard D. Sletten, Clerk
Jenny Dunbar Deputy
Clerk

# EXHIBIT N

## MAGISTRATE JUDGE GRIFFIN COURTROOM MINUTES FOR CRIMINAL PROCEEDINGS

U.S.A. v. _Hamdi Ahmed Mohamud_ , No. _3:11-00132_

**ATTORNEY FOR GOVERNMENT:** _Van Vincent_

**ATTORNEY FOR DEFENDANT:** _Jim Thomas_ ☐ AFPD (Panel) ☐ Retained

**PRETRIAL SERVICES/PROBATION OFFICER:** _Tim Searcy_

**INTERPRETER NEEDED?** ☐ YES (NO) **LANGUAGE/INTERPRETER:** _____
☐ PRESENT ☐ ON TELEPHONE

☒ **INITIAL APPEARANCE** ☒ **DEFENDANT ARRESTED ~~ON:~~** _in MN_
☐ **DEFENDANT APPEARED ON A SUMMONS**

DEFENDANT HAS A COPY OF:
☐ Complaint ☐ Indictment ☐ Information ☐ Supervised Release Pet. ☒ Other _Bond Violation_
☒ Defendant advised of the charges ~~and the maximum penalties~~
☐ Defendant has a copy of notice of rights ☐ Has Read ☐ Has Not Read
☐ Defendant advised of right to counsel ☐ Counsel retained
☐ Defendant sworn and financial affidavit filed ☐ FPD Appointed
☐ Defendant advised of right to silence
☐ **RULE 5** -Defendant advised of right to identity hearing ☐ Defendant waived identity hearing
☐ Defendant advised of right to preliminary hearing ☐ Defendant waived preliminary hearing
☐ **RULE 5** - Defendant reserved right to have hearing in District of Prosecution
☐ Government motion for detention
☐ Defendant temporarily detained ☐ ICE detainer on defendant
☐ **RULE 5** - Defendant elected to have hearing in District of Prosecution
☐ Defendant waived detention hearing/detained ☐ Defendant reserved right to hearing in future
☒ Defendant to remain in Federal custody ☐ Defendant to be returned to State custody
☐ Defendant ordered to psychological/psychiatric evaluation _pursuant to Order_
☐ Defendant to remain on current conditions of supervised release _from MN Court_
☐ Defendant released on: _see attached_
    ☐ Own recognizance with conditions of release ☐ standard ☐ special
    ☐ Appearance bond in the amount of: _____
    ☐ Property bond [description of property]:_____
    ☐ Performance bond [as set out in conditions of release]
☐ **RULE 5** - DEFENDANT ADVISED OF RIGHT TO RULE 20 TRANSFER

☐ **PRELIMINARY/DETENTION/ARRAIGNMENT CONTINUED TO:**_____

☐ **GRAND JURY WAIVED IN OPEN COURT** [Defendant sworn and advised of rights by Court]

☐ **ARRAIGNMENT**
    ☐ Defendant acknowledges he/she has copy of Indictment/Information
    ☐ Indictment/Information read to defendant by Judge ☐ Defendant waives reading thereof
    **PLEA:** ☐ **GUILTY** ☐ **NOT GUILTY** ☐ Defendant intends to plead guilty and case referred to DJ

DATE: _11-17-11_ TOTAL TIME: _6 min_
BEGIN TIME: _3:24_ END TIME: _3:30_
TAPE NO.(S) _G2011-142_

Form Revised 8/8/2011

Page 1 of _1_

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 11-MJ-00451(FLN)

UNITED STATES OF AMERICA,              )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )   ORDER OF DETENTION
                                       )
HAMDI AHMED MOHAMUD,                   )
                                       )
            Defendant.                 )

     This matter came before the Court on November 1, 2011, for a
removal and detention hearing.  The defendant was present and
represented by her attorney, Caroline Durham.  The United States
was represented by Assistant United States Attorney Charles J.
Kovats, Jr.

     The defendant was charged in the Middle District of Tennessee
with Failure to Report to Probation and Whereabouts Unknown, in
violation of Title 18, United States Code, Sections 1513(f) and
1513(c).  Based upon the matters alleged in the charges from the
Middle District of Tennessee and after hearing the arguments of
counsel, the Court concludes that probable cause exists to believe
that the defendant is in violation of her conditions of pretrial
release.  Further, the Court concludes by clear and convincing
evidence that the defendant has failed to meet her burden of
showing that she does not pose a danger to the safety of any other
person or the community.  See Fed. R. Crim. P. 32.1(a)(6); 18
U.S.C. § 3143(a).

NOW THEREFORE IT IS HEREBY ORDERED:

1.   That the motion of the United States for detention of defendant is granted;

2.   That the defendant is committed to the custody of the Attorney General;

3.   That the defendant shall be afforded reasonable opportunity to consult privately with her lawyer; and

4.   That upon Order of the Court or request by the United States Attorney, the person in charge of the corrections facility in which the defendant is confined shall deliver her to the United States Marshal for the purpose of appearance in connection with further court proceedings.

Dated:   November 2, 2011


                    s/ Arthur J. Boylan
                    ARTHUR J. BOYLAN
                    United States Chief Magistrate Judge

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA v. HAMDI AHMED MOHAMUD        CASE NO.: 3:11-00132

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## RELEASE ORDER AND CONDITIONS OF RELEASE

☒    Defendant is released on his/her own recognizance, no appearance bond shall be posted, and the following ~~statutorily required standard~~ conditions of release are hereby imposed:

☐    Defendant shall be released on a non-surety bond in the amount of _____, no security or monies shall be required for defendant to be released, and the following conditions of release are hereby imposed:

☐    Defendant shall be released on a non-surety bond in the amount of _____, cash in the amount of _____ shall be posted to the Clerk of Court, or such other security as listed below, and the following conditions of released are hereby imposed:

☐    Defendant shall be released on a surety bond as described below:

☐    Defendant shall remain on the conditions of supervised release that have been previously imposed by the District Judge.  In addition, defendant shall abide by the following conditions:

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WHILE ON RELEASE, I FULLY UNDERSTAND:

1)    I may not change my address or move without permission of the Court.  My correct address has been provided to Pretrial Services.

2)    I must be in Court each and every time I am instructed to be there, and surrender to serve any sentence imposed.

3)    I cannot intimidate or harass any witness, victim, informant, juror or officer of the Court; I cannot obstruct any criminal investigation.

4)    I must not violate any local, state or federal law.  If I do, I could be punished by as much as from 90 days to 10 years imprisonment in addition to the penalty provided for the offense committed.

Page 1 of 6

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA v. HAMDI AHMED MOHAMUD        CASE NO.: 3:11-00132

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

5)      If I violate any condition of release, a warrant for my arrest could be issued, ~~any bond~~ I
        ~~signed may be forfeited~~, and new bonds with additional conditions, or my detention until
        trial, could be ordered by the Court, and I could be held in contempt of Court.

6)      If I fail to appear at any proceeding in this case or I fail to surrender to serve any sentence
        imposed, I could be charged and convicted of bail jumping which is punishable by, in some
        cases, as much as 10 years imprisonment and/or a fine, in addition to any other
        punishments imposed in the original case.

7)      This special condition or conditions:

        A.      Defendant shall report to Pretrial Services as directed

        B.      Defendant shall ~~surrender her passport to Pretrial Services and shall~~ not apply for
                a ~~new~~ passport during the pendency of this case

        C.      Defendant's travel is restricted to the Middle District of Tennessee and the District
                of Minnesota (where she will reside) unless she obtains prior approval from Pretrial
                Services; defendant will be permitted to travel between the two districts for court
                appearances, consultation with counsel, or any other travel related to this case
                and/or with permission of Pretrial Services

        D.      Defendant shall avoid all contact, directly or indirectly, with any persons who are
                or who may ~~become a victim or potential witness this criminal case, and in the~~
                ~~subject investigation or prosecution; including, but not limited to~~, Somali Outlaws    and
                or Somali Mafia members, defendants in criminal case number 3:10-00260, ~~any~~    witnesses
                Jane Doe involved in criminal case number 3:10-00260, Muna Abdulkadir a/k/a
                Muna Ugly a/k/a Muna Savage, and any member of ~~her~~ their family~~y~~es

Page 2 of 6

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA v. HAMDI AHMED MOHAMUD      CASE NO.: 3:11-00132

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

E.     Defendant shall not have in her possession any firearm, ammunition, or other destructive device

F.     Defendant shall refrain from the excessive use of alcohol

G.     Defendant shall refrain from the use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner

H.     Defendant shall submit to any method of testing required by the Pretrial Services Office for determining whether the defendant is using a prohibited substance, such methods may be used with random frequency ,and include urine testing, the wearing of a sweat patch, a ~~remote alcohol testing system~~, and/or any form of prohibited substance screening or testing

I.     Defendant shall participate in a program of inpatient or outpatient substance abuse therapy and counseling if deemed appropriate by the Pretrial Services Officer, ~~any inpatient treatment may be followed by up to 90 days in a halfway house.~~

J.     Defendant shall refrain from obstructing or attempting to obstruct of tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing which is required as a condition of release

Page 3 of 6

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA v. HAMDI AHMED MOHAMUD          CASE NO.: 3:11-00132

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

K.  Defendant shall participate in mental health counseling and treatment as directed
by Pretrial Services

L.  Defendant shall report as soon as possible, within 48 hours, to the supervising
officer, any contact with any law enforcement personnel, including, but not limited
to any arrest, questioning, or traffic stop

M.  Defendant shall allow a Probation/Pretrial Services Officer to visit at any time at
home or elsewhere and confiscate any contraband observed in plain view

N.  Defendant shall reside with her mother, Mariam Ibrahim, at the Minneapolis,
Minnesota, address provided to the Court and to Pretrial Services

O.  Defendant shall be approved by Section 8 Housing authorities to be added to the
lease at her mother's address in Minneapolis, Minnesota, and attend the requisite
intake meeting scheduled for January 22, 2013, to complete the lease process

P.  Defendant shall be placed on home detention to be monitored by an electronic
monitoring system; defendant may not leave her residence without prior approval
from Pretrial Services

Page 4 of 6

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA v. HAMDI AHMED MOHAMUD        CASE NO.: 3:11-00132

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Q.    ~~Defendant shall post an unsecured appearance bond in the amount of $10,000~~


Q.R.    Defendant shall be placed in the third-party custody of her sister, Hayad Mohamud


S.

Page 5 of  6

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA v. HAMDI AHMED MOHAMUD          CASE NO.: 3:11-00132

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

　　　　**I acknowledge I have read this Order.  I understand that I will receive a copy of it and any Appearance Bond that the Court has ordered at the conclusion of this hearing.**

Date:  __January 16, 2013__          X  _____
　　　　　　　　　　　　　　　　　　　　　**Defendant**

It is ORDERED that the conditions listed above are imposed.  18 U.S.C. § 3142.

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

The **Middle District of Tennessee** consists of the following counties:  Cannon, Cheatham, Clay, Cumberland, Davidson, DeKalb, Dickson, Fentress, Giles, Hickman, Houston, Humphreys, Jackson, Lawrence, Lewis, Macon, Marshall, Maury, Montgomery, Overton, Pickett, Putnam, Robertson, Rutherford, Smith, Stewart, Sumner, Trousdale, Wayne, White, Williamson and Wilson.

The following are pertinent Middle District of Tennessee numbers (Area Code 615):

|  |  |
|---|---|
| U.S. Magistrate Judge Juliet Griffin | - 736-5164 |
| U.S. Magistrate Judge Joe B. Brown | - 736-7052 |
| U.S. Magistrate Judge E. Clifton Knowles | - 736-7347 |
| U.S. Magistrate Judge John S. Bryant | - 736-5878 |
| Clerk of Court | - 736-5498 |
| U.S. Marshal | - 736-5417 |
| U.S. Attorney | - 736-5151 |
| U.S. Probation | - 736-5771 |
| Federal Public Defender | - 736-5047 |

The United States District Court in **Nashville** is located in the United States Courthouse, 801 Broadway, at the corner of Eighth and Broad.  The Court in **Cookeville** is located at 9 East Broad Street.  The Court in **Columbia** is located at 816 South Garden Street.

Page 6 of  6