UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Hamdi A. Mohamud,

        Plaintiff,

v.                                   Case No. 17-cv-2069 (JNE/TNL)
                                   ORDER

Heather Weyker, in her individual capacity
as a St. Paul Police Officer,

        Defendant.

Claiming that Heather Weyker violated her rights under the Fourth Amendment to the U.S. Constitution, Hamdi A. Mohamud sued Weyker under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Weyker moved to dismiss Mohamud's claims. Weyker asserted that she is entitled to qualified immunity and that Mohamud cannot sue her under § 1983 or *Bivens*. The Court denied Weyker's motion. She appealed. The United States Court of Appeals for the Eighth Circuit vacated and remanded with directions to dismiss Mohamud's *Bivens* claim and to determine whether Mohamud's case can proceed under § 1983. *Ahmed v. Weyker*, 984 F.3d 564, 571 (8th Cir. 2020). The case is before the Court on Mohamud's Motion for Leave to File Second Amended Complaint and Weyker's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. For the reasons set forth below, the Court denies Mohamud's motion and grants Weyker's motion.

For most of the time since the Eighth Circuit issued the mandate, the case has been stayed at the parties' request. Two days after the mandate was issued, the parties filed a Joint Motion to Stay. They sought to stay the action "pending a decision by the Eighth

Circuit in *Yassin v. Weyker*, No. 20-3299."  The parties represented that Mohamud's case is "related to *Yassin v. Weyker*, No. 16-2580 (D. Minn.)"; that "*Yassin* arises from the same incident as [Mohamud's] suit[] and involves the same questions of law"; that "the question which the Eighth Circuit remanded for this Court to decide (whether 'Weyker was acting under color of *state* law,' *Ahmed*, 984 F.3d at 571) has already been decided by this Court" in *Yassin*; that "Yassin has appealed that decision to the Eighth Circuit, where briefing is ongoing"; and that, "[b]ecause the Eighth Circuit's decision on the § 1983 question in *Yassin* will be controlling and potentially dispositive in [this] case[], judicial economy and efficiency for the parties favors staying proceedings pending the Eighth Circuit's decision in the *Yassin* appeal."  The Court granted the joint motion.

In July 2022, the Eighth Circuit issued its opinion in *Yassin*: "The question in this case is whether a St. Paul police officer acted under color of state law when she allegedly lied to protect a federal witness while serving on a federal task force.  The district court concluded that she did not, and we affirm."  *Yassin v. Weyker*, 39 F.4th 1086, 1087 (8th Cir. 2022) (footnote omitted) (citation omitted), *cert. denied*, 143 S. Ct. 779 (2023).

After the Eighth Circuit issued the mandate in *Yassin*, Mohamud and Weyker filed another Joint Motion to Stay.  They acknowledged their prior "recognition that the Eighth Circuit's decision on the § 1983 question in *Yassin* will be controlling and potentially dispositive."  "Because any Supreme Court decision to review the Eighth Circuit's decision about the § 1983 question in *Yassin* will be controlling and potentially dispositive in [this] case[]," Mohamud and Weyker stated, "judicial economy and efficiency for the parties favors staying further proceedings pending the Supreme Court's

decision to review the Eighth Circuit's decision [in] *Yassin*."  The Court granted the joint motion.

After the Supreme Court denied the petition for a writ of certiorari in *Yassin*, the Court received a status report from Mohamud.  She stated that the "parties believe it appropriate to hold this matter in abeyance pending a possible petition for rehearing in *Yassin v. Weyker*."  One month later, Mohamud submitted another status report.  She stated that "*Yassin*'s proceedings before the Supreme Court are . . . concluded," that her action "can resume," and that new counsel will appear for her.

The next month, a status conference took place.  The parties disclosed their intent to file motions—a motion to amend by Mohamud and a motion to dismiss or, in the alternative, for summary judgment by Weyker—and they agreed to a briefing schedule. The parties subsequently filed their motions.

## I.    Mohamud's Motion for Leave to Amend

Mohamud moved for leave to file a Second Amended Complaint.  *See* Fed. R. Civ. P. 15(a)(2).  She sought leave to amend for two purposes:

> (1) to provide more detailed allegations and newly uncovered evidence to confirm Officer Weyker was acting under color of state law consistent with the legal standards the Eighth Circuit announced in *Yassin* and (2) to clarify that Officer Weyker, a St. Paul police officer leading a state-federal task force and cross-deputized as a Special Deputy U.S. Marshal, was simultaneously acting under color of both state and federal law when she violated Ms. Mohamud's clearly established Fourth Amendment rights.

A court "should freely give leave [to amend] when justice so requires."  *Id.*

"[D]enial of leave to amend may be justified by undue delay, bad faith on the part of the

moving party, futility of the amendment or unfair prejudice to the opposing party."
*Nuevos Destinos, LLC v. Peck*, 999 F.3d 641, 646 n.4 (8th Cir. 2021) (citation omitted).

Mohamud asserted that "[t]here has been no delay in filing [her] motion" and that,
"[e]ven if there were delay, it has not prejudiced Officer Weyker."  Mohamud maintained
that "[t]he amendments have not been submitted for a dilatory or other improper
purpose."  She stated that she "has not squandered any prior opportunities to adjust her
pleadings based on the developments that occurred in her own case or *Yassin*."
Mohamud claimed that the amendments are meritorious and do not prejudice Weyker.

Weyker responded that Mohamud's motion should be denied as futile.  According
to Weyker, "amendment would be futile because even under the facts as posited in the
proposed Second Amended Complaint, [she] was acting under color of federal law and
cannot be sued under Section 1983—Plaintiff's only remaining claim."

"Denial of a motion for leave to amend on the basis of futility 'means the district
court has reached the legal conclusion that the amended complaint could not withstand a
motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.'" *Zutz v.
Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (quoting *Cornelia I. Crowell GST Tr. v. Possis
Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008)).  "To survive a motion to dismiss for
failure to state a claim, a complaint must allege sufficient facts to state a facially plausible
claim to relief." *Cook v. George's, Inc.*, 952 F.3d 935, 938 (8th Cir. 2020) (citing
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A plaintiff satisfies this requirement by
"plead[ing] factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "[T]he tenet that

4

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*   "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

"Every section 1983 action has two key elements: (1) 'the violation of a right secured by the Constitution and laws of the United States' (2) by 'a person acting under color of state law.'" *Yassin*, 39 F.4th at 1089 (citation omitted).  "[T]he under-color-of-law determination is a 'question of law.'" *Id.* (citation omitted).  It "can turn out to be quite 'fact[ ]bound.'  But as long as the underlying material facts are undisputed, courts can decide the question, even when those undisputed facts point in different directions." *Id.* at 1090 (alteration in original) (citations omitted).

"Color of law is rooted in authority." *Id.*   "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1961)).  "The question is whether the conduct is 'fairly attributable to the State.'  To determine if it is, the focus is on the 'nature and circumstances of the officer's conduct and the relationship of that conduct to

the performance of . . . official duties.'"  *Yassin*, 39 F.4th at 1090 (alteration in original)
(citations omitted).

A summary of Mohamud's proposed Second Amended Complaint follows.
"Before June 16, 2011, in the matter of *United States v. Adan*, M.D. Tenn., No. 3:10-CR-
00260, and related criminal cases (the '*Adan* cases'), Defendant Weyker, acting under
color of state and federal law, fabricated evidence to create false, sex-trafficking, criminal
cases and to secure indictments, for which there was no probable cause, against dozens of
individuals."  (2d Am. Compl. ¶ 2)  "Of the 30 people indicted in the *Adan* cases, only
nine were ultimately tried, and each was acquitted."  (*Id.* ¶ 4)  Mohamud "had no
involvement as a suspect, witness, or person of interest in the *Adan* cases.  Nonetheless,
. . . after concocting the *Adan* cases, Weyker, acting under color of state and federal law,
knowingly provided false information, fabricated evidence, and withheld exculpatory
evidence, about Plaintiff, thus causing her to be unlawfully seized, detained, arrested, and
jailed for allegedly tampering with a witness and obstructing the investigation of the
*Adan* cases."  (*Id.* ¶ 5)  "Because Weyker furnished false information, fabricated
evidence, and withheld exculpatory evidence, Plaintiff was seized and arrested by
Minneapolis police on June 16, 2011.  But for Weyker's fabrication of evidence,
furnishing of false information, and withholding of exculpatory evidence, no probable
cause or arguable probable cause existed to seize, apprehend, arrest, or detain Plaintiff for
witness tampering or obstruction.  All charges against Plaintiff were dismissed in July
2013."  (*Id.* ¶ 6)

Mohamud "is a Somali-American woman, a U.S. citizen, and a long-time resident of Minnesota, who came to this country as a refugee." (*Id.* ¶ 10) "At all times material, Weyker was a U.S. citizen, a resident of Minnesota, and a St. Paul police officer, licensed as a peace officer under Minnesota law. For a period, Weyker was also cross-deputized as a Special Deputy U.S. Marshal for work on a joint state-federal task force. During this time, she acted under color of state and federal law and in her individual capacity to deprive Plaintiff of her clearly established constitutional rights." (*Id.* ¶ 11)

On June 16, 2011, Mohamud and two friends were involved in an altercation with Muna Abdulkadir.[1] (*Id.* ¶ 14) The incident took place at Abdulkadir's apartment building in Minneapolis, Minnesota. (*Id.*) Ahmed and Abdulkadir agreed to fight to settle their "beef." (*Id.*) After they agreed to fight, Abdulkadir indicated she wanted to go upstairs and change her clothes. (*Id.*) The four entered an elevator, where a scuffle briefly took place. (*Id.* ¶¶ 14–15) Abdulkadir exited the elevator, and the other three descended in the elevator. (*Id.* ¶ 15) Mohamud was not involved in the scuffle. (*Id.*)

Abdulkadir retrieved a knife from her apartment, proceeded downstairs, and exited the building. (*Id.* ¶¶ 16–17) Abdulkadir approached Mohamud's friend's vehicle and smashed its windshield with the knife. (*Id.* ¶ 17) A short time later, Mohamud and her friends exited the building. (*Id.*) Abdulkadir struck one of Mohamud's friends with the knife. (*Id.*) Mohamud and her friends called 911 to report Abdulkadir for assault and property damage. (*Id.*)

---

[1]       The two friends——Ifrah Yassin and Hawo Ahmed—separately sued Weyker.

When Abdulkadir realized the police had been summoned, she returned to her apartment building and called Weyker. (*Id.* ¶ 18) Abdulkadir told Weyker that she had been in a fight, that she had attacked Mohamud and Mohamud's friends with a knife, that the police had been summoned, that she was hiding in a neighbor's apartment, and that she feared she was going to be arrested. (*Id.*) Weyker, worried about the possibility of losing a witness in the *Adan* cases, "sprang into action." (*Id.*)

A Minneapolis police officer, Anthijuan Beeks, responded to the 911 call made by Mohamud and her friends. (*Id.* ¶ 19) When he arrived on the scene, Beeks regarded them as victims of a crime committed by Abdulkadir. (*Id.*) He had no reason to suspect that Mohamud or her friends "had sought to harm, threaten, or intimidate Abdulkadir because of [Abdulkadir's] role as a witness in the *Adan* cases." (*Id.*) Beeks had no reason to suspect that Mohamud had committed any crime. (*Id.*)

Approximately 20 minutes after he arrived on the scene, Beeks "learned that he had an urgent message on the computer in his patrol vehicle: 'OFFICER HEATHER WEYKER 710 out of St. Paul would like Officers to call her ASAP at [a given phone number].'" (*Id.* ¶ 20 (alteration in original)) "Using her Minnesota credentials and specialized knowledge of local policing, Weyker quickly injected herself into the state-law investigation of Abdulkadir's attack. Weyker contacted Minneapolis police dispatch and, through her self-identification as a St. Paul police officer, was put in contact with officers on the scene." (*Id.* ¶ 21) Beeks called Weyker, and she told him that "Abdulkadir was 'a federal witness in a prostitution investigation in which 30 Somali males have been indicted,'" that Weyker had information and documentation that

Mohamud and Mohamud's friends had been actively seeking out Abdulkadir and attempting to intimidate and harm Abdulkadir, and that one of Mohamud's friends was dating a man who had been indicted in the *Adan* cases. (*Id.* ¶ 22) "At the time she reported this information to Officer Beeks, Weyker knew it was untrue." (*Id.* ¶ 23) She had no information or documentation that Mohamud and Mohamud's friends were actively looking for Abdulkadir and attempting to intimidate or harm Abdulkadir. (*Id.*) Weyker had no information that one of Mohamud's friends was dating a man who had been indicted in the *Adan* cases. (*Id.*)

After he spoke with Weyker, Beeks interviewed Abdulkadir. (*Id.* ¶ 24) Abdulkadir told Beeks that the altercation started with a casual conversation. (*Id.*) Abdulkadir did not say anything about having a dispute with Mohamud or Mohamud's friends, about Mohamud and Mohamud's friends making any threats, about the *Adan* cases or her role in them, about Mohamud or Mohamud's friends having a knife, about why she agreed to fight Mohamud's friend, or about being injured by a knife. (*Id.*) Beeks determined that Abdulkadir did not attempt to call 911 and that she instead obtained a knife and proceeded downstairs to smash the windshield of Mohamud's friend's car. (*Id.*) Abdulkadir admitted to Beeks that she struck one of Mohamud's friends with the knife. (*Id.*)

In addition to Beeks, Weyker spoke with a Minneapolis police sergeant, Gary Manty, who was "on the scene for the state-law investigation" on June 16. (*Id.* ¶ 26) "Again, Weyker held herself out as a St. Paul officer 'on special assignment with the FBI in Tennessee.'" (*Id.*) Weyker gave Manty false information: "that one of Plaintiff's

9

friends had stated to Abdulkadir that she had gotten her '[friends] locked up' and that these incarcerated persons were 'SOL' (Somali Outlaws); that one of Plaintiff's friends was acquainted with a man who had been indicted in the *Adan* cases; that Plaintiff and her friends were there (at the scene in Minneapolis) to intimidate Abdulkadir about being a witness against persons who had been arrested and charged in the *Adan* cases; and that Abdulkadir feared for her life and feared retaliation because of her involvement in the *Adan* cases." (*Id.*)

Weyker provided the false information to Beeks and Manty to shield Abdulkadir from arrest. (*Id.* ¶ 27) Weyker "sought to assist Abdulkadir with avoiding criminal charges as further incentive for her to continue to work with Weyker by fabricating evidence and providing false testimony in the *Adan* cases." (*Id.*)

"Weyker documented her actions in a St. Paul police report, which she emailed to Sergeant Manty." (*Id.* ¶ 28) In the report, "Weyker fabricated facts, knowingly relayed false information, and withheld exculpatory facts." (*Id.*) For example, Weyker "stated that the altercation was related to the 'case in Nashville,' but she knew there were no facts to support the assertion," and Weyker "failed to state that there was no prior history of Plaintiff and her friends being involved with persons who had been indicted in the *Adan* cases." (*Id.*) "Weyker noted that she read Abdulkadir her *Miranda* rights over the phone using a St. Paul Police Department form." (*Id.*)

"[B]ased solely on Weyker's intentional misrepresentations to the Minneapolis Police about Plaintiff and her friends, their actions, and their motives, Plaintiff and her friends were apprehended, arrested, and transported to jail on suspicion of tampering with

a witness under Minnesota law.  While transporting Plaintiff and her friends to jail, Officer Beeks indicated they were being arrested because of the assertions Weyker had made about them."  (*Id.* ¶ 29)

"One day after causing Plaintiff's unlawful seizure, Weyker doubled down on her scheme to frame Plaintiff and her friends.  Listing her official title as 'FBI TFO/ST PAUL PD,' she swore out a federal criminal complaint and supporting affidavit against Plaintiff and her friends for tampering with a federal witness and obstructing the investigation of the *Adan* cases."  (*Id.* ¶ 31)  In the affidavit, "Weyker repeated the false information she included in her St. Paul police report."  (*Id.*)

On June 17, 2011, "an arrest warrant was issued and Plaintiff and her friends were placed in federal custody for allegedly violating 18 U.S.C. § 1513(b)(1)–(2)."  (*Id.* ¶ 32) "Plaintiff and her friends were indicted for violating federal laws . . . on June 29, 2011." (*Id.* ¶ 33)  "From June 17, 2011, until the complete dismissal of all charges against her on July 10, 2013, Plaintiff remained seized and in federal custody . . . .  For a small portion of this time, she was subject to supervised release."  (*Id.* ¶ 34)

"In all her actions that harmed Plaintiff, Weyker was a sworn officer of the St. Paul Police Department and licensed Minnesota peace officer acting under color of state law."  (*Id.* ¶ 36)  Her "investigation leading to the *Adan* cases began as work on a state-federal task force called the 'Gerald D. Vick Human Trafficking Task Force of Minnesota' (the 'Vick Task Force').  The Vick Task Force was originally comprised of three 'core member agencies': The St. Paul Police Department, a nonprofit called 'Breaking Free,' and the United States Attorney's Office for the District of Minnesota."

(*Id.* ¶ 37)  The task force's mission statement sets forth goals, which include "combat domestic and international human trafficking when it appears in Minnesota."  (*Id.* ¶ 38)

"Beginning in 2008, Weyker led a wide-ranging state-federal investigation by the Vick Task Force into what would become the *Adan* cases."  (*Id.* ¶ 39)  "Through her Vick Task Force investigation, Weyker met Muna Abdulkadir in 2009 and began to cultivate her as a witness for the St. Paul Police Department."  (*Id.* ¶ 40)  "That same year, the Vick Task Force asked its partners in the Minnesota U.S. Attorney's Office to bring charges in the *Adan* cases, but prosecutors declined to do so because the evidence 'supported a state prosecution, but not a federal case.'"  (*Id.* ¶ 41)  "Weyker continued her Vick Task Force investigation."  (*Id.*)

"Weyker's investigation eventually grew to the point where it, as Weyker put it in a news article, 'required a lot more resources, and hence the dual-state effort.'"  (*Id.* ¶ 42)  "[T]he Vick Task Force began working together with another group of state and federal agencies (the 'ad hoc task force') in 2010 to continue Weyker's investigation.  The St. Paul Police Department, FBI, and ICE—already working together on the Vick Task Force—were joined by another group of state and federal agencies: the Minneapolis Police Department, U.S. Department of Homeland Security, Tennessee Bureau of Investigation, and U.S. Secret Service."  (*Id.*)

"After the Vick Task Force and ad hoc task force began working together on Weyker's investigation into the *Adan* cases, she was sponsored by the FBI and cross-deputized as a Special Deputy U.S. Marshal on August 24, 2010."  (*Id.* ¶ 43)  "Weyker's deputization form made clear that her federal authority was narrow.  Of six checkboxes

available to grant her specific federal authority as a cross-deputized officer, only one was checked: 'To seek and execute arrest and search warrants supporting a federal task force.'"  (*Id.* ¶ 45)  "Weyker was selected for cross-deputization only because the ad hoc task force was assisting the Vick Task Force to continue the investigation Weyker had already been leading into the *Adan* cases since 2008 as a St. Paul officer."  (*Id.* ¶ 46)

"Contemporaneous agreements between the FBI and St. Paul Police Department outline standard operating procedures and customs for state-federal task force work conducted by these agencies.  The agreements explicitly provide that cross-deputized officers like Weyker can and do act under color of state law and are, therefore, subject to liability under 42 U.S.C. § 1983 . . . ."  (*Id.* ¶ 47)  A Memorandum of Understanding entered into by the St. Paul Police Department and the FBI in 2005 states: "Liability for violations of federal constitutional law rests with the individual federal agent or officer pursuant to <u>Bivens</u> . . . or pursuant to 42 U.S.C. Section 1983 for state and local officers or cross-deputized federal officers."  (*Id.* ¶ 48 & Exh. 2)  A Memorandum of Understanding entered into by the FBI and the St. Paul Police Department in 2011 contains almost identical language.  (*Id.* ¶ 48 & Exh. 3)  The 2005 memorandum relates to a joint terrorism task force.  (*Id.* Exh. 2)  The 2011 memorandum relates to a cyber crime task force.  (*Id.* Exh. 3)

"While Weyker may have been acting under color of federal law by the time she framed Plaintiff, Weyker was also acting under color of state law—then and at all relevant times."  (*Id.* ¶ 49)  Weyker's "affidavit supporting the criminal complaint against Plaintiff" states that Weyker is a St. Paul police officer and "a Federal Bureau of

Investigation Task Force Officer" and that Weyker "is currently assigned to the Vice Unit [of the St. Paul Police Department] and is part of a federally funded human trafficking task force [the Vick Task Force] which investigates human trafficking crimes and other related crimes such as drugs, fraud and smuggling." (*Id.* ¶ 50 (alterations in original)) "[A]ll of Weyker's actions in her investigation leading up to the *Adan* cases and toward Plaintiff and her friends were intended to accomplish the state-oriented mission of the Vick Task Force: 'to combat domestic and international human trafficking when it appears in Minnesota.'" (*Id.* ¶ 51) "Weyker (the lead agent)," the principal victim-witness, and most defendants on the *Adan* cases resided in Minnesota, and most of the events at issue occurred in Minnesota. (*Id.*)

In Count I of her Second Amended Complaint, Mohamud asserted a claim against Weyker under 42 U.S.C. § 1983 for alleged violations of Mohamud's Fourth Amendment rights. (*Id.* ¶¶ 52–59) In Count II, Mohamud asserted a claim against Weyker under *Bivens* for alleged violations of Mohamud's Fourth Amendment rights. (*Id.* ¶¶ 60–67)

In *Yassin*, the Eighth Circuit stated that "[s]tate law had nothing to do with 'the nature and circumstances' of Weyker's conduct":

> At the time, [Weyker] was in Nashville working on a federal task force as a Special Deputy United States Marshal. She introduced the other task-force members in the room during the call, including the lead federal prosecutor and a federal agent. And the witness she was trying to protect, Muna Abdulkadir, was only on her radar because she was assigned to a federal investigation.
>
> Weyker also did not stray from the "performance of [her] official duties" when she spoke to Officer Beeks and his supervising officer. As someone who was tasked with

"investigative work on the [sex-trafficking] task force," she acted within the scope of those duties by trying to keep a federal witness out of trouble.  The same goes for her statements in the affidavit she prepared the next day.

It is true that Weyker occasionally let her local practices creep into her federal activities.  One example was introducing herself as a St. Paul police officer.  Another was when she used a St. Paul police form to advise Abdulkadir of her *Miranda* rights.  And a third was when she filed an incident report with the St. Paul Police Department, despite preparing an affidavit a short time later to support federal charges against Yassin and her friends.

But these practices do not alter the federal character of what she did.  Weyker's work on the federal sex-trafficking investigation led to Yassin's arrest, she acted within the scope of her federal duties while dealing with the situation, and she referenced her federal-task-force role during her conversations with Officer Beeks and his supervisor.  What matters, in other words, is that she "act[ed] or *purport[ed] to act* in the performance of [her federal] duties, even if [s]he overstep[ped] [her] authority and misuse[d] power."

Our rule today is straightforward.  Without any "actual or purported relationship between [Weyker's] conduct and [her] duties as a [St. Paul] police officer," no section 1983 action is available.

*Id.* at 1090–91 (alterations in original) (footnote omitted) (citations omitted).  The allegations of Mohamud's proposed Second Amended Complaint do not yield a conclusion that differs from the one reached by the Eighth Circuit in *Yassin.*

According to Mohamud's proposed Second Amended Complaint, Weyker "led a wide-ranging state-federal investigation by the Vick Task Force into what would become the *Adan* cases."  She met Abdulkadir in 2009 "and began to cultivate [Abdulkadir] as a witness."  In 2010, the Vick Task Force and the ad hoc task force continued the investigation, which yielded indictments against dozens of individuals in the Middle

District of Tennessee, and Weyker was cross-deputized as a Special Deputy U.S. Marshal.  She was authorized "[t]o seek and execute arrest and search warrants supporting a federal task force."  Approximately ten months after Weyker's cross-deputization, she allegedly provided false information to Beeks and Manty in an effort to protect Abdulkadir, a witness in the federal sex-trafficking investigation.  Weyker, "on special assignment with the FBI in Tennessee," specifically referenced the federal cases in her conversations with Beeks and Manty.  She "act[ed] or *purport[ed] to act* in the performance of [her federal] duties, even if [s]he overstep[ped] [her] authority and misuse[d] power."  *Yassin*, 39 F.4th at 1091 (alterations in original) (citation omitted).  The 2005 and 2011 memoranda of understanding attached to Mohamud's proposed Second Amended Complaint do not relate to the task force on which Weyker served, and Mohamud acknowledged that the memoranda "cannot establish the law."  *Cf. Askar v. Hennepin County*, 600 F. Supp. 3d 948, 954 (D. Minn. 2022) ("[C]ourts look to federal law, not private contracts, to determine 'whether a defendant is a federal employee.'"); *Nelson v. Weber*, Case No. C16-5680, 2017 WL 3017632, at *1 (W.D. Wash. July 17, 2017) (stating that the defendants "act[ed] in their capacity as special deputies clothed in the power and authority" of the U.S. Marshal's Service "whether or not the [Washington State] Department of Corrections was contractually obligated to compensate any tort liabilities of the Defendants pursuant to the [memorandum of understanding]").  Under Mohamud's proposed Second Amended Complaint, Weyker acted under color of federal law.

Mohamud's assertion that Weyker acted under color of both state and federal law is not well founded:

> There is no dispute that Weyker was clothed with governmental authority when she acted.  The question is what type.  If the answer is state law, then any claim must arise under 42 U.S.C. § 1983.  But if she was acting under color of *federal* law, *Bivens* is the only option.

*Yassin*, 39 F.4th at 1088–89; *see id.* at 1091 n.3 ("A joint-action theory . . . finds no support in the record.").  Because Mohamud's proposed Second Amended Complaint could not withstand a motion to dismiss for failure to state a claim, the Court denies her motion for leave to amend.

## II.   **Weyker's Motion to Dismiss or, in the Alternative, for Summary Judgment**

Weyker moved to dismiss Mohamud's § 1983 claim or, in the alternative, for summary judgment on Mohamud's § 1983 claim.  Weyker asserted that "Mohamud's Section 1983 claim against Officer Weyker fails because Officer Weyker was acting under color of federal, not state, law at the time of the alleged conduct."  Next, citing the Eighth Circuit's decision in *Yassin* and the stipulations to stay this action pending resolution of the appellate proceedings in *Yassin*, Weyker maintained that "Mohamud is precluded from relitigating the Section 1983 issue."  Finally, Weyker asserted that "Mohamud's claim fails because Officer Weyker is entitled to qualified immunity."[2]

---

[2]    Weyker moved to dismiss or, in the alternative, for summary judgment on the issue of whether she acted under color of state law.  She moved to dismiss on the issue of whether preclusion bars Mohamud's § 1983 claim.  Weyker moved for summary judgment based on qualified immunity.

Mohamud opposed Weyker's motion.  Mohamud maintained that Weyker acted under color of state law; that preclusion does not apply to the § 1983 issue; that Weyker is not entitled to qualified immunity; that Weyker's reliance on documents outside the pleadings is inappropriate; and that, if the Court does not grant her motion to amend and does not exclude matters outside the pleadings, the Court should defer ruling on Weyker's motion for summary judgment until she has had an opportunity to engage in discovery.

The Court considers Weyker's motion as one for summary judgment.  *See* Fed. R. Civ. P. 12(d); *Johnson v. Moody*, 903 F.3d 766, 772 (8th Cir. 2018); *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 836 (8th Cir. 2015).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must view genuinely disputed facts in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Court addresses the issue of whether Weyker acted under color of state law. *Ahmed*, 984 F.3d at 571; *see Wilkie v. Robbins*, 551 U.S. 537, 567 (2007); *Yassin*, 39 F.4th at 1089–90; *Farah v. Weyker*, 926 F.3d 492, 503 n.1 (8th Cir. 2019). In support of her motion, Weyker relied on a record similar to the one that was before the Court in *Yassin*. Briefly, Weyker, a Saint Paul police officer, was deputized as a Special Deputy United States Marshal in August 2010. As such, her duties included investigative work on a task force that was investigating individuals who allegedly engaged in a wide variety of criminal conduct, including human trafficking for sex. The task force's work resulted in the indictment of 30 individuals in the Middle District of Tennessee. In June 2011, Abdulkadir, a witness in the sex-trafficking investigation, called Weyker after the altercation involving Abdulkadir, Mohamud, and Mohamud's friends. Beeks, the Minneapolis police officer who was investigating the altercation, received a message to contact Weyker. He reached her in Nashville, where she was on assignment with the task force. Weyker introduced herself and other law enforcement officers who were on the call. Weyker told Beeks that Abdulkadir was a witness in a federal prostitution investigation; that the investigation resulted in the indictment of 30 Somali males; and that Weyker had information and documentation that Yassin, Ahmed, and Mohamud were looking for Abdulkadir to intimidate her or cause bodily harm to her. Beeks continued his investigation.

Additional law enforcement officers were present at the scene in Minneapolis. They included agents from the Federal Bureau of Investigation and a sergeant from the Minneapolis Police Department, Gary Manty. Beeks spoke with one of the agents after

the agent interviewed Yassin and Ahmed.  Beeks also conferred with Manty.  Yassin,

Ahmed, and Mohamud were arrested.

The next day, the United States filed a criminal complaint against Mohamud in the

Middle District of Tennessee.  The United States charged Mohamud with retaliation

against a witness.  Weyker signed the criminal complaint, submitted an affidavit in

support of it, and identified herself as an FBI Task Force Officer and St. Paul Police

Officer.  On June 29, 2011, Mohamud was indicted in the Middle District of Tennessee

for retaliation against a witness and obstruction.  In July 2013, the Middle District of

Tennessee granted Mohamud's motion to dismiss the indictment and dismissed the

indictment against her with prejudice.

Because the Eighth Circuit concluded that Weyker acted under color of federal

law on a similar record, Weyker maintained that summary judgment in her favor is

appropriate.  *See Yassin*, 39 F.4th at 1091.  Mohamud's responsive arguments are not

persuasive.

Mohamud maintained that "[c]ross-deputization as a concept anticipates an officer

can and will act under color of both federal and state law at once"; that the viability of her

§ 1983 claim depends not on whether Weyker acted under color of federal law, but on

whether Weyker acted under color of state law; and that Weyker did act under color of

state law.  Mohamud asserted that the federal sex-trafficking investigation continued the

investigation Weyker began as a Saint Paul police officer under the Vick Task Force, that

Weyker "was eligible for her cross-deputized role only because she was a St. Paul police

officer," that Weyker "was selected to the task force because she had been developing the

*Adan* investigation as a St. Paul officer," and that Weyker "had developed a relationship

with Ms. Abdulkadir since 2008, as a St. Paul police officer."  Mohamud argued that

Weyker "used her knowledge of local police practices and her St. Paul credentials to

reach Officer Beeks," deceived Beeks, and ensured the arrest of Mohamud instead of

Abdulkadir, around whom "Weyker had spent years developing [the] investigation."

Mohamud also stated that Weyker "injected herself info a state-law investigation and

persuaded on-scene local officers to arrest Ms. Mohamud for the Minnesota crime of

witness tampering" and that "Weyker used communication systems generally reserved

for state law-enforcement officers."  The Court rejects Mohamud's argument.  *See id.* at

1088–91.  That the investigation began in Minnesota does not alter the conclusion that, in

June 2011, Weyker, "on special assignment with the FBI in Tennessee," acted or

purported to act in the performance of her federal duties to protect a witness in a federal

prosecution.

Next, Mohamud claimed that "Office Weyker was both a state and federal officer

who could (and did) carry out joint state-federal action all on her own."  The Court

rejects Mohamud's joint-action theory:

> It is true that Weyker occasionally let her local
> practices creep into her federal activities. . . .
>
> But these practices do not alter the federal character of
> what she did.

*Id.* at 1091.  "A joint-action theory . . . finds no support in the record."  *Id.* at 1091 n.3.

Third, Mohamud contended that "the state was pervasively entwined with Officer

Weyker's task-force work."  The Court rejects Mohamud's pervasive-entwinement

argument: "Federal and state officers work together all the time without clouding their distinct sources of authority . . . ." *Id.*

Finally, the Court considers Mohamud's request for discovery. *See* Fed. R. Civ. P. 56(d). According to Mohamud, discovery would reveal that "Officer Weyker met Ms. Abdulkadir and began cultivating her as a witness in 2009, when Officer Weyker was working exclusively as a St. Paul police officer on a St. Paul-led task force called the Vick Task Force"; that Weyker "was not performing any functions permitted by her limited federal authority as a cross-deputized officer when she injected herself into the state investigation of Ms. Abdulkadir's knife attack"; that Weyker's "task-force work grew out of her work exclusively as a St. Paul police officer on the Vick Task Force"; that Weyker's "task force assignment was part of, not independent from, her duties as a St. Paul police officer"; that Weyker's "conduct in framing Ms. Mohamud served the purpose of protecting an investigation she had begun and continued to pursue through her St. Paul duties"; and that "Officer Weyker's St. Paul authority, credentials, and resources are the very things that provided her the motive, means, and opportunity to insert herself into the state investigation and turns its victims into suspects."

"Under Rule 56(d), a court may defer considering a summary judgment motion or allow time for discovery '[i]f a nonmovant shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition.'" *Anzaldua*, 793 F.3d at 836 (alteration in original). "A party seeking additional discovery under Federal Rule of Civil Procedure 56(d) has to show: '(1) that [she] [has] set forth in affidavit form the specific facts that [she] hope[s] to elicit from further discovery, (2) that

the facts sought exist, and (3) that these sought-after facts are essential to resist the summary judgment motion.'" *Yassin*, 39 F.4th at 1091 (alterations in original) (citation omitted); *see Johnson*, 903 F.3d at 772.

In a declaration, Mohamud maintained that "discovery is needed so [she] can address the following fact-intensive issues": "[w]hether Officer Weyker acted under color of state law when she orchestrated Ms. Mohamud's detention based on lies about Ms. Mohamud intimidating Muna Abdulkadir for her participation as a witness in the *Adan* cases"; and "[w]hether Officer Beeks conducted an independent investigation that gave him probable cause to arrest Ms. Mohamud without the false inculpatory information Officer Weyker conveyed to him about Ms. Mohamud and her friends." Mohamud sought "discovery on facts essential to address these specific intermediate issues": "[t]he source of Officer Weyker's authority to begin and conduct her investigation into the *Adan* cases"; "[t]he history surrounding Officer Weyker's work investigating the *Adan* cases"; "Officer Weyker's eligibility and selection for cross-deputization as a Special Deputy U.S. Marshal"; [t]he scope of Officer Weyker's federal authority while cross-deputized"; "[t]he source of any control and supervision exercised over Officer Weyker when she framed Ms. Mohamud"; "[t]he resources and authority Officer Weyker used to reach Officer Beeks and Minneapolis Police Sergeant Gary Manty and convey information to them"; "[t]he resources and authority Officer Weyker used to secure Ms. Mohamud's arrest and confinement"; "[t]he relationship between Officer Weyker's work on any task force—ad hoc or formally constituted—and her work on the St. Paul-led Vick Task Force while she was exclusively a St. Paul police officer"; "[t]he reasons the

*Adan* cases were prosecuted in Tennessee instead of Minnesota"; "[h]ow Officer Beeks and Sergeant Manty's investigation of Muna Abdulkadir's knife attack unfolded"; "[t]he reasons Officer Beeks and Sergeant Manty arrested Ms. Mohamud and her friends"; and "[t]he credibility of Officer Beeks, Sergeant Manty, Officer Weyker, and Muna Abdulkadir."  Mohamud stated that "[t]here is ample reason to believe that discovery will reveal evidence on these topics supporting [her] Section 1983 claim" and that "discovery will uncover evidence proving allegations 36 through 51 of [her] proposed second amended complaint."  To support her belief regarding the issue of whether Weyker acted under color of state law, Mohamud cited information regarding the Vick Task Force, a request for funding of the Vick Task Force, a police report prepared by Weyker in 2009, newspaper articles from 2010 and 2011, Weyker's affidavit supporting the criminal complaint against Mohamud, the memoranda regarding the joint terrorism and cyber crime task forces, and a memorandum regarding an FBI/Minneapolis Child Exploitation Human Trafficking Task Force.[3]  Mohamud has not demonstrated the requested discovery demonstrates that Weyker did not act or did not purport to act in the performance of Weyker's federal duties in June 2011 in connection with the altercation involving Abdulkadir, Mohamud, and Mohamud's friends.  The Court denies Mohamud's request for discovery.  *See Yassin*, 39 F.4th at 1092.

---

[3]     In a declaration, the records unit manager of the Saint Paul Police Department stated that the memorandum of understanding of the FBI/Minneapolis Child Exploitation Human Trafficking Task Force is dated September 2018.

Viewing the record in the light most favorable to Mohamud, the Court concludes that Weyker acted under color of federal law.  *See id.* at 1091.  The Court therefore grants summary judgment in Weyker's favor on Mohamud's § 1983 claim.  The Court need not consider the parties' arguments regarding preclusion and qualified immunity.  *See Wilkie*, 551 U.S. at 567; *Neb. Beef Ltd. v. Greening*, 398 F.3d 1080, 1085 (8th Cir. 2005).

## III.  Conclusion

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.  Weyker's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [Docket No. 65] is GRANTED.

2.  Mohamud's Motion for Leave to File Second Amended Complaint [Docket No. 74] is DENIED.

3.  This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 25, 2024

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge